

1 Donald L. Samuels (CA State Bar No. 126287)
2 *donald.samuels@bryancave.com*
  BRYAN CAVE LLP
3 120 Broadway, Suite 300
4 Santa Monica, CA 90401-2386
  Telephone: (310) 576-2100
5 Facsimile: (310) 576-2200

6 Katherine Keating (CA State Bar No. 217908)
7 *katherine.keating@bryancave.com*
  BRYAN CAVE LLP
8 560 Mission Street, 25th Floor
9 San Francisco, CA 94105-2994
  Telephone: (415) 268-2000
10 Facsimile: (415) 268-1999

11 Attorneys for Plaintiff
12 CITY OF BEVERLY HILLS

13
14          UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
15          WESTERN DIVISION – LOS ANGELES

16
17 CITY OF BEVERLY HILLS,             Case No. **CV14-4662** SJO JCX

18          Plaintiff,                **COMPLAINT FOR BREACH OF
                                      CONTRACT; FEDERAL
19     v.                             TRADEMARK INFRINGEMENT;
                                      AND FEDERAL UNFAIR
20 JT BRANDS, INC.,                   COMPETITION AND FALSE
                                      DESIGNATION OF ORIGIN**
21          Defendant.

22          Plaintiff City of Beverly Hills (the "City" or "Plaintiff") brings this Complaint

23 against defendant, JT Brands, Inc. ("JT Brands" or "Defendant"), for injunctive

24 relief and damages and alleges as follows:

25                    **NATURE OF THE ACTION**

26     1.   This case arises from the repeated breaches of license agreements under

27 which Defendant was allowed to use certain registered trademarks, including the

28

COMPLAINT

City's iconic Beverly Hills Shield Design, in exchange for, among other things, guaranteed quarterly payments.  In 2012, Defendant ceased making its guaranteed payments.  Despite the City's attempts to resolve the matter amicably, Defendant refused to pay the guaranteed payments or otherwise fulfill its contractual obligations.  The City therefore terminated the license agreement, eliminating any right or authorization for Defendant to use the trademarks.  Notwithstanding the revocation of the licenses,  Defendant continues to use the trademarks on an unlicensed basis, thereby infringing those marks.  Through this lawsuit, the City seeks to collect approximately $3,000,000 in guaranteed payments, to obtain injunctive relief requiring Defendant to comply with its other obligations under the agreements, and to stop the Defendant from infringing on the City's valuable trademark rights.

2.     The Action is for breach of contract; infringement of a federally registered trademark under the Lanham Act (15 U.S.C. § 1114); and unfair competition and false designation of origin under the Lanham Act (15 U.S.C. § 1125(a)).

## PARTIES

3.     The City of Beverly Hills is a municipal corporation formed under and pursuant to the laws of the State of California, with its principal place of business located in Beverly Hills, California.

4.     The City is informed and believes, and on that basis alleges, that JT Brands is a California corporation, with its principal place of business located in Long Beach, California.

5.     Beverly Hills Chamber of Commerce and Civic Association (the "Chamber"), a nonprofit corporation formed under and pursuant to the laws of the State of California, is not a party to this Action but was a party to the trademark license agreements at issue in this Action.  As set forth in more detail below, the Chamber has assigned its rights under the trademark license agreements to the City.

2

COMPLAINT

**JURISDICTION AND VENUE**

6.  This Court has subject matter jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338, in that this case arises under the federal Lanham Act, 15 U.S.C. §§ 1051 *et. seq.* This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over all claims arising under state law, as such claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

7.  This Court has personal jurisdiction over Defendant by virtue of Defendant's transacting business in this District.

8.  Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant conducts business within this District and has engaged in, and continues to engage in, acts of advertising and offering goods and services to consumers located within this District.

**GENERAL ALLEGATIONS**

**The City of Beverly Hills and its Shield Mark**

9.  For more than forty years, the City has offered goods and services under several variations of its iconic Beverly Hills shield design mark depicted below (the "Shield Mark"):

   

10.  Through the City's decades of promotion of the Shield Mark in connection with a wide variety of goods and services, the Shield Mark has developed tremendous goodwill and has become famous throughout the United States and beyond.

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

3

COMPLAINT

11. The Shield Mark is inherently distinctive and has acquired further distinctiveness through the City's prominent use for more than forty years.

12. Through its continuous use of the Shield Mark in connection with the City's goods and services, the City has acquired strong common law rights in the Shield Mark.

13. The City owns numerous federal trademark registrations for its Shield Mark, including Registration Nos. 4,186,999 and 4,187,000, both in connection with "perfume." The City's federal trademark registrations for goods and services other than perfume include Registration Nos. 2,677,651; 2,766,280; 2,768,789; 2,774,666; 3,123,926; 3,843,763; 3,843,764; 3,948,468; 3,948,469; 4,072,903; 4,072,904; 4,076,054; 4,076,055; 4,076,056; 4,076,057; and 4,206,623.

14. Protecting the ability of the Shield Mark to continue representing to consumers both the source and quality of products and services originating from the City is of paramount importance to the City.

### Beverly Hills Chamber of Commerce and Civic Association and its LOVE, BEVERLY HILLS XX Mark

15. The Chamber is a nonprofit corporation organized to serve the Beverly Hills business community through marketing, advocacy, and education. The Chamber works with city officials, local businesses, and the community at large to promote the local economy of Beverly Hills.

16. Since at least as early as 2005, the Chamber has used the word mark LOVE, BEVERLY HILLS XX and the design mark shown below (collectively, the "LOVE, BEVERLY HILLS XX Mark") in connection with its services:



560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

4

COMPLAINT

17.     The Chamber owns several federal trademark registrations for the LOVE, BEVERLY HILLS XX word mark, including Registration No. 4,003,411 in connection with "fragrances; [and] toilet water."

18.     The Shield Mark and the LOVE, BEVERLY HILLS XX Mark are referred to collectively herein as the "Marks."

**The City and Chamber License the Marks to Defendant for Use with Perfume and Related Merchandise**

19.     On March 13, 2007, the City and the Chamber entered into an agreement to permit the Chamber to seek out merchandising opportunities for the City and its Shield Mark.  Pursuant to this merchandising agreement, the City granted the Chamber the right, license, and privilege to sublicense the Shield Mark to third parties for use in connection with goods and services, subject to the City's approval.

20.     The merchandising agreement between the City and Chamber entitles the City to 50% of the Chamber's net revenue from merchandising sublicenses of the Shield Mark.

21.     On June 26, 2008, the Chamber and Defendant entered into an agreement pursuant to which the Chamber granted Defendant the right and license to use the Shield Mark in connection with the manufacture, distribution, and sale of products that would fall within Class 3 of the international trademark classification system, including perfume.  As set forth in more detail below, the parties amended the agreement on September 1, 2009 and October 18, 2010.  This license agreement, as amended, is referred to herein as the "Shield License Agreement."  A copy of the Shield License Agreement, including the 2009 and 2010 amendments, is attached hereto as "Exhibit A" and incorporated herein by this reference.

22.     On June 26, 2008, the Chamber and Defendant entered into a separate agreement pursuant to which the Chamber granted Defendant the right and license to use the LOVE, BEVERLY HILLS XX Mark in connection with the manufacture,

560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

COMPLAINT

distribution, and sale of products that would fall within Class 3 of the international trademark classification system, including perfume.  As set forth in more detail below, the parties amended the agreement on July 1, 2008, September 1, 2009 and April 1, 2011.  This license agreement, as amended, is referred to herein as the "LBXX License Agreement."  A copy of the LBHXX License Agreement, including the 2008, 2009, and 2011 amendments, is attached hereto as "Exhibit B" and incorporated herein by this reference.  The Shield License Agreement and LBHXX License Agreement are referred to collectively herein as the "License Agreements."

23.    Each of the License Agreements required Defendant to pay quarterly royalties to the Chamber based on Defendant's net wholesale sales of products, as set forth Schedule E to the License Agreements (Section 4.1) (section numbers correspond to the same substantive provision for each of the License Agreements).

24.    Each of the License Agreements further provides that "notwithstanding the actual amount of Net Wholesale Sales, [Defendant] shall be obliged to make certain minimum payments within each period ("Guaranteed Minimum Royalties") as set forth in Schedule E.  For each quarter [Defendant] shall pay the greater of the actual Royalties owed under this Agreement, as set forth in Schedule E, or the Guaranteed Minimum Royalties" (Section 4.3).

25.    Each of the License Agreements further required Defendant to submit quarterly royalty reports to the Chamber's licensing agent "regardless of whether Royalties are actually due and payable for such quarterly period" (Section 6.1).

26.    Through each of the License Agreements, Defendant acknowledged "the tremendous value and goodwill of" the Marks and agreed not to use the Marks "in any manner which may, in LICENSOR's judgment, be inconsistent with LICENSOR's public image or which may in any way disparage LICENSOR or its reputation, including, but not limited to, types of placement of advertising and types of channels of distribution, nor take any action which will harm or jeopardize the [Marks]" (Section 10.4).

560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

COMPLAINT

27.     Each of the License Agreements further provides for the Chamber's termination of the relevant agreement upon written notice to Defendant in the event of Defendant's failure to meet specified sales targets, failure to remit payments, or failure to remit royalty reports (Sections 11.1.1 and 11.1.7).  Each of the License Agreements further provides that Defendant had no right of cure or correction in the event of payments or royalty reports being late twice in any year or in the event of the repeated occurrence of any particular default more than twice during the term of the agreement (Section 11.3).

28.     Each of the License Agreements further provides that upon expiration or termination thereof, Defendant "shall have no further right to exploit or in any way deal with any Licensed Products, Collateral or related materials" (Section 13.1).

29.     Each of the License Agreements further required Defendant to take certain actions upon termination ("Post-Termination Obligations"), including but not limited to:

a.     Immediately turn over all molds, printing plates, artwork, films, silk-screens, and other materials used in the design, creation, or reproduction of the licensed products, or provide evidence of the destruction of such materials (Section 13.1);

b.     Within 30 days of termination, deliver a final statement certifying the number and description of licensed products on hand or in process of manufacture (Section 13.2);

c.     Immediately make all payments due, including all prospective guaranteed minimum royalties due for the full term of the License Agreement (Section 13.3);

d.     Immediately deliver all labels, signs, packages, wrappers, cartons, circulars, advertisements and other items bearing or containing any reproduction or representation of the licensed mark, or destroy such items and promptly deliver a certificate of destruction (Section 13.4); and

560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

COMPLAINT

e. Promptly deliver a copy of the most recent lists of all accounts to which Defendant sells licensed products and a list of all of Defendant's subcontractors and manufacturers (Section 13.5).

30. Each of the License Agreements further provided that "[i]mmediately upon termination or expiration of this Agreement … LICENSEE shall immediately cease all use of the [Marks]" (Section 9.13).

31. The City is informed and believes, and on that basis alleges, that Defendant developed and began selling perfume branded with the Marks, including the examples shown below:





BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

8

COMPLAINT





**The City and Chamber Accommodate Defendant's Requests to Repeatedly Amend the License Agreements**

32.    In the first years of the License Agreements, Defendant requested – and the City and Chamber agreed to – multiple amendments of both License Agreements to reduce Defendant's sales targets and the guaranteed minimum royalties it had agreed to pay each quarter.

33.    On July 1, 2008, the Chamber agreed to a reduction of Defendant's projected sales targets under the LBHXX License Agreement.

34.    On September 1, 2009, the Chamber and City agreed to a further reduction of projected sales targets and guaranteed minimum royalty payments under both License Agreements.

COMPLAINT

35.     On October 18, 2010, the Chamber and City agreed to a further reduction in sales targets and guaranteed minimum payments under the Shield License Agreement.

36.     On April 1, 2011, the Chamber agreed to a further reduction of sales targets and guaranteed minimum payments under the LBXX License Agreement.

**Defendant Repeatedly Breaches Both License Agreements**

37.     Despite the repeated accommodations made by the City and Chamber reducing Defendant's sales targets and guaranteed minimum payments, Defendant failed to adequately perform under either of the License Agreements.

38.     Defendant failed to make payments for the third calendar quarter of 2011 under both of the License Agreements by the deadline for making such payments.

39.     Although Defendant eventually made the payments for the third calendar quarter of 2011 under both of the License Agreements, these were the last payments Defendant made under either License Agreement, despite written notices of default from the City and Chamber.

40.     On February 13, 2013, the Chamber assigned all of its right, title, and interest in the License Agreements to the City, including the right to receive all guaranteed minimum payments owed by Defendant and any other rights necessary to enforce the License Agreements.

41.     Having exhausted efforts to resolve Defendant's repeated and continuing breaches of the License Agreements amicably, and having been told by Defendant to "litigate the matter," the City wrote to Defendant on April 1, 2014, providing written notice of termination of the License Agreements and giving Defendant a final opportunity to correct its defaults by paying the amounts owed as guaranteed minimum payments and providing assurances that appropriate corrective measures had been taken with respect to making future guaranteed minimum royalty payments and meeting wholesale sales targets.  The City informed Defendant that

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

COMPLAINT

the License Agreements would terminate on April 16, 2014 if Defendant had not paid the amount due and provided satisfactory assurances by that date.

42.     The City's April 1, 2014 letter further outlined Defendant's Post-Termination Obligations and reminded Defendant that in no event was it entitled to dispose of licensed products through a distress sale or to third parties for resale.

43.     Defendant responded by letter on April 15, 2014, asserting, among other things, that it refused to make the guaranteed minimum payments required under the License Agreements.

44.     Pursuant to Schedule E of the Shield License Agreement, guaranteed minimum payments due from Defendant under the Shield License Agreement and unpaid as of the date of the filing of this Complaint are as follows:

| Payment Due Date | Payment Amount |
|---|---|
| 1/1/12 | $48,000 |
| 4/1/12 | $48,000 |
| 7/1/12 | $55,000 |
| 10/1/12 | $55,000 |
| 1/1/13 | $85,000 |
| 4/1/13 | $115,000 |
| 7/1/13 | $135,000 |
| 10/1/13 | $135,000 |
| 1/1/14 | $154,197 |
| 4/1/14 | $159,845 |
| 4/16/14 (2nd Quarter 2014 payment, due on termination of agreement) | $159,845 |
| 4/16/14 (3rd Quarter 2014 payment, due on termination of agreement) | $159,845 |
| 4/16/14 (4th Quarter 2014 payment, due on termination of agreement) | $159,845 |

560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

COMPLAINT

45.   Pursuant to Schedule E of the LBXX License Agreement, guaranteed minimum payments due from Defendant under the LBXX License Agreement and unpaid as of the date of the filing of this Complaint are as follows:

| Payment Due Date | Payment Amount |
|---|---|
| 1/1/12 | $45,000 |
| 4/1/12 | $38,000 |
| 7/1/12 | $45,000 |
| 10/1/12 | $50,000 |
| 1/1/13 | $70,000 |
| 4/1/13 | $100,000 |
| 7/1/13 | $110,000 |
| 10/1/13 | $120,000 |
| 1/1/14 | $157,203 |
| 4/1/2014 | $173,855 |
| 4/16/2014 (2nd Quarter 2014 payment, due on termination of agreement) | $173,855 |
| 4/16/2014 (3rd Quarter 2014 payment, due on termination of agreement) | $173,855 |
| 4/16/2014 (4th Quarter 2014 payment, due on termination of agreement) | $173,855 |

46.   Defendant has not complied with its Post-Termination Obligations under either of the License Agreements.

47.   Any and all right of Defendant to use the Marks terminated on April 16, 2014, with the termination of the License Agreements.

48.   The City is informed and believes, and on that basis alleges, that Defendant has continued to use the Marks following termination of the Agreement, including, without limitation, by continuing to sell products bearing the Marks and by using the Marks to promote Defendant's goods and services.

COMPLAINT

49.     The City is informed and believes, and on that basis alleges, that Defendant owns and controls the web sites at www.bhbeauty.net and www.abeverlyhillslife.com, on which it continues to use the Shield Mark to promote products and services.

50.     The City is informed and believes, and on that basis alleges, that Defendant owns and controls the web site at www.jtbrands.com, on which it continues to use both Marks to promote products and services under the Marks.

51.     The City is informed and believes, and on that basis alleges, that Defendant controls the "Love Beverly Hills xx – Beauty" Facebook page at www.facebook.com/lovebeverlyhillsxxbeauty, on which it continues to use the LOVE, BEVERLY HILLS XX Mark to promote products and services.

52.     The City has no adequate remedy at law, and is suffering irreparable harm and damages as a result of the above acts.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

53.     The City realleges and incorporates by reference the allegations contained in paragraphs 1 through 52 of this Complaint.

54.     Any and all right and authorization Defendant had to use the Marks terminated on April 16, 2014.

55.     The City is informed and believes, and on that basis alleges, that despite the termination of the License Agreements, Defendant has continued to use the Marks without license or authorization from the City or Chamber.

56.     Defendant was required to make guaranteed minimum royalty payments on a quarterly basis under the License Agreements.

57.     Defendant has failed to make required guaranteed minimum royalty payments due under the License Agreements in the amount of $2,900,200.

58.     Defendant was obligated under the License Agreements to provide quarterly reports stating the number of each licensed product shipped during the

COMPLAINT

quarter, the amount of net wholesale sales for each licensed product during the quarter, and the amount of royalties due for the quarter.

59.     The City is informed and believes, and on that basis alleges, that Defendant has not provided any reports required by the License Agreements since July 15, 2012, and has not otherwise accounted for its shipment or sales of licensed products under the License Agreements since July 15, 2012.

60.     Defendant was required to perform Post-Termination Obligations related to accounting for and disposing of all products and other materials bearing the Marks.

61.     Defendant has failed to perform its Post-Termination obligations under the License Agreements.

62.     Defendant's refusal to perform its Post-Termination Obligations has deprived and continues to deprive the City and Chamber of their ability to ensure that the Marks have been and are being used consistently with the City's and Chamber's public image and reputation, pursuant to Section 10.4 of the License Agreements.

63.     The City and Chamber have performed all of their obligations under the License Agreements except to the extent prevented from doing so by Defendant.

64.     The City is entitled to judgment on all amounts owed to it by Defendant under the License Agreements.

65.     The City is further entitled to an order requiring Defendant to perform the Post-Termination Obligations of the License Agreements.

66.     The City is further entitled to an order enjoining Defendant from using the Marks.

67.     Pursuant to Section 16.11 of the License Agreements, the City is further entitled to an order requiring Defendant to pay the City's out-of-pocket costs, expenses, and attorneys' fees incurred in litigating the dispute.

560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

COMPLAINT

## SECOND CLAIM FOR RELIEF
### (Federal Trademark Infringement in Violation of 15 U.S.C. § 1114)

68.     The City realleges and incorporates by reference the allegations contained in paragraphs 1 through 52 of this Complaint.

69.     The City is the owner of all right, title, and interest in and to the federally registered Shield Mark, and all goodwill appurtenant thereto.

70.     Defendant had limited authority to use the Shield Mark in accordance with the terms and conditions of the Shield License Agreement, solely by reason of the license from the City.

71.     Upon termination of the Shield License Agreement on April 16, 2014, Defendant's authority to use the Shield Mark was revoked, and Defendant was required to discontinue use of the Shield Mark.

72.     Despite the termination of the Shield License Agreement, Defendant continues to use the Shield Mark to promote its goods and services.

73.     Use of the Shield Mark in connection with Defendant's goods and services after the termination of the Shield License Agreement is likely to cause confusion, mistake, or deception as to the affiliation with or sponsorship of Defendant's goods and services by the City, in violation of 15 U.S.C. § 1114.

74.     Defendant has engaged in the aforementioned activity with the intent to confuse and deceive the public into believing that Defendant and its goods and/or services are sanctioned, approved, or authorized by the City and that Defendant is authorized and entitled to use the Shield Mark when in fact Defendant is not so authorized.

75.     Defendant's actions constitute knowing, deliberate, and willful infringement of the Shield Mark.  The knowing and intentional nature of the acts set forth in this Complaint renders this an exceptional case under 15 U.S.C. § 1117(a).

76.     As a result of Defendant's infringement, the City has suffered damages, as well as the continuing loss of goodwill established in the Shield Mark.  The

DRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

COMPLAINT

continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and an injury for which the City has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF
**(Federal Unfair Competition and False Designation of Origin in Violation of 15 U.S.C. § 1125(a))**

77.     The City realleges and incorporates by reference the allegations contained in paragraphs 1 through 52 of this Complaint.

78.     The City is the owner of all right, title, and interest in and to the federally registered Shield Mark, and all goodwill appurtenant thereto.

79.     Defendant had limited authority to use the Shield Mark in accordance with the terms and conditions of the Shield License Agreement, solely by reason of the license from the City.

80.     Upon termination of the Shield License Agreement on April 16, 2014, Defendant's authority to use the Shield Mark was revoked, and Defendant was required to discontinue use of the Shield Mark.

81.     Despite the termination of the Shield License Agreement, Defendant continues to use the Shield Mark to promote its goods and services.

82.     Defendant's use of the Shield Logo in connection with its goods and services after termination of the Shield License Agreement is a false designation of origin; is a false representation; wrongfully and falsely designates the origin of Defendant's goods and services as originating from or being associated or affiliated with the City; and is a false description or representation in interstate commerce in violation of 15 U.S.C. § 1125(a).

83.     Defendant's use of the Shield Logo in connection with its goods and services after termination of the Shield License Agreement is likely to cause confusion, mistake, or deception among consumers as to the affiliation, connection, endorsement, sponsorship or association of Defendant's goods and services with the City's goods and services.

560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

COMPLAINT

84.     Defendant has acted willfully and intentionally in continuing to use the Shield Mark after termination of the Shield License Agreement.  The knowing and intentional nature of the acts set forth herein renders this an exceptional case under 15 U.S.C. § 1117(a).

85.     As a result of Defendant's infringement, the City has suffered damages, as well as the continuing loss of goodwill established in the Shield Mark.  The continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and an injury for which the City has no adequate remedy at law.

## PRAYER

WHEREFORE, the City of Beverly Hills prays for judgment in its favor and against Defendant as follows:

1.      A judgment in favor of the City on its claims for payment due and owing under the License Agreements;

2.      Specific enforcement of Defendant's Post-Termination Obligations under the License Agreements;

3.      A judgment that Defendant has infringed the City's Shield Mark;

4.      A preliminary and permanent injunction enjoining Defendant and its agents, servants, employees, affiliates, attorneys, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors and assigns, and any person having knowledge of such injunction, from:

a.      using any reproduction, counterfeit, copy, or colorable imitation of the Shield Mark or LOVE, BEVERLY HILLS XX Mark in connection with selling goods or rendering services not authorized by the City;

b.      engaging in any course of conduct likely to cause confusion, deception or mistake, to weaken the distinctive quality of the City's Shield Mark, or to injure or diminish the goodwill of the City's Shield Mark;

c.      further infringing the City's Shield Mark by manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising,

560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

17

COMPLAINT

promoting, displaying or otherwise disposing of any goods or services not authorized by the City that bear any simulation, reproduction, counterfeit, copy or colorable imitation of the City's Shield Mark;

       d.     using any simulation, reproduction, counterfeit, copy or colorable imitation of the City's Shield Mark in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of any unauthorized goods or services in such fashion as to relate or connect, or tend to relate or connect, such goods or services in any way to the City, or to any services offered, sponsored, or approved by or connected with the City, including on web sites and social media;

       e.     engaging in any conduct constituting an infringement of the City's Shield Mark, of the City's rights in, or to use or to exploit its Shield Mark, or constituting any weakening of the City's Shield Mark or the goodwill symbolized therein;

       f.     effecting assignments or transfers, forming new entities or associations or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (a) through (e);

5.     An order that Defendant be required to deliver to the City all unauthorized materials bearing the Shield Mark or LOVE, BEVERLY HILLS XX Mark in association with unauthorized goods or services and the means for production of same pursuant to 15 U.S.C. § 1118;

6.     An order directing that this Court retain jurisdiction of this action for the purpose of enabling the City to apply to the Court at any time for such further orders and interpretation or execution of any Order entered in this action, for the modification of any such Order, for the enforcement or compliance therewith and for the punishment of any violations thereof;

7.     An Order directing Defendant to file with this Court and serve on the City's counsel within 30 days after service of an injunction a report under oath

BRYAN CAVE LLP
560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

setting forth in detail the manner and form in which Defendant has complied with the injunction, pursuant to 15 U.S.C. § 1116(a);

8. A judgment awarding the City all damages adequate to compensate for Defendant's infringement of the Shield Mark;

9. Actual damages suffered by the City as a result of Defendant's unlawful conduct, in an amount to be proven at trial;

10. An accounting of Defendant's profits pursuant to 15 U.S.C. § 1117;

11. A judgment trebling any damages awarded pursuant to 15 U.S.C. § 1117;

12. Restitution for Defendant's unjust enrichment as a result of the conduct complained of herein, including disgorgement of wrongfully obtained profits and any other appropriate relief;

13. Pre-judgment and post-judgment interest on the above damage awards as authorized by law;

14. Costs of suit and attorneys' fees as provided by the License Agreements and/or otherwise authorized by law; and

15. Any other remedy to which the City may be entitled, including all remedies provided for in 15 U.S.C. § 1117 and any other law.

Dated: June 17, 2014                    BRYAN CAVE LLP

                                        By: _____
                                             Donald L. Samuels
                                             Katherine Keating
                                             Attorneys for Plaintiff
                                             CITY OF BEVERLY HILLS

560 MISSION STREET, 25TH FLOOR
SAN FRANCISCO, CA 94105

19

# EXHIBIT A

# LICENSE AGREEMENT

## BETWEEN

## THE BEVERLY HILLS CHAMBER OF COMMERCE

## AND

## JT BRANDS, INC.

## JUNE 26, 2008

80215633.4 RWG1066679.1

# **TABLE OF CONTENTS**

1.  GRANT OF LICENSE

2.  TERRITORY; MODIFICATION

3.  TERM

4.  CONSIDERATION AND RELATED LICENSEE OBLIGATIONS

5.  REPRESENTATIVE

6.  STATEMENTS, PAYMENTS AND RECORDS

7.  QUALITY STANDARDS AND CONTROL

8.  RIGHT OF INSPECTION

9.  INTELLECTUAL PROPERTY

10.  OTHER LICENSEE REPRESENTATIONS, RIGHTS AND OBLIGATIONS

11.  TERMINATION AND EXPIRATION

12.  REVOCATION OF EXCLUSIVITY

13.  EFFECT OF EXPIRATION OR TERMINATION

14.  ASSIGNABILITY

15.  NOTICES

16.  MISCELLANEOUS

**EXHIBIT A PAGE 22**

<u>Schedules</u>

Schedule A        Property

Schedule B        Licensed Products

Schedule C        Territory and Channels of Distribution

Schedule D        Performance Schedule

Schedule E        Royalties and Projected Wholesale Sales

Schedule F        Royalty Report

**EXHIBIT A PAGE 23**

# LICENSE AGREEMENT

THIS AGREEMENT is made and entered into effective as of the 26th day of June, 2008 ("Effective Date"), by and between Beverly Hills Chamber of Commerce and Civic Association, a California non-profit corporation with its principal place of business at 239 South Beverly Drive, Beverly Hills, California 90212 (hereinafter referred to as "LICENSOR"), and J.T. Brands, Inc. a California corporation with its principal place of business at 200 Pine Avenue, Long Beach California (hereinafter referred to as "LICENSEE").

**RECITALS:**

      A.     The City of Beverly Hills, California (the "City") is the owner of the *BEVERLY HILLS SHIELD DESIGN®* as depicted in **Schedule A** of this Agreement (the "Property"). The City has granted LICENSOR an exclusive license to sublicense all or any portion of the Property to others for the exploitation of the Property.

      B.     Bradford Licensing Inc. ("Bradford") is the licensing agent of the LICENSOR in connection with the licensing of the Property.

      C.     LICENSEE desires to obtain the right and license to use the Property on and in connection with the manufacture, distribution and sale of the products indicated on **Schedule B** hereto (the "Licensed Products") in the geographical territory indicated on **Schedule C** hereto (the "Territory"), on the terms and conditions herein, and LICENSOR is willing to grant LICENSEE such right and license on such terms and conditions.

NOW THEREFORE, in consideration of the above premises and the mutual covenants, conditions and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties agree as follows:

**1.     GRANT OF LICENSE**

     1.1    Grant.  LICENSOR hereby grants to LICENSEE, and LICENSEE hereby accepts upon the terms and conditions herein specified, the exclusive right and license to utilize the Property in the Territory solely upon and in connection with the manufacture, distribution and sale of the Licensed Products.  No license is granted hereunder for the use of the Property for any other purpose other than on or in connection with the Licensed Products as set forth herein, or anywhere except in the Territory.  In the event of any question about whether any specific product or products are Licensed Products, the determination of LICENSOR shall be conclusive.

     1.2    Retail Distribution of Licensed Products.  LICENSEE agrees to use good faith efforts to design, manufacture, market and distribute the Licensed Products throughout the Territory. The Licensed Products produced under this Agreement shall be placed in distribution by the LICENSEE in a fully finished condition

**EXHIBIT A PAGE 24**

solely for sale at the retail market level or its equivalent, solely in the Territory, and solely through the Channels of Distribution (as defined in Schedule C). LICENSEE agrees that it will not make or authorize any use, direct or indirect, of the Licensed Products outside the Territory or outside the Channels of Distribution and that it will not intentionally sell Licensed Products to any person who intends or is likely to resell them or to alter, modify, re-package or refill them, or make them a part of some other product, to sell them outside the Territory or outside the Channels of Distribution, or to use them in any unauthorized manner outside the Territory or outside the Channels of Distribution.

1.3     <u>Reservation of Rights</u>

1.3.1   Any and all rights in and to the Property which are not expressly granted to LICENSEE herein are hereby reserved by the LICENSOR for its own use or for grant to other parties.  Any one or more of such reserved rights may be exercised or enjoyed by the LICENSOR, directly or indirectly, from time to time at any and at all times.

1.3.2   Accordingly, without limiting the foregoing, LICENSOR may grant rights or licenses to others to use the Property to manufacture, distribute and sell, or have others manufacture, distribute or sell for them any products other than the Licensed Products inside of the Territory.  LICENSOR further reserves the right to itself for the use of the Property for premium items, promotions (including those involving payment or partial payment by customers), athletic, entertainment and other sponsorship-related programs, catalogues, mail order and electronic commerce, and in restricted venues, *e.g.*, events, concerts, sports events, recreation, theme and amusement parks, schools, stadiums and theaters ("<u>LICENSOR Uses</u>").

1.3.3   LICENSOR hereby grants to LICENSEE the right of first refusal to supply LICENSOR with products for LICENSOR Uses as defined in Section 1.3.2.

1.3.4   In the event that LICENSEE acts as a supplier of products to LICENSOR, or any parties authorized by LICENSOR, such sales shall be subject to the provisions of Section 4.1 of this Agreement regarding payment of Royalties.

1.3.5   If LICENSEE is unable or unwilling to fill an order for Licensed Products for LICENSOR as provided in Section 1.3.2, or for any customer of LICENSOR within sixty (60) days from said order, LICENSOR shall have the right to seek and license another party or parties to fill said order(s).

1.3.6   LICENSEE may not sub-license the rights granted by this Agreement without the express prior written approval of LICENSOR, and any such

**EXHIBIT A PAGE 25**

sub-license or attempted sub-licensed shall constitute a material breach of this Agreement.

## 2. TERRITORY; MODIFICATION

2.1 <u>Territory</u>. The rights granted to LICENSEE under this Agreement shall be limited to those countries ("<u>Countries</u>") identified on Schedule C hereto which, collectively, shall constitute the "<u>Territory</u>." LICENSEE agrees that it will not make or authorize any use, direct or indirect, of the Property outside of the Territory or outside of the Channels of Distribution, and that it will not intentionally sell Licensed Products to persons who intend or are likely to resell them outside the Territory or outside the Channels of Distribution.

2.2 <u>Reduction in Territory</u>. LICENSEE agrees that LICENSOR shall be entitled to reduce the scope of the Territory, on a Country-by-Country basis, if at any time during the Term of this Agreement LICENSEE fails to perform this Agreement in accordance with the terms and conditions herein with respect to any such Country. For purposes of this Agreement, the term *"perform this Agreement"* shall mean actively selling Licensed Products in commercial quantities within each Country in accordance with the performance schedule for such Country attached as **Schedule D** ("<u>Performance Schedule</u>"). In the event that LICENSEE fails to perform this Agreement in accordance with the Performance Schedule as to any Country, LICENSOR may give written notice to LICENSEE specifying the Country which is at risk of being lost. If LICENSEE fails to perform this Agreement with respect to such Country within one hundred and eighty (180) days following such notice, then such Country shall be removed from the Territory and this Agreement effective upon the expiration of the one hundred and eighty (180) day period. The parties agree to negotiate in good faith to establish mutually-acceptable performance criteria for any country not listed on Schedule D. Once established, the country shall be added to Schedule D as a "Country" for all purposes under this Agreement.

## 3. TERM

3.1 <u>Term.</u> The term ("<u>Term</u>") of this Agreement shall commence on June 1, 2008, and shall terminate on December 31, 2013 ("<u>Termination Date</u>"), unless sooner terminated in accordance with the provisions of this Agreement.

3.2 <u>Renewal</u>. LICENSOR agrees that provided LICENSEE continues to "perform this Agreement" (as defined hereinabove) throughout the Term, LICENSEE may request renewal of the term of this Agreement for an additional five (5)-year period by giving notice of requested renewal to LICENSOR at least one hundred and eighty (180) days prior to the expiration of the Term. Such renewal shall be subject to LICENSOR's consent, which shall not be unreasonably withheld and shall be provided in writing to LICENSEE at least ninety (90) days prior to the expiration of the Term. The Royalty Rates for any such renewal period shall increase at LICENSOR's request, but not by adding more than 0.5% to the current rates.

**EXHIBIT A PAGE 26**

4.    **CONSIDERATION AND RELATED LICENSEE OBLIGATIONS**

4.1    <u>Royalties</u>.  In consideration of the right and license herein granted, LICENSEE shall pay to LICENSOR, on all units of Licensed Products sold, royalties at the royalty rates as set forth in **Schedule E** hereto ("<u>Royalties</u>"), which shall be a percentage of LICENSEE'S Net Wholesale Sales of the Licensed Products covered by this Agreement, in United States Dollars, computed upon each unit of the Licensed product sold, shipped or otherwise distributed by LICENSEE or any of its representatives, affiliated and associated or subsidiary companies (each hereinafter a "<u>Related Company</u>").  Royalties shall accrue when the Licensed Products are invoiced or shipped, whichever occurs first, and shall be payable concurrently with the periodic statements required in Section 6 herein.  The term "Net Wholesale Sales" shall mean the gross invoice price billed to LICENSEE'S customers, less customary quantity discounts, returns actually credited and charged to and paid by the customer, and reasonable returns of defective products, provided such discounts, credits and returns do not aggregate greater than 10% of the gross invoice price plus sales taxes (if applicable).  No other deductions shall be permitted from Net Wholesale Sales, including, without limitation, deductions for the cost of shipping, cost of packaging, advertising or promotional expenses, cash or volume discounts, uncollectible accounts, bad debts, excise or income taxes, or other costs or expenses incurred by LICENSEE in the manufacture, sale, distribution, advertisement or promotion of Licensed Products.  If LICENSEE sells Licensed Products to a Related Company, the invoice price used to determine Net Wholesale Sales shall be based on the invoice price at which the Licensed Products are re-sold by the Related Company to an unrelated customer in an arms-length transaction.  If Licensed Products are bundled with non-licensed products, Royalties shall be paid on the Net Wholesale Sales of the entire bundle of products.

4.2    <u>Advance</u>.  LICENSEE agrees to pay LICENSOR a non-refundable advance against Royalties ("<u>Advance</u>") in two (2) payments as follows: first, the sum of $12,656.25, payable upon execution of this Agreement, and second, a payment of $12,656.25 due and payable on October 1, 2008.  The Advance shall be applied against the total minimum referred to in Section 4.3 below.

4.3    <u>Guaranteed Minimum Royalties</u>.  LICENSEE agrees that, notwithstanding the actual amount of Net Wholesale Sales, it shall be obliged to make certain minimum payments within each period ("<u>Guaranteed Minimum Royalties</u>") as set forth in Schedule E.  For each quarter LICENSEE shall pay the greater of the actual Royalties owed under this Agreement, as set forth in Schedule E, or the Guaranteed Minimum Royalties.

4.4    <u>Taxes and Changes</u>.  LICENSEE shall be responsible for and shall indemnify, defend and hold harmless LICENSOR from and against all excise and income taxes, customs duties, levies, imposts or any similar charges now or hereafter imposed, based upon the manufacture, delivery, license, sale, possession or use of the Licensed Products (including, but not limited to sales, use, inventory, income

**EXHIBIT A PAGE 27**

and value-added taxes on sales of Licensed Products), and no such charges shall be deducted from any Royalties or Advance.

4.5   <u>Close-Out Sales</u>. LICENSEE shall use its best efforts to ensure that Licensed Products are not sold to close-out retailers or at close-out prices while at retail (which is agreed to mean a discount of more than 30% below MSRP) more than twice per calendar year per retailer. This includes, but is not limited to, including a clause prohibiting such discounts in its agreements with third party retailers and distributors. Such permitted discounts shall be restricted to retailer promotions lasting no more than one (1) calendar month each. LICENSEE shall use reasonable efforts to police any discounting of 30% below MSRP.

## 5.   <u>REPRESENTATIVE</u>

5.1   <u>Bradford</u>. LICENSEE acknowledges that Bradford is acting as exclusive Agent for LICENSOR and is designated to generally act on behalf of LICENSOR hereunder, sometimes in conjunction with LICENSOR and sometimes in its place and stead, to perform functions such as, but not limited to, receiving payments made payable to LICENSOR, providing statements as set forth in Section 6, and performing the various quality control functions as set forth in Section 7. All references to administrative duties of the LICENSOR in this Agreement may be performed by Bradford. LICENSOR agrees that it will be bound by any authorized communications or representations of Bradford. Notwithstanding anything herein to the contrary, LICENSOR, in its sole and complete discretion, may replace Bradford immediately at any time upon written notice to LICENSEE, without affecting the validity of this Agreement.

## 6.   <u>STATEMENTS, PAYMENTS AND RECORDS</u>

6.1   <u>Royalty Reports</u>. LICENSEE shall, on a calendar quarterly basis, pay to LICENSOR, the amounts described in Section 4, together with a royalty report covering such quarter. Royalty reports shall be submitted to Bradford on behalf of LICENSOR in the form attached hereto as **Schedule F** ("<u>Royalty Report</u>") or such other mutually agreed upon format and shall be rendered regardless of whether Royalties are actually due and payable for such quarterly period. Royalty Reports shall state:

6.1.1   LICENSEE'S net shipments, by number of each Licensed Product, reported separately, for the reporting period;

6.1.2   LICENSEE'S Net Wholesale Sales for each Licensed Product, reported separately, for the reporting period; and

6.1.3   a computation of Royalties due, taking into account and applying any Guaranteed Minimum Royalties.

If the Territory covers more than one country, Royalty Reports shall be prepared on a country-by-country basis as well as for the entire Territory. LICENSEE shall

**EXHIBIT A PAGE 28**

ensure that all Royalty Reports are received by LICENSOR on a quarterly basis within fifteen (15) days after the close of each calendar quarter (March 31, June 30, September 30 and December 31 of each year) during the Term, commencing with the first full calendar quarter following the Effective Date of this Agreement.

6.2    Payments.  Royalties (including Guaranteed Minimum Royalties) shall be paid quarterly and received no later than fifteen (15) days after the closed of each quarter during the Term (each a "Royalty Payment").  LICENSEE acknowledges and agrees that notwithstanding anything in herein contrary, its obligation to make any Royalty Payments under this Agreement shall survive any expiration of this Agreement.

6.3    Currency.  Royalties may be computed in the currency of the country where earned and paid to the LICENSOR in U.S. Dollars at the exchange rate received by LICENSEE at the time of conversion.  LICENSEE shall be solely responsible for all costs of any currency conversion to U.S. Dollars, foreign withholding taxes, and similar taxes or charges, and such costs shall not reduce the amounts due to LICENSOR hereunder.

6.4    Acceptance of Reports.  LICENSOR'S acceptance of any Royalty Report or Royalty Payment by LICENSEE shall not act as a waiver of any of LICENSOR'S rights hereunder, including, without limitation, LICENSOR'S rights to recover amounts due as a result of errors or inconsistencies in any Royalty Report. LICENSEE shall promptly pay all such amounts upon LICENSOR'S request.  All payments to LICENSOR hereunder shall be non-refundable and shall be made without set-off of any amount whatsoever, whether based upon any claimed debt or liability of LICENSOR to LICENSEE.  All Royalties shall be payable and, together with the Royalty Reports, shall be sent to: **Bradford Licensing Associates, 7 Oak Place, Suite 1, Montclair, New Jersey 07042, Attention: Michael Almedia.**

6.5    Records.  LICENSEE shall keep, maintain and preserve in LICENSEE'S principal place of business during the Term and for at least three (3) years following any expiration or termination of this Agreement for any reason, complete and accurate records and accounts covering all transactions relating to this Agreement including, without limitation, invoices, correspondence, banking, financial and all other pertinent records and accounts.  Such records and accounts shall be maintained in accordance with generally accepted accounting principles consistently applied.  LICENSOR or its designee shall be entitled to: (i) audit and inspect such records and accounts, as often as it deems necessary at any time during or after the Term of this Agreement during reasonable business hours and upon five (5) days prior written notice to LICENSEE; and (ii) upon ten (10) days prior written notice, obtain copies and summaries of such records and accounts. LICENSEE agrees not to cause or permit any interference with LICENSOR or its designee in the performance of their duties of inspection and audit.  In the event any errors or discrepancies are discovered in any records, statements or accounts or in payments resulting therefrom, they shall immediately be rectified by

**EXHIBIT A PAGE 29**

LICENSEE and the appropriate payments made by LICENSEE, together with interest at the then Citibank, N.A. prime rate per annum compounded from the date the payment was originally due. Should any willful errors or discrepancies be disclosed or any audit deficiency of ten percent (10%) or more of the Royalties owing to LICENSOR for the applicable audit period be discovered, then in addition to all other relief to which LICENSOR may be entitled, LICENSOR may, at its sole option, immediately terminate this Agreement upon notice to LICENSEE. In addition, LICENSEE shall promptly reimburse LICENSOR for the full cost of such inspection and audit, together with interest at the then Citibank, N.A. prime rate per annum for any additional monies found to be due as a result of the inspection or audit compounded from the date the payment was originally due. Any termination hereunder shall not relieve LICENSEE of any obligation to remit any audit deficiency and associated costs and expenses, or any unpaid portion of the Guaranteed Minimum Royalties, or any other amounts owed hereunder to LICENSOR.

6.6     <u>Right to Dispute Records</u>.  Receipt or acceptance by LICENSOR or its nominees of any of the statements furnished pursuant to this Agreement, the exercise by LICENSOR in whole or in part at any time or times of the right to audit and inspect records and accounts, or the receipt or deposit by LICENSOR or its nominees of any payment tendered by or on behalf of LICENSEE shall be without prejudice to any rights or remedies of LICENSOR and shall not prevent LICENSOR from thereafter disputing the accuracy of any such statements, payments, records and accounts.

## 7.     <u>QUALITY STANDARDS AND CONTROL</u>

7.1     <u>Quality Standards</u>.  LICENSEE covenants that all the Licensed Products, and also all related materials displaying the Property, such as, but not limited to, containers, packaging, wrapping materials, labels, hang tags, advertising materials, promotional displays and materials, catalogs, artwork, and other pictorial and textual materials prepared in connection with the Licensed Products (collectively the "<u>Collateral</u>"), shall be of the highest standard and quality and meet beauty industry standards for luxury items approved by LICENSOR.  In all cases, the quality of produced Licensed Products shall be at least as high as the quality of samples approved by LICENSOR.  Under no circumstances shall the Licensed Products be pornographic, or controversial for political, ethnic, racial, or gender reasons, or be in bad taste, or reflect adversely upon LICENSOR or the City, determined solely in the discretion of LICENSOR.

7.2     <u>Supplies</u>.  LICENSEE shall ensure that there are sufficient quantities of each type of Licensed Product available throughout the Territory to meet public demand and that the manufacture, distribution, sale, promotion and advertisement of the Licensed Products comply with all applicable laws and regulations.

7.3     <u>Materials</u>.  LICENSEE agrees that the products used in the production of the Licensed Products shall be: essential oils, lotions, creams, soaps, shampoos,

**EXHIBIT A PAGE 30**

conditioners, cosmetics and organics, all of which shall meet current legal, industry, environmental, health and safety standards in each jurisdiction in the Territory.

7.4     Artwork/Samples.  LICENSEE shall submit to LICENSOR for its prior written approval all artwork, pre-production prototypes and samples of Licensed Products and Collateral, such as cartons, containers, packing or wrapping material, tags, labels or similar item or any related advertising, promotional or display materials in connection with the Licensed Products, clearly indicating the specific placement and use of the Property on such Licensed Products and Collateral (collectively, "Artwork/Samples"), at all stages of development and production. LICENSOR'S approval may be granted or withheld in LICENSOR'S sole discretion, which will not be unreasonably withheld, as LICENSOR shall have absolute and final approval of all such Artwork/Samples.  LICENSEE may not manufacture, use, offer for sale, sell, advertise, ship or distribute any Licensed Products or Collateral without LICENSOR'S prior written approval of the Artwork/Samples, which must be obtained in writing from LICENSOR before the Licensed Products or Collateral are manufactured, advertised, promoted, distributed or sold.  LICENSOR and LICENSEE agree to the following approval process:

7.4.1   LICENSEE shall first submit Artwork/Samples to Bradford for review and approval.  Bradford shall have five (5) business days from day of receipt to review submissions and provide comments to LICENSOR. LICENSOR shall provide written approval or provide further comments to LICENSEE within five (5) business days of receipt from Bradford.  If LICENSOR does not provide LICENSEE written approval or comments by the conclusion of the five (5)-day period, LICENSEE shall provide notice to LICENSOR advising LICENSOR that it shall have ten (10) additional business days to provide formal approval or comments.  If the Artwork/Samples have not been approved or comments provided by the conclusion of this extended period, the submission shall, upon such conclusion, be deemed approved.  All costs associated with the approval process shall be borne by LICENSEE.

7.4.2   Comments from LICENSOR may include required changes.  Any required changes to any Artwork/Samples shall be made by LICENSEE in a timely manner and updated Artwork/Samples shall be shipped to LICENSOR, at LICENSEE'S expense, for approval in the manner set forth herein.  After the Artwork/Samples have been fully approved by LICENSOR, LICENSEE shall not materially depart therefrom (*i.e.*, in type, style, model, grade, description or the like) without the express written consent of LICENSOR in the manner set forth herein.

7.4.3   All Artwork/Samples not approved by LICENSOR shall be destroyed or shall have the Property removed (if possible) within thirty (30) days after disapproval, and any approved Artwork/Samples shall be

**EXHIBIT A PAGE 31**

destroyed or shall have the Property removed (if possible) within thirty (30) days following the expiration or termination of this Agreement. In all cases, disposition of Artwork/Samples shall be attested to in a certificate, signed by one of LICENSEE'S officers and delivered to LICENSOR upon LICENSOR's request.

7.5   Production Samples.   LICENSEE shall furnish LICENSOR, without charge, a minimum of six (6), but not more than twelve (12), samples of each finished Licensed Product from the first production run ("Production Samples") together with any Collateral, if applicable.   No Licensed Product shall be manufactured, distributed, sold or used by LICENSEE until all Artwork/Samples as defined above have been finally approved by LICENSOR.   Further written approval will be necessary if there is any change proposed by LICENSOR or LICENSEE in type, style, model, grade, description or the like from any previously approved Licensed Products and Collateral. Licensed Products/Collateral shall not be manufactured, distributed, sold or used which differ from the approved pre-production Samples.

7.6   Deficiency.  Promptly upon receipt from LICENSOR of information or notice that any Licensed Products or Collateral manufactured, sold or used by LICENSEE do not meet or have not met the specifications or standards of nature and quality prescribed by LICENSOR, LICENSEE shall correct such deficiency forthwith at LICENSEE'S expense.   LICENSEE shall thereupon submit samples of the corrected Licensed Products or Collateral pursuant to this Section 7, for approval. In the event the deficiency is that of sub-standard Licensed Product or that of material misuse of the Property, all existing inventory or work in progress of Licensed Products and/or Collateral containing the deficiency shall, at LICENSEE'S expense, either be corrected to LICENSOR'S satisfaction or shall be destroyed.   The foregoing shall not preclude or limit in any way LICENSOR'S rights under Section 10 herein.

7.7   Additional Samples.  LICENSOR may, periodically, but not more often than four (4) times per calendar year during the Term, require that LICENSEE submit to LICENSOR, without charge, additional samples of Licensed Products together with Collateral beyond that provided for in this Section 7, for subsequent review of the quality and copyright, trademark, and other legal notices on same and for any other purpose the LICENSOR deems appropriate.  No Royalties shall be due or payable on samples furnished to LICENSOR.

7.8   Changes.  In the event that LICENSEE changes or modifies any Artwork/Samples previously approved by LICENSOR without LICENSOR'S written consent, or in the event LICENSEE'S manufacture, distribution, sale or marketing of the Licensed Products reflects unfavorably upon LICENSOR, the Property or Licensed Products, LICENSOR shall have the right in its sole discretion to withdraw its approval and, at its election, to terminate this Agreement with respect to such Licensed Products or in its entirety.   Upon notice from LICENSOR, LICENSEE shall immediately cease all use of the Property

**EXHIBIT A PAGE 32**

including but not limited to, the manufacture, distribution, sale and marketing of Licensed Products to which the termination applies, and within ten (10) days thereafter shall remit all amounts, if any, due and owing to LICENSOR hereunder. If there are other Licensed Products under this Agreement not affected by such termination, this Agreement shall remain in full force and effect as to those other Licensed Products only.

7.9   Warranty.  LICENSEE shall insure at all times that the Licensed Products and Collateral meet LICENSOR'S standards of nature and quality and LICENSEE shall cooperate fully in all reasonable ways with LICENSOR in enabling LICENSOR to ascertain that all Licensed Products and Collateral materials meet said standards.  LICENSEE acknowledges and agrees that if any Licensed Products manufactured and sold by it under this Agreement are of inferior quality in material and/or workmanship, the substantial goodwill which LICENSOR has cultivated and now possesses in and to the Property will be impaired, diminished and/or diluted. Therefore, LICENSEE represents and warrants to LICENSOR as well as to LICENSEE'S customers that the Licensed Products will be merchantable, fit for the purposes for which LICENSEE has advertised or marketed them, and will meet or exceed the quality of like products manufactured by LICENSEE.

## 8.   RIGHT OF INSPECTION

8.1   Inspection.   LICENSEE shall allow LICENSOR or its designee to enter LICENSEE'S premises and all other facilities utilized by LICENSEE in connection with the Licensed Product during regular business hours, upon three (3) business days' notice, for the purpose of inspecting the Licensed Products, the Collateral and/or the facilities in which they are manufactured and/or packaged. In the event that LICENSOR'S quality standards are not met, LICENSEE shall, upon written notice from LICENSOR, discontinue the manufacture, distribution and sale of such Licensed Products and/or related Collateral.  LICENSEE shall remedy such failure of quality to LICENSOR'S satisfaction within ten (10) business days after LICENSEE'S receipt of notice thereof; failure to timely complete such remedial measures shall constitute a material breach of this Agreement and shall entitle LICENSOR to terminate this Agreement upon written notice to LICENSEE.

## 9.   INTELLECTUAL PROPERTY

9.1   LICENSOR and City Rights.  LICENSEE acknowledges LICENSOR'S exclusive rights in the Property and further acknowledges the value of the good will associated with the Property, that the Property and all ultimate rights therein belong exclusively to the City, and that the Property is famous and has developed secondary meaning and connotes an image of prestige, quality and exclusivity in the minds of the public. LICENSEE agrees that the Property is, and shall remain, the property of the City and that LICENSEE obtains no right, title or interest in or to the Property except for the limited rights set forth in this Agreement.

**EXHIBIT A PAGE 33**

LICENSEE acknowledges and agrees that any goodwill generated by LICENSEE'S use of the Property shall inure exclusively to the benefit of LICENSOR.

9.2     <u>Waiver of Rights</u>.  LICENSEE waives all claims of and to ownership of any rights in the Property and shall not, during the Term, any extension and/or renewal thereof, or at any time thereafter, dispute or contest, directly or indirectly, the City's ownership in and to the Property, the City's and LICENSOR'S exclusive right (subject to the rights granted in this license) to use and/or exploit the Property, the validity of any of the copyrights or trademarks pertaining thereto or the City's ownership thereof, nor shall the LICENSEE assist or aid others whether directly or indirectly in doing so.

9.3     <u>Use.</u>  LICENSEE shall use the Property only in connection with the Licensed Products and agrees that all of LICENSEE'S use under this Agreement inures to the benefit of LICENSOR.

9.4     <u>LICENSEE Contributions</u>.  LICENSEE agrees that all artwork, graphics, layouts slogans, names, titles or similar materials incorporating, or being used in association with, the Property which may be created by the LICENSEE or its subcontractors pursuant to this Agreement shall become the sole property of LICENSOR, including trademark and copyright rights, and LICENSEE agrees on behalf of itself, its employees, its subcontractors and any other party with whom it may contract to create such materials, to promptly execute any and all appropriate documents, *e.g.*, assignments, in this regard.  LICENSEE warrants and represents that all such materials which it creates or uses shall be original and, to the best of its knowledge, will not infringe the copyright or trademark rights of others.

9.5     <u>LICENSOR Registration</u>.  LICENSEE expressly acknowledges that LICENSOR makes no representation or warranty as to its rights to the Property in the various specific Countries in the Territory.  LICENSEE understands and agrees that it is relying upon its own due diligence in this respect.  Further, LICENSOR shall have no obligation to register or seek registration, or renew the registration or legal protection, of any of the Property in any Country in the Territory.  The City shall have the right to register trademarks and/or claims to copyright for any design incorporating the Property as may be reasonably necessary, in the City's sole discretion, to protect the City's interests in and to the Property.  Any and all applications for registration or claims to copyright, where applicable, shall identify the City as the copyright owner; all applications to register trademarks shall identify the City as the trademark owner.  The LICENSEE shall, upon LICENSOR'S request, assign to the City, in writing, any and all intellectual property rights in the Property that might accrue to LICENSEE under the laws of any jurisdiction, and all intellectual property rights in or works derived from the Property.

9.6     <u>LICENSEE Registration</u>.  LICENSEE shall not adopt or seek to register, nor assist or aid others to adopt or seek to register, or take any action to use or

**EXHIBIT A PAGE 34**

establish rights, including assisting or aiding others to take any action to use or establish rights, in any of the Property, or in any name, mark, word (in any language), symbol, letter, or design which is confusingly similar to the Property, or to use any variant, colorable imitation, translation and/or simulation of the Property without LICENSOR's prior written consent.  Without limiting the foregoing, LICENSOR agrees that LICENSEE may seek registration and/or legal protection of the Property anywhere in the Territory where such registration and/or protection does not already exist, provided it does so on LICENSOR's behalf and with LICENSOR's prior written consent, which shall not be unreasonably withheld, and at no more than nominal expense to LICENSOR.  The City shall be identified as the applicant and owner of the Property in and on any applications or other papers filed or submitted in any jurisdiction.  All ownership and registration rights resulting from such registration and/or legal protection secured by LICENSEE shall belong to LICENSOR, but shall become an integral part of the Property under this Agreement, subject to the exclusive grant and license to LICENSEE for all purposes herein.

9.7  <u>Samples</u>.  LICENSEE shall, at LICENSOR'S request, and at LICENSOR'S expense, provide any samples of the Licensed Products, or any photographic reproductions of the same, for use in the filing of copyright claims or trademark applications.

9.8  <u>Notice Labels</u>.  LICENSEE represents and warrants that it will provide notice on all Licensed Products and Collateral materials bearing any reproductions or use of the Property, as follows:  *The BEVERLY HILLS SHIELD DESIGN® is a registered trademark of the City of Beverly Hills, California, U.S.A.*  LICENSEE agrees to follow LICENSOR'S instructions and guidelines regarding proper usage of the Property in all respects.  LICENSEE acknowledges that the omission of said notice shall constitute a material breach of this Agreement and recourse shall be at the sole discretion of LICENSOR, including, but not limited to penalties and/or additional compensation for such omission LICENSOR may seek legal and/or equitable relief in connection therewith.

9.9  <u>Changes to Property</u>.  LICENSOR shall have the right at any time, upon notice to LICENSEE, to make additions to, deletions from, and changes in the Property at its complete discretion, and LICENSEE shall adopt and use any and all such additions, deletions and changes as soon as practicable in all new production of the Licensed Products and/or Collateral.

9.10  <u>Copying, Duplication</u>.  LICENSEE shall not undertake or permit any copying, duplication, reproduction or other exploitation of the Property (or any portion or element thereof) except as expressly authorized hereunder.

9.11  <u>Third-Party Marks</u>.  LICENSEE shall ensure that no Licensed Products (including any Collateral related thereto) contain or incorporate any names, characters and/or likenesses trademarks, service marks or trade names owned by any other third party without LICENSOR'S prior written consent.

**EXHIBIT A PAGE 35**

9.12   <u>Infringement</u>. LICENSEE agrees to promptly notify LICENSOR of any actual or suspected infringements of the Property and/or the Licensed Products and to assist LICENSOR in protecting and enforcing such rights of LICENSOR. LICENSOR shall be under no obligation to defend its rights in the Property or to refute any third-party claims of ownership or infringement. At LICENSOR'S request, LICENSEE shall cooperate with LICENSOR and assist fully in preventing any infringement or unfair use by any third party of the Licensed Products, or the Property. LICENSOR, in its sole discretion, shall determine what course of action, if any, it elects to pursue in regard to said infringement or unfair use and shall be under no obligation whatsoever to take action at LICENSEE'S request. This section shall survive the expiration or any termination of this Agreement.

9.13   <u>Termination</u>. Immediately upon termination or expiration of this Agreement, subject to the provisions of this Section 9, LICENSEE shall immediately cease all use of the Property and all rights granted LICENSEE hereunder shall revert to LICENSOR.

9.14   <u>Survival</u>. All provisions of this Section 9 shall survive any termination hereof.

## 10.   OTHER LICENSEE REPRESENTATIONS, RIGHTS AND OBLIGATIONS

10.1   <u>Authorization</u>. LICENSEE represents, warrants and agrees that: (i) LICENSEE is a corporation duly organized, validly existing and in good standing under the laws of the State of California; has full corporate power and authority to conduct its business as now being conducted and as contemplated hereby; and holds all necessary licenses and permits from all government entities for the proper conduct of said business; (ii) LICENSEE has the unrestricted right, power and authority to enter into this Agreement and to perform its obligations hereunder, and neither the execution and delivery of this Agreement nor the consummation of the actions contemplated hereby will (a) violate any provisions of its charter documents, (b) violate, conflict with or constitute a default under any contract to which it is a party or (c) violate any law binding on it; (iii) LICENSEE will comply with all applicable laws, regulations, ordinances and other requirements involving the use of the Property and the conduct of LICENSEE'S business in connection therewith in any and all jurisdictions, domestic and foreign; and (iv) LICENSEE will not harm, misuse or bring disrepute to the Property.

10.2   <u>Subcontracting</u>. LICENSEE shall have the right to subcontract for the manufacture and production of the Licensed Products and/or Collateral provided however, that, irrespective of, or in addition to, any other agreements between LICENSEE and a subcontractor, LICENSEE agrees that:

10.2.1   any such subcontractor shall be fully subject to, and bound by, every provision of this Agreement;

10.2.2   any such subcontractor shall be made aware that it may not sell any Licensed Products manufactured by it to anyone but LICENSEE;

**EXHIBIT A PAGE 36**

10.2.3   any such subcontractor shall agree that any related designs, labels, packaging or other materials incorporating or associated with the Property shall become the property of LICENSOR and that LICENSEE shall be responsible for obtaining any relevant supporting legal documentation;

10.2.4   any such subcontractor shall agree to immediately cease all manufacture of Licensed Products upon notice of termination or expiration of this Agreement;

10.2.5   a breach by a subcontractor of any provision of this Agreement shall be considered a breach by LICENSEE;

10.2.6   LICENSEE shall remain primarily and completely obligated under all of the provisions of this Agreement;

10.2.7   LICENSEE shall promptly furnish to LICENSOR a list of all such subcontractors and shall update this list each quarter; and

10.2.8   LICENSEE agrees to immediately notify any sub-contractor in writing upon termination or expiration of this Agreement, with a copy sent to LICENSOR.

10.3   <u>Compliance with Laws</u>.  LICENSEE warrants and represents that it will:  comply with all laws, regulations, ordinances, governmental standards and the like applicable to the manufacture, sale, distribution, promotion and advertisement of the Licensed Products in all jurisdictions; that all Licensed Products will meet current industry environmental, health and safety standards in all jurisdiction; and agrees to indemnify and hold LICENSOR harmless in this regard.

10.4   <u>Goodwill</u>.  LICENSEE acknowledges the tremendous value and goodwill of the Property accruing solely to LICENSOR and agrees not to use the Property in any manner which may, in LICENSOR'S judgment, be in bad taste, be inconsistent with LICENSOR'S public image or which may in any way disparage LICENSOR or its reputation, including, but not limited to, types and placement of advertising and types of channels of distribution, nor take any action which will harm or jeopardize the Property or LICENSOR'S ownership thereof, in any way.

10.5   <u>Confidentiality</u>.    During the Term and thereafter, LICENSEE shall keep confidential all of LICENSOR'S confidential proprietary information, knowledge or trade secrets, such as but not limited to, marketing and advertising plans, licensing plans, market research data and the like, of which it becomes aware during the course of its relationship with LICENSOR.  If LICENSEE is uncertain about the status of a particular piece of information, it shall consult with LICENSOR to determine such status.  This confidentiality obligation shall cease when the information becomes generally known to the public.

**EXHIBIT A PAGE 37**

10.6    Indemnification.   LICENSEE hereby agrees to indemnify, defend and hold harmless forever the City, the City's Council and each member thereof, and the City's officers, employees and agents, LICENSOR, Bradford, and their respective agents, representatives, employees, attorneys, successors and assigns (all individually and collectively referred to as "Indemnitees") from and against any and all causes of action, claims, demands, losses, costs, fines, judgments, settlements and expenses (including attorneys' fees and court costs incurred), investigations, damages, penalties and liabilities of any kind or nature whatsoever, directly or indirectly arising out of, resulting from, relating to or connected with LICENSEE'S use of the Property, including without limitation: (i) any breach of any representation, warranty or covenant of LICENSEE hereunder; (ii) any defect in the design, formulation or manufacture, or any use by any person or entity of, any Licensed Products; (iii) any defamation by LICENSEE or invasion of the right of privacy, publicity or other personal or property right; (iv) any breach of any confidentiality or trade secret provision or agreement; (v) any use of any patent, process, method or device; (vi) any infringement of any copyright or trademark not licensed hereunder by LICENSOR; and (vii) any manufacture, storage, advertising, promotion, warranty, distribution or use of the Licensed Products.   LICENSEE shall promptly upon receipt of notice of any such claim defend such claim at LICENSEE'S sole cost and expense by counsel reasonably satisfactory to Indemnitees; or LICENSOR, at its option, may engage counsel and defend such claim at LICENSEE'S sole cost and expense for which LICENSEE shall pay within ten (10) business days upon being invoiced therefore.   No settlement of any claim for which indemnity shall be made hereunder shall be made by LICENSEE without the prior written consent of LICENSOR.   This Section shall survive the expiration or any termination of this Agreement.

10.7    Insurance.   LICENSEE will obtain and maintain, at its sole cost and expense, during the Term and for a period of five (5) years thereafter, general comprehensive liability insurance, product liability insurance and advertiser's liability insurance covering, without limitation, bodily injury, personal injury, property damage and casualty loss.   Such policies of insurance shall provide full protection against any and all claims, demands, causes of action arising out of any defects in, or the reasonably foreseeable use of the Licensed Products which is the subject of this Agreement and shall name the City, LICENSOR and Bradford as additional insureds with a deductible of not more than $10,000 (certificate of which shall be furnished to LICENSOR) providing adequate protection for City, LICENSOR, Bradford and their respective officers, agents, and employees against any claims, demands, costs and liabilities of any kind arising out of or in connection with any alleged defects in Licensed Products or any use thereof.   Such policies of insurance shall have endorsements or coverage with combined single limits of Two Million dollars (U.S. $2,000,000), and shall be provided by insurers admitted in the state of California and with a rating of B+, VII or better in the most recent edition of Best's Key Rating Guide, Property-Casualty Edition qualified insurance carrier.   Each policy of insurance shall be endorsed to state that coverage shall not be suspended, voided or canceled and shall not be reduced in coverage or limits except after thirty (30) days prior written notice provided to

City. Upon prior request of the carrier, the notice period may be reduced to ten (10) days in the event of non-payment of premium. In addition, such policies of insurance shall contain an endorsement that negates the "other insurance" clause in the policy and a statement that the insurance provided is primary and that any similar insurance carried by City or LICENSOR is neither primary nor contributing. Maintenance of such insurance and performance of LICENSEE of its obligations hereunder shall not relieve LICENSEE of liability under the indemnity contained in this Section 10.

**11.**   **TERMINATION AND EXPIRATION**

11.1   <u>Termination.</u>  LICENSOR shall have the right to terminate this Agreement, or any portion thereof, upon written notice to LICENSEE, without prejudice to any other rights which it may have, for any of the following:

11.1.1   LICENSEE fails to generate the Projected Wholesale Sales set forth on Schedule E within the time period indicated therein, subject to cure in accordance with Section 12.1.4; or

11.1.2   LICENSEE defaults in the performance of any of its obligations, or breaches of its representations or warranties provided for in this Agreement; or

11.1.3   any court, arbitration panel, government agency or body finds that the Licensed Products manufactured by LICENSEE are defective in any way, manner or form; or

11.1.4   the LICENSEE shall be unable to pay its debts when due, or shall make any assignment for the benefit of creditors, or shall file any petition under the bankruptcy or insolvency laws of any jurisdiction, country or place, or shall have or suffer a receiver or trustee to be appointed for its business or property, or be adjudicated a bankrupt or an insolvent; or

11.1.5   a subcontractor engages in conduct which, if engaged in by LICENSEE, would entitle LICENSOR to terminate this Agreement (however, LICENSOR will endeavor to discuss with LICENSEE what action LICENSEE must take or cause to be taken to remedy any damages to LICENSOR resulting from such subcontractor's conduct and the nature and extent of the action to be taken shall be at LICENSOR'S sole and absolute discretion); or

11.1.6   LICENSEE'S use of the Property violates the terms and conditions of this Agreement; or

11.1.7   LICENSEE fails to remit any payment due hereunder or to deliver any of the Royalty Reports, and such default shall continue without cure for a period of three (3) business days after written notice of such default is sent by LICENSOR to LICENSEE; provided however, that with respect

**EXHIBIT A PAGE 39**

to subsequent breaches under this paragraph, LICENSOR may terminate this Agreement immediately upon notice to LICENSEE.

11.2 <u>Notice of Termination and Right of Correction</u>. Except as otherwise provided herein, in the event that any of these defaults occur, LICENSOR may give written notice of termination. LICENSEE shall have twenty (20) days after the receipt of notice in which to correct the situation giving rise to the notice, or to assure to LICENSOR'S satisfaction that appropriate corrective measures are being taken. For the purposes hereof, the cessation by LICENSEE of all sales and distribution of the Licensed Products which shall have given rise to a default hereunder shall be deemed a correction of such default. Failing such satisfactory correction or assurance, this Agreement shall terminate.

11.3 <u>Exceptions to Right of Correction</u>. Notwithstanding the provisions of Section 11.2, LICENSEE shall have no right of correction in the event of:

11.3.1 willful errors or discrepancies in LICENSEE'S records as referred to in Section 6; or

11.3.2 statements or payments being late more than twice in any year during the Term; or

11.3.3 the occurrence of the same default, other than concerning statements or payments, more than twice during the Term, or during any renewal period.

## 12. **REVOCATION OF EXCLUSIVITY**

12.1 <u>Distribution Obligations</u>. LICENSEE' agrees that its failure to comply with any of the following covenants, whether or not constituting a material breach of this Agreement, shall result in LICENSOR having the special revocation rights (in its sole discretion) set forth in Section 12.2 below:

12.1.1 LICENSEE agrees to submit each Licensed Product to LICENSOR for its approval no later than the end of the fourth (4th) full calendar quarter following the Effective Date of this Agreement. Submissions may consist of flat concept art or pre-production samples.

12.1.2 Once a Licensed Product is approved by LICENSOR for production, LICENSEE shall commence manufacturing and shall distribute the Licensed Product, in commercial quantities, through its Channels of Distribution, in one (1) or more Countries (each a "<u>Target Country</u>") in the Territory, no later than the end of the second (2nd) full calendar quarter thereafter.

12.1.3 Once distribution of a Licensed Product has commenced in a Target Country, LICENSEE shall use its best efforts to continuously distribute

**EXHIBIT A PAGE 40**

the Licensed Product in such Country, in commercially reasonable quantities, and LICENSEE shall not allow a period of more than ninety (90) days to elapse during which it does not distribute the Licensed Products in commercially reasonable quantities within such Target Country.

12.1.4   LICENSEE shall assure that actual total wholesale sales shall be within 15% of the Projected Wholesale Sales targets set forth on **Schedule E**; provided, however, if at any time such total sales fall below the Projected Wholesale Sales targets by more than 15%, LICENSEE shall have two (2) full calendar quarters to cure.

12.2·   Loss of Exclusivity. If LICENSEE fails to meet any of the foregoing requirements in Section 12.1.1, 12.1.2 or 12.1.3, then upon sixty (60)-days' prior written notice, LICENSOR shall be entitled to revoke LICENSEE's exclusive right to use the Property with respect to the subject Licensed Products in the subject Target Country. If LICENSEE fails to meet the requirement in Section 12.1.4, then upon sixty (60) days' prior written notice, LICENSOR shall be entitled to revoke LICENSEE's exclusive right to use the Property for all purposes in the Territory.

13.   **EFFECT OF EXPIRATION OR TERMINATION**

13.1   Rights Revert. Upon the expiration or termination of this Agreement, all rights granted to LICENSEE hereunder shall automatically and immediately revert to LICENSOR, and LICENSEE shall have no further right to exploit or in any way deal with any Licensed Products, Collateral or related materials. Immediately upon the expiration or termination of this Agreement, LICENSEE shall at LICENSOR'S election either: (i) turn over to LICENSOR all molds, printing plates, artwork, films, silk-screens, and other materials used in the design, creation or reproduction of the Licensed Products, the Collateral or the Property; at their fully-amortized cost; or (ii) provide evidence satisfactory to LICENSOR of their destruction. In the event of any termination of this Agreement by LICENSOR, LICENSEE shall not be relieved or released from any of its obligations existing prior to such termination.

13.2   Delivery of Final Statement. LICENSEE shall within thirty (30) days after termination, deliver to LICENSOR a final statement certifying the number and description of Licensed Products on hand or in process of manufacture and make all payments due LICENSOR. LICENSOR shall have the right to conduct a physical inventory in order to ascertain such inventory or verify such statement. LICENSEE shall have the sole right of disposal of Licensed Products in the event of termination.

13.3   Payment. Any and all payments due from LICENSEE, including all prospective Guaranteed Minimum Royalties due for the full Term during which the expiration

**EXHIBIT A PAGE 41**

or termination takes place, shall be accelerated and immediately due and payable to LICENSOR, less any Royalties or advances already paid, and no portion of any prior payments shall be repayable to LICENSEE.

13.4   Delivery of Property.  Upon termination or expiration  of this Agreement, all labels, signs, packages, wrappers, cartons, circulars, advertisements and other items bearing or containing any reproduction or representation of any of the Property shall automatically and without cost to LICENSOR become the property of LICENSOR, and LICENSEE shall immediately deliver the same to LICENSOR'S place of business or any other location designated by LICENSOR. The reasonable cost of such delivery shall be paid by the LICENSEE. Alternatively, such items may be destroyed at LICENSEE'S sole cost and expense and LICENSEE shall deliver a certificate of destruction to LICENSOR promptly thereafter.

13.5   Delivery of List of Accounts.  Upon termination or expiration of this Agreement, LICENSEE shall promptly deliver to LICENSOR a copy of the most recent lists of all accounts to which it sells Licensed Products and a list of all subcontractors or manufacturers of LICENSEE.

13.6   Guaranteed Minimum Royalties.   Upon termination or expiration  of this Agreement, the total amount of outstanding Guaranteed Minimum Royalties, if any, remaining due under the Term shall become immediately due and payable, less any related Royalties or advances already paid.

13.7   Expiration Right of Disposal.

13.7.1   LICENSEE shall, within thirty (30) days after the normal expiration of the Term or any renewal, deliver to LICENSOR a final statement certifying the number and description of Licensed Products on hand or in process of manufacture and make all payments due LICENSOR. LICENSOR shall also have the right to conduct a physical inventory in order to ascertain such inventory or verify such statement.

13.7.2   After expiration of this Agreement, provided all sums due LICENSOR have first been paid, and statements due are furnished, LICENSEE may dispose of the Licensed Products, in compliance with this Agreement, which are in LICENSEE'S inventory or in process of manufacture at the time of expiration for a period of ninety (90) days after said expiration; provided further that all Royalties with respect to that disposal period are paid and statements therefor are furnished in accordance with the terms of this Agreement within thirty (30) days after the disposal period has ended.  Without limitation of the foregoing, LICENSEE shall not, without prior written consent of LICENSOR, distribute or sell any such remaining Licensed Products in a "distress sale" or to third parties for resale, or otherwise.  A "distress sale" shall mean a sale in which the

EXHIBIT A PAGE 42

merchandise is sold for less than fifty percent (50%) of its normal wholesale selling price.  At the end of the sell-off period, LICENSOR shall have the right, at its option, to purchase at cost all or any portion of the Licensed Products in License's possession or under its control.  Any Licensed Products purchased hereunder by LICENSOR shall be shipped, at LICENSEE'S expense, to LICENSOR within fifteen (15) days of such order being placed.  Any Licensed Products not purchased by LICENSOR shall be destroyed at LICENSEE'S sole cost and expense and LICENSEE shall deliver a certificate of destruction to LICENSOR promptly thereafter.

13.7.3   Any right of disposal by LICENSEE shall not prohibit LICENSOR from granting rights to others to use the Property on Licensed Product during that disposal period.

13.8   No Consequential Damages.   In no event, whether as a result of breach of contract, tort, (including the negligence of LICENSOR), strict liability, indemnity or otherwise, shall LICENSOR or the City be liable for loss of profit or revenues or for any special, incidental, consequential indirect or exemplary damages arising out of or in connection with this Agreement.

## 14.   ASSIGNABILITY

14.1   Assignment.  All rights and the license hereby granted are and shall be personal to the LICENSEE and shall not be assignable by any action of the LICENSEE or by operation of law, and any attempt at such assignment shall be null and void. Notwithstanding the foregoing, LICENSEE may engage subcontractors subject to the provisions in Section 10.2.  This Agreement may be freely assigned by LICENSOR without LICENSEE'S consent or approval.  This Agreement shall inure to the benefit of and shall be binding upon LICENSOR'S successors and assigns.

## 15.   NOTICES

15.1   Notices.  All notices and other communications which either party hereto is required or may desire to give to the other, except for payments and statements which shall be sent to the party designated by LICENSOR, e.g., Bradford, shall be given by addressing the same to the other or to Bradford at the address hereinafter set forth in this paragraph, or at such other address as may be designated in writing by any party in a notice to the other given in the manner prescribed in this paragraph.  All such notices shall be deemed given when sent so addressed by certified or registered mail, postage prepaid or by hand delivery, with proof of receipt, or by a reputable express delivery company which requires proof of receipt, such as, but not limited to, Federal Express® or Airborne.®   The addresses to which the foregoing shall be given are the following:

EXHIBIT A PAGE 43

If to LICENSOR:

Beverly Hills Chamber of Commerce
    and Civic Association
239 South Beverly Drive
Beverly Hills, California 90212
Attention: Daniel Walsh

with a copy to:

Bradford Licensing Associates
7 Oak Place, Suite 1
Montclair, NJ 07042

If to LICENSEE:

J.T. Brands, Inc.
200 Pine Avenue, Ste. 522
Long Beach California 90802
Attention: Geoffrey Thompson

With a copy to :

City of Beverly Hills
455 N. Rexford Drive
Beverly Hills, CA 90210
Attn: City Manager

16.    **<u>MISCELLANEOUS</u>**

16.1    <u>Remedy For Breach</u>.  LICENSEE acknowledges and agrees that a breach of any of the covenants, agreements or undertakings hereunder will cause LICENSOR irreparable injury which cannot be readily remedied in damages or solely by termination of this Agreement and that LICENSOR, in addition to all other legal and equitable remedies, including costs and reasonable attorneys' fees, shall have the right of injunction for any breach of this Agreement by LICENSEE.

16.2    <u>Relationship Between LICENSOR and LICENSEE</u>.  Nothing herein shall create, be deemed to create or be construed as creating any partnership, employer-employee, joint venture, or agency relationship between the parties hereto or shall be deemed to render LICENSOR or its Representatives liable for any of the debts or obligations of LICENSEE.  LICENSEE shall in no way be considered an agent or representative of LICENSOR in any dealings which LICENSEE may have with any third party and neither of the parties hereto nor any of their employees or agents shall have the power or authority to bind or obligate the other party.

16.3    <u>Survival of Provisions</u>.  The expiration or termination of this Agreement shall not affect those provisions, and the rights and obligations therein, set forth in this Agreement which either:

16.3.1    by their terms state, or evidence the intent of the parties, that the provisions survive the expiration or termination of the Agreement, or

16.3.2    must survive to give effect to the provisions of this Agreement.

16.4    <u>Entirety of Agreement; Amendment</u>.  This Agreement constitutes and contains the entire agreement of the parties hereto relating to the subject matter hereof and no oral or written statements, representations, documents, promises or any other prior materials not embodied herein shall be of any force or effect.  This Agreement

**EXHIBIT A PAGE 44**

cannot be amended, altered or modified except by a written instrument executed by both parties hereto.  Once so executed, such amendments shall become an integral part of this Agreement, subject to all the terms and conditions herein and shall have full force and effect.

16.5     <u>No Waiver</u>.  The failure or delay of LICENSOR to exercise its rights under this Agreement or to complain of any act, omission or default on the part of LICENSEE, no matter how long the same may continue, or to insist upon a strict performance of any of the terms or provisions herein, shall not be deemed or construed to be a waiver by LICENSOR of its rights under this Agreement or a waiver of any subsequent breach or default of the terms or provisions of this Agreement.

16.6     <u>Ownership</u>.  Neither this Agreement nor any act or omission by LICENSOR, nor any use by LICENSEE of the Property in connection with the Licensed Products shall in any way confer or imply a grant of rights, title or interest thereto, or to any element or portion thereof or any other rights, including, without limitation, copyrights, trademarks, trade names, service marks or goodwill associated therewith, the ownership of which shall be and at the times remain solely and exclusively with the City.  The City reserves all rights now known or hereafter devised in and to the Property, the City's copyrights and trademarks including but not limited to the City's name and logo throughout the universe in perpetuity to the extent it owns or controls such rights.  No use by LICENSOR or the City of the Property in any media or manner shall be deemed by LICENSEE to interfere with the limited grant made to it by LICENSOR pursuant hereto.

16.7     <u>LICENSOR'S Claims</u>.     Whatever claim LICENSOR may have against LICENSEE hereunder for Royalties, Advances, and/or Guarantee Minimum Royalties, upon the expiration or early termination of this Agreement, as well as for damages, shall become a first lien upon all Licensed Products manufactured or produced pursuant to the terms of this Agreement and in the possession or under the control of LICENSEE or any related companies.

16.8     <u>Headings</u>.  The headings as to contents of particular provisions herein are inserted only for convenience and are in no way to be construed as part of this Agreement or as a modification of the scope of any terms or provisions of this Agreement.

16.9     <u>Governing Law</u>.

16.9.1     This Agreement, its validity, construction and effect, shall be governed and construed in accordance with the laws of the State of California, without reference to its conflicts of laws principles.  All disputes under this Agreement shall be resolved by the courts of the State of California, including the United States District Court for the Central District of California, and the parties consent to the jurisdiction of such courts,

**EXHIBIT A PAGE 45**

agree to accept service of process by mail, and hereby waive any jurisdiction or venue defenses otherwise available to them.

16.9.2   Nothing in this Agreement is intended to be contrary to the laws of any country or political sub-division thereof. In the event that any of the paragraphs or particular terms or conditions set forth herein are held to be unenforceable by a court of record with competent jurisdiction, such paragraph or particular term of condition therein shall be deemed to modified to the extent required within the jurisdiction of such Court and the Agreement shall otherwise remain in full force and effect in such jurisdiction and in its entirety in other jurisdictions.

16.9.3   While any action relating to this Agreement is pending, LICENSEE shall remain obligated to continue to pay Royalties as provided herein.

16.10   Clearances.   Notwithstanding any rights granted by LICENSOR herein with respect to the Property, LICENSEE shall be solely responsible for obtaining all consents and permissions necessary in connection with the activities contemplated hereby including, without limitation, all permissions from copyright owners of all photographs, images, illustrations, stills, sound recordings, audio visual recordings and/or artwork used in the advertising, sale or distribution of the Licensed Products and all persons appearing therein, whether depicting the Property or otherwise.

16.11   Attorney Fees.   In the event of any dispute between the parties arising out of the subject matter of this Agreement, the out-of-pocket costs, expenses and attorneys' fees of the prevailing party incurred in resolving, settling or litigating the dispute shall be paid by the other party in addition to any other relief or damages to which the prevailing party may be entitled.

16.12   Counterparts.   This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same Agreement.

**EXHIBIT A PAGE 46**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first set forth hereinabove.

("LICENSOR")

BEVERLY HILLS CHAMBER OF COMMERCE
AND CIVIC ASSOCIATION

By: _____
Name:  Daniel Walsh
Title: Executive Director

By:_____

[signatures continued]

**EXHIBIT A PAGE 47**

("LICENSEE")

JT BRANDS, INC.

By: _____
     Name: Geoffrey Thompson
     Title: President

By: _____
     Name:   JB TRUSCELLO
     Title:  Secretary

[signatures continued]

EXHIBIT A PAGE 48

APPROVED:

CITY OF BEVERLY HILLS

By: _~Maxwell~_
Name: ALISON MAXWELL
Title: Director Economic Development.

BRADFORD LICENSING ASSOCIATES

Name: MICHELLE MINIERI
Title: PRESIDENT

<u>Schedule A</u>

<u>Property</u>

The *Beverly Hills Shield Design*® as set forth in the following trademark applications owned by the City:

<u>United States</u>:
U.S. Trademark Application Serial No. 77/440,601
U.S. Trademark Application Serial No. 77/440,612
U.S. Trademark Application Serial No. 77/443,084

<u>Singapore</u>:

Singapore Trademark Application No. 2007-78890

<u>European Community</u>:

European Community Application No. 006898852
European Community Application No. 006898282



**EXHIBIT A PAGE 50**

Schedule B

Licensed Products

All International Class 3 Products, including fragrance, bath and body care, advanced skincare, haircare, toiletries and cosmetics, to be packaged individually or as gift sets, more specifically described as: perfume such as *eau de parfum*, *eau de toilette*, pure perfume; body and bath care such as shower gels, soaps, body creams, body lotions, body scrubs, body powders, deodorants, hand creams, bath and massage oils, aroma therapy products, candles (nonexclusive); scented wipes; hair care products such as shampoo, conditioner, sculpting products, hair repair; skincare products such as creams, anti-aging skincare, clear skin and pigmentation products; cosmetics and toiletries such as color make-up.

**EXHIBIT A PAGE 51**

Schedule C

Territory and Channels of Distribution

1.      **Territory**.  The Territory shall be worldwide.

2.      **Channels of Distribution**.  The Channels of Distribution, which shall be those market(s) in which LICENSEE is authorized to sell and/or distribute the Licensed Products directly or through its authorized wholesalers, representatives and/or distributors for eventual resale to the consumer, shall be:  (1) high-end department stores, as this term is customarily used in the industry (*e.g.,* Nordstroms, Neiman Marcus, Bloomingdales); (2) specialty and boutique stores (*e.g.,* Sephora, Anthropologie); and (3) online distribution at price points consistent with in-store price points.  If the City or LICENSOR creates a "city store" (online, stand-alone, or store within a store), the Licensed Products under this Agreement shall be eligible for sale at such location.

**EXHIBIT A PAGE 52**

Schedule D

Performance Schedule

**EXHIBIT A PAGE 53**

**Schedule D**

**BH SHIELD - Sales By Territory**
**2009 - 2011**

Revised 6/26/08

**Territories**      Estimated Sales

| Priority One | | Year 1* | Year 2* | Year 3* |
|---|---|---|---|---|
| USA | | 600000 | 1000000 | 2000000 |
| | | | | |
| **International** | | | | |
| UAE | | 337500 | 370000 | 400000 |
| JAPAN | | 200000 | 250000 | 300000 |
| SINGAPORE | | 150000 | 200000 | 250000 |
| UK / IRELAND | | | | 35000 |
| SAUDI ARABIA | | 150000 | 180000 | 200000 |
| EU | | | | |
| | Germany | 50000 | 100000 | 220000 |
| | France | 50000 | 100000 | 220000 |
| | Spain | | | 60000 |
| CANADA | | | | 35000 |
| MEXICO | | 150000 | 200000 | 250000 |
| | Total | 1087500 | 1400000 | 1900000 |

| Priority Two | | | | |
|---|---|---|---|---|
| ITALY | | | | 35000 |
| GREECE | | | | 35000 |
| TURKEY | | | | 35000 |
| SCANDINAVIA | | | | 35000 |
| SWITZERLAND | | | | 35000 |
| HOLLAND | | | | 35000 |
| CARIBBEAN | | | | 35000 |
| SOUTH KOREA | | | | 50000 |
| INDONESIA | | | | 100000 |
| PHILLIPINES | | | | 120000 |
| CHINA | | | | 100000 |
| RUSSIA | | | | 200000 |
| UKRAINE | | | | 50000 |
| INDIA | | | | 100000 |
| KUWAIT | | | | 80000 |
| BAHRAIN | | | | 50000 |
| QATAR | | | | 10000 |
| LEBANON | | | | 20000 |
| ISRAEL | | | | 100000 |
| VIETNAM | | | | 100000 |
| HONG KONG | | | | 100000 |
| LATVIA/LITHUANIA/ESTONIA | | | | 50000 |
| | Total | | | 1265000 |

| Priority Three | | | | |
|---|---|---|---|---|
| SOUTH AMERICA | | | | 50000 |
| CENTRAL AMERICA | | | | 50000 |
| CIS STATES | | | | 35000 |
| SOUTH AFRICA | | | | 35000 |
| AFRICA | | | | 35000 |
| MALAYSIA | | | | 35000 |
| TAIWAN | | | | 35000 |
| PANAMA | | | | 20000 |
| | Total | | | 295000 |

| | Total all International | 1087500 | 1400000 | 3460000 |
|---|---|---|---|---|
| TOTAL | | | | |

* Year 1 shall begin on January 1, 2009 and each subsequent year shall begin on January 1 of that year

**EXHIBIT A PAGE 54**

<u>Schedule E</u>

<u>Royalties</u>
<u>and Projected Wholesale Sales</u>

**EXHIBIT A PAGE 55**

**SCHEDULE E**

| Royalty Rate Sliding Scale | | |
|---|---|---|
| Total Wholesale Sales | Royalty Rate | Projected Slide Quarter |
| $0 - $2,999,999 | 6% | n/a |
| $3,000,000 - $14,999,999 | 5% | Q3 2010 |
| $15,000,000 + | 4% | Q4 2012 |

**Year 1**
**May 1, 2008 - December 31, 2009**
**Projected Wholesale (WS) Sales: $1,687,500**

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|
| Q3 2008 | n/a | n/a | $12,656.25 (ADVANCE) | n/a |
| Q4 2008 | n/a | n/a | $12,656.25 (ADVANCE) | n/a |
| Q1 2009 | $ 421,875.00 | 6% | n/a | $ 421,875 |
| Q2 2009 | $ 421,875.00 | 6% | $ 25,312.50 | $ 843,750 |
| Q3 2009 | $ 421,875.00 | 6% | $ 25,312.50 | $ 1,265,625 |
| Q4 2009 | $ 421,875.00 | 6% | $ 25,312.50 | $ 1,687,500 |

| Year 1 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| Upon Execution | n/a | $ 12,656.25 |
| 1-Oct-08 | n/a | $ 12,656.25 |
| 1-Apr-09 | Q1 2009 | $ 25,312.50 |
| 1-Jul-09 | Q2 2009 | $ 25,312.50 |
| 1-Oct-09 | Q3 2009 | $ 25,312.50 |
| Total Guarantee Paid Year 1: | | $ 101,250 |
| Total Guarantee Paid Term to Date: $101,250 | | |

**Year 2**
**January 1, 2010 - December 31, 2010**
**Projected Wholesale Sales: $2,500,000**

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|
| Q1 2010 | $ 625,000 | 6% | $ 37,500 | $ 2,312,500 |
| Q2 2010 | $ 625,000 | 6% | $ 37,500 | $ 2,937,500 |
| Q3 2010 | $ 625,000 | 5% | $ 31,250 | $ 3,562,500 |
| Q4 2010 | $ 625,000 | 5% | $ 31,250 | $ 4,187,500 |

| Year 2 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| 1-Jan-10 | Q4 2009 | $ 25,312.50 |
| 1-Apr-10 | Q1 2010 | $ 37,500 |
| 1-Jul-10 | Q2 2010 | $ 37,500 |
| 1-Oct-10 | Q3 2010 | $ 31,250 |
| Total Guarantee Paid Year 2: | | $ 131,562.50 |
| Total Guarantee Paid Term to Date: $232,812.50 | | |

**EXHIBIT A PAGE 56**

**Year 3**
**January 1, 2011 - December 31, 2011**
**Projected Wholesale Sales: $5,500,000**

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|
| Q1 2011 | $ 1,375,000 | 5% | $ 68,750 | $ 5,562,500 |
| Q2 2011 | $ 1,375,000 | 5% | $ 68,750 | $ 6,937,500 |
| Q3 2011 | $ 1,375,000 | 5% | $ 68,750 | $ 8,312,500 |
| Q4 2011 | $ 1,375,000 | 5% | $ 68,750 | $ 9,687,500 |

| Year 3 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| 1-Jan-11 | Q4 2010 | $ 31,250 |
| 1-Apr-11 | Q1 2011 | $ 68,750 |
| 1-Jul-11 | Q2 2011 | $ 68,750 |
| 1-Oct-11 | Q3 2011 | $ 68,750 |
| Total Guarantee Paid Year 3: | | $ 237,500.00 |
| Total Guarantee Paid Term to Date: $470,312.50 | | |

**Year 4**
**January 1, 2012 - December 31, 2012**
**Projected Wholesale Sales: $7,500,000**

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|
| Q1 2012 | $ 1,875,000 | 5% | $ 93,750 | $ 11,562,500 |
| Q2 2012 | $ 1,875,000 | 5% | $ 93,750 | $ 13,437,500 |
| Q3 2012 | $ 1,875,000 | 5% | $ 93,750 | $ 15,312,500 |
| Q4 2012 | $ 1,875,000 | 4% | $ 75,000 | $ 17,187,500 |

| Year 4 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| 1-Jan-12 | Q4 2011 | $ 68,750 |
| 1-Apr-12 | Q1 2012 | $ 93,750 |
| 1-Jul-12 | Q2 2012 | $ 93,750 |
| 1-Oct-12 | Q3 2012 | $ 93,750 |
| Total Guarantee Paid Year 4: | | $ 350,000 |
| Total Guarantee Paid to Date: $820,312.50 | | |

**Year 5**
**January 1, 2013 - December 31, 2013**
**Projected Wholesale Sales: $10,000,000**

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|
| Q1 2013 | $ 2,500,000 | 4% | $ 100,000 | $ 19,687,500 |
| Q2 2013 | $ 2,500,000 | 4% | $ 100,000 | $ 22,187,500 |
| Q3 2013 | $ 2,500,000 | 4% | $ 100,000 | $ 24,687,500 |
| Q4 2013 | $ 2,500,000 | 4% | $ 100,000 | $ 27,187,500 |

| Year 5 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| 1-Jan-13 | Q4 2012 | $ 75,000 |
| 1-Apr-13 | Q1 2013 | $ 100,000 |
| 1-Jul-13 | Q2 2014 | $ 100,000 |
| 1-Oct-13 | Q3 2014 | $ 100,000 |
| 1-Jan-14 | Q4 2014 | $ 100,000 |
| Total Guarantee Paid Year 5: | | $ 475,000 |
| Total Guarantee Paid to Date: $1,295,312.50 | | |

<u>Schedule F</u>

<u>Royalty Report</u>

Licensee:                                                          Date:
Address:                                                          For the Period Ending:


Licensing Program:


List All Products (list by Country)                    _____

Net Shipments by Unit (Itemize by Licensed Product):    _____

Net Wholesale Sales (Itemize by Licensed Product):    _____

Total (all Licensed Products) Net Wholesale Sales:    _____

**<u>Combined Net $ Sales for all Countries</u>:**    _____

Royalty Rate %:                                        _____

Total Royalties Due:                                   _____

Guaranteed Minimum Royalties Due:                     _____

Minimum Royalties Already Paid                        _____

**TOTAL PAYMENT DUE:**                                 _____

State Advertising Expenditures (by Product):          _____

By:_____

Name:_____

Title:_____

Original statement and corresponding back up report, plus check made payable to:

Mail to:          Bradford Licensing Associates
                  7 Oak Place, Suite 1
                  Montclair, NJ  07042
                  Attn:  Sabrina Puleo
                  973-509-0200

**EXHIBIT A PAGE 58**

# AMENDMENT OF LICENSE AGREEMENT

**THIS AMENDMENT AGREEMENT** effective as of this 1st day of September 2009, by and between the Beverly Hills Chamber of Commerce and Civic Association, a corporation of the State of California, with its principal place of business at 239 South Beverly Drive, Beverly Hills, California 90212, (hereinafter referred to as ("LICENSOR") and J.T. Brands, Inc., a corporation of California, with its principal place of business at 200 Pine Avenue, Long Beach California (hereinafter referred to as "LICENSEE").

**WHEREAS** LICENSOR, the owner and licensed rights holder, and LICENSEE are parties to a certain License Agreement dated May 1st, 2009, wish to amend said Agreement in certain respects without modifying, changing, or otherwise amending any other provisions of said Agreement, and therefore the parties agree as follows:

- EXHIBIT A: DEAL TERM SHEET TO BE AMENDED AS PER ATTACHEMENT.

**IN WITNESS WHEREOF,** the parties hereto have executed this Amendment Agreement effective as of the date and year first set forth herein above.

**Beverly Hills Chamber of Commerce and Civic Association ("LICENSOR")**

Signature:
Name: Daniel Walsh
Title: Executive Director

**City of Beverly Hills**

Signature:
Name: Alison Maxwell
Title: Director of Economic Development

**JT Brands, Inc. ("LICENSEE")**

Signature:
Name: Geoffrey Thompson
Title: President

**Bradford Licensing, LLC ("Bradford")**

Signature:
Name: Michelle Minieri
Title: President

1 | *AMENDMENT OF LICENSE AGEEMENT 2009*

**EXHIBIT A PAGE 59**

Ex. E   Aveluard Bl

## BEVERLY HILLS SHEILD - JT BRANDS DEAL TERMS

*Terms indicate the following assumptions:
Registration costs absorbed by Client
Worldwide availability of Marks in Int'l Class 3
Timely approvals

**Royalty Rate Sliding Scale**

| Total Wholesale Sales | Royalty Rate | Projected Slide Quarter |
|---|---|---|
| $0 - $2,999,999 | 6% | n/a |
| $3,000,000 - $14,999,999 | 5% | Q3 2010 |
| $15,000,000 + | 4% | Q4 2012 |

**Year 1**
July 1, 2008 - December 31, 2009
Projected Wholesale (WS) Sales: n/a

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|
| Q3 2008 | n/a | n/a | $12,656.25 (ADVANCE) | n/a |
| Q4 2008 | n/a | n/a | $12,656.25 (ADVANCE) | n/a |
| Q1 2009 | n/a | 6% | 12656.25 | n/a |
| Q2 2009 | n/a | 6% | $ 18,984.36 | n/a |
| Q3 2009 | n/a | 6% | $ 25,312.50 | n/a |
| Q4 2009 | n/a | 6% | $ 25,312.50 | $ |

**Year 1 Payment Schedule**

| Payment Due Date | For Selling Quarter | Amount |
|---|---|---|
| Upon Execution | n/a | $ 12,656.25 |
| 1-Oct-08 | n/a | $ 12,656.25 |
| 1-Apr-09 | Q1 2009 | $ 12,656.25 |
| 1-Jul-09 | Q2 2009 | $ 18,984.36 |
| 1-Oct-09 | Q3 2009 | $ 25,312.50 |
| Total Guarantee Paid Year 1: | | $ 82,266 |
| Total Guarantee Paid Term to Date: | | $ 82,266 |



**Year 2**
**January 1, 2010 - December 31, 2010**
Projected Wholesale Sales:      $      1,749,219

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|
| Q1 2010 | $ 210,938 | 6% | $ (12656.25) | $ 210,938 |
| Q2 2010 | $ 316,406 | 6% | $ (18984.36) | $ 527,344 |
| Q3 2010 | $ 421,875 | 6% | $ 25312.50 | $ 949,219 |
| Q4 2010 | $ 800,000 | 6% | $ 48000.00 | $ 1,749,219 |

**Year 2 Payment Schedule**

| Payment Due Date | For Selling Quarter | Amount |
|---|---|---|
| 1-Jan-10 | Q4 2009 | 25312.50 |
| 1-Apr-10 | Q1 2010 | 25312.50 |
| 1-Jul-10 | Q2 2010 | 25312.50 |
| 1-Oct-10 | Q3 2010 | 25312.50 |
| Total Guarantee Paid Year 2: | | $ 101,250.00 |
| Total Guarantee Paid Term to Date: | | 183,515.61 |

**Year 3**
**January 1, 2011 - December 31, 2011**
Projected Wholesale Sales:      $      4,400,000

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|
| Q1 2011 | $ 800,000 | 6% | $ 48,000 | $ 2,549,219 |
| Q2 2011 | $ 1,000,000 | 5% | $ 50,000 | $ 3,549,219 |
| Q3 2011 | $ 1,200,000 | 5% | $ 60,000 | $ 4,749,219 |
| Q4 2011 | $ 1,400,000 | 5% | $ 70,000 | $ 6,149,219 |

**Year 3 Payment Schedule**

| Payment Due Date | For Selling Quarter | Amount |
|---|---|---|
| 1-Jan-11 | Q4 2010 | $ 48,000 |



**EXHIBIT A PAGE 61**

| | | |
|---|---|---|
| 1-Apr-11 | Q1 2011 | $ 48,000 |
| 1-Jul-11 | Q2 2011 | $ 50,000 |
| 1-Oct-11 | Q3 2011 | $ 60,000 |
| Total Guarantee Paid Year 3: | | $ 206,000.00 |
| Total Guarantee Paid Term to Date: | | $ 389,515.61 |

## Year 4
### January 1, 2012 - December 31, 2012
Projected Wholesale Sales: $ 7,000,000

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|
| Q1 2012 | $ 1,400,000 | 5% | $ 70,000 | $ 7,549,219 |
| Q2 2012 | $ 1,600,000 | 5% | $ 80,000 | $ 9,149,219 |
| Q3 2012 | $ 1,800,000 | 5% | $ 90,000 | $ 10,949,219 |
| Q4 2012 | $ 2,200,000 | 5% | $ 110,000 | $ 13,149,219 |

### Year 4 Payment Schedule

| Payment Due Date | For Selling Quarter | Amount |
|---|---|---|
| 1-Jan-12 | Q4 2011 | $ 70,000 |
| 1-Apr-12 | Q1 2012 | $ 70,000 |
| 1-Jul-12 | Q2 2012 | $ 80,000 |
| 1-Oct-12 | Q3 2012 | $ 90,000 |
| Total Guarantee Paid Year 4: | | $ 310,000 |
| Total Guarantee Paid Term to Date: | | $ 699,515.61 |

## Year 5
### January 1, 2013 - December 31, 2013
Projected Wholesale Sales: $ 10,200,000

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|
| Q1 2013 | $ 2,100,000 | 4% | $ 103,604 | $ 15,249,219 |
| Q2 2013 | $ 2,400,000 | 4% | $ 115,604 | $ 17,649,219 |

**EXHIBIT A PAGE 62**

| Q3 2013 | $ | | 2,700,000 | 4% | $ | $ 127,604 | $ | 20,349,219 |
| Q4 2013 | $ | | 3,000,000 | 4% | $ | $ 120,000 | $ | 23,349,219 |

**Year 5 Payment Schedule**

| Payment Due Date | For Selling Quarter | Amount |
|---|---|---|
| 1-Jan-13 | Q4 2012 | $ 110,000 |
| 1-Apr-13 | Q1 2013 | $ 103,604 |
| 1-Jul-13 | Q2 2013 | $ 115,604 |
| 1-Oct-13 | Q3 2013 | $ 127,604 |
| 1-Jan-14 | Q4 2013 | $ 120,000 |
| **Total Guarantee Paid Year 5:** | | **$ 576,812** |
| **Total Guarantee Paid to Date:** | | **1,276,327.61** |



**EXHIBIT A PAGE 63**

**Schedule D**

**BH SHIELD - Sales by Territory**
**2009 - 2011**
2010 - 2012
**Territories**                                  Revised 6/26/08

Estimated Sales

| | | Year 1* | Year 2* | Year 3* |
|---|---|---|---|---|
| **Priority One** | | | | |
| USA | | 600000 | 1000000 | 2000000 |
| | | | | |
| **International** | | | | |
| UAE | | 337500 | 370000 | 400000 |
| JAPAN | | 200000 | 250000 | 300000 |
| SINGAPORE | | 150000 | 200000 | 250000 |
| UK / IRELAND | | | | |
| SAUDI ARABIA | | 150000 | 180000 | 200000 |
| EU | | | | |
| | Germany | 50000 | 100000 | 220000 |
| | France | 50000 | 100000 | 220000 |
| | Spain | | | 60000 |
| CANADA | | | | |
| MEXICO | | 150000 | 200000 | 250000 |
| | Total | 1087500 | 1400000 | 1900000 |
| | | | | |
| **Priority Two** | | | | |
| ITALY | | | | 35000 |
| GREECE | | | | 35000 |
| TURKEY | | | | 35000 |
| SCANDINAVIA | | | | 35000 |
| SWITZERLAND | | | | 35000 |
| HOLLAND | | | | 35000 |
| CARIBBEAN | | | | 35000 |
| SOUTH KOREA | | | | 50000 |
| INDONESIA | | | | 100000 |
| PHILLIPINES | | | | 120000 |
| CHINA | | | | 100000 |
| RUSSIA | | | | 200000 |
| UKRAINE | | | | 50000 |
| INDIA | | | | 100000 |
| KUWAIT | | | | 80000 |
| BAHRAIN | | | | 50000 |
| QATAR | | | | 10000 |
| LEBANON | | | | 20000 |
| ISRAEL | | | | 100000 |
| VIETNAM | | | | 100000 |
| HONG KONG | | | | 100000 |
| LATVIA/LITHUANIA/ESTONIA | | | | 50000 |
| | Total | | | 1265000 |
| | | | | |
| **Priority Three** | | | | |
| SOUTH AMERICA | | | | 50000 |
| CENTRAL AMERICA | | | | 50000 |
| CIS STATES | | | | 35000 |
| SOUTH AFRICA | | | | 35000 |
| AFRICA | | | | 35000 |
| MALAYSIA | | | | 35000 |
| TAIWAN | | | | 35000 |
| PANAMA | | | | 20000 |
| | Total | | | 295000 |
| | | | | |
| | Total all International | 1087500 | 1400000 | 3460000 |
| TOTAL | | | | |

* Year 1 shall begin on January 1, 2009 and each subsequent year shall begin on January 1 of that year



**EXHIBIT A PAGE 64**

## AMENDMENT NO 2 TO LICENSE AGREEMENT

This Amendment No 2 is hereby entered into this 18th of October 2010 ("effective date") to that certain license agreement between the Beverly Hills Chamber of Commerce and Civic Association, a corporation of the State of California, with its principal place of business at 239 South Beverly Drive, Beverly Hills, California, 90212 (hereinafter referred to as "LICENSOR") and J.T. Brands, Inc., a corporation of California, with its principal place of business at 200 Pine Avenue, Long Beach, California (hereinafter referred to as "LICENSEE") entered into on June 26, 2008 as amended on September 1, 2009 (collectively the "License Agreement").

WHEREAS, LICENSOR, the licensed rights holder for the BEVERLY HILLS SHIELD DESIGN trademark pursuant to an agreement with the City of Beverly Hills;

WHEREAS, LICENSOR and LICENSEE are parties to a certain License Agreement and wish to amend said License Agreement in certain respects without modifying, changing or otherwise amending any other provisions of said License Agreement;

NOW THEREFORE, in consideration of the foregoing recitals and the mutual promises and undertakings contained herein and for other good and valuable consideration, the adequacy of which is hereby acknowledged, the parties, each intending to be legally bound hereby, hereby promise and mutually agree as follows:

Section 1.    Section 3.1 ("Term") of the License Agreement shall be amended to read as follows:

"The term ("Term") of this Agreement shall commence on June 1, 2008 and shall terminate on December 31, 2014 ("Termination Date"), unless sooner terminated in accordance with the provisions of this Agreement."

Section 2.    Schedule E ("Royalties and Projected Wholesale Sales") attached to the License Agreement is hereby amended and replaced with a new Schedule E as attached to this Amendment No. 2 to the License Agreement as Attachment 1.

Section 3.    This Amendment No. 2 to the License Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof.   There are no agreements or understandings between the Parties and no representations by either Party to the other as an inducement to enter into this Amendment No. 2 to the License Agreement, except as may be expressly set forth herein.

Section 4.    If any party should bring any legal action or proceeding relating to this Amendment No. 2 to the License Agreement (including, without limitation, any action or proceeding to interpret or enforce any provision hereof), the party in whose favor a judgment or decision is rendered shall be entitled to recover reasonable attorneys' fees and expenses from the other.   The parties agree that any legal action or proceeding or agreed-upon arbitration or mediation shall be filed in and shall occur in the County of Los Angeles.

Section 5.    The laws of the State of California shall govern this Amendment No. 2 to the License Agreement.

B0785-0001\1174813v1.doc

**EXHIBIT A PAGE 65**

Section 6.    Except as specifically amended by this Amendment No. 2 to the License Agreement, the terms set forth in the License Agreement shall remain in full force and effect. Unless otherwise amended herein, capitalized terms used in this Amendment No. 2 to the License Agreement but not defined shall have the meaning ascribed thereto in the License Agreement.

Section 7.    This Amendment No. 2 to the License Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the Parties have executed this Amendment No. 2 to the License Agreement as of the day and year first written above.

("LICENSOR")

BEVERLY HILLS CHAMBER OF COMMERCE
AND CIVIC ASSOCIATION

By: _____
Name: Daniel Walsh     TODD SOHIVSON
Title: Executive Director    CHAIRMAN

By: _____

("LICENSEE")

JT BRANDS, INC.

By: _____
Name: Geoffrey Thompson
Title: President

By: _____
Name:
Title: Secretary

B0785-0001\1174813v1.doc

**EXHIBIT A PAGE 66**

APPROVED:

CITY OF BEVERLY HILLS

By: _Cheryl Frieding_
    Name: Cheryl Frielding
    Title: Deputy City Manager, Public Affairs

BRADFORD LICENSING ASSOCIATES

_Michelle Minieri_
Name: Michelle Minieri
Title: President

**EXHIBIT A PAGE 67**

**ATTACHMENT 1**

B0785-0001\1174813v1.doc

**EXHIBIT A PAGE 68**

## EXHIBIT E    BEVERLY HILLS SHIELD - JT BRANDS DEAL TERMS

**Terms indicate the following assumptions:
Registration costs absorbed by Client
Worldwide availability of Marks in Int'l Class 3
Timely approvals

### Royalty Rate Sliding Scale

| Total Wholesale Sales | Royalty Rate | Projected Slide Quarter |
|---|---|---|
| $0 - $2,999,999 | 6% | n/a |
| $3,000,000 - $14,999,999 | 5% | Q1 2012 |
| $15,000,000 + | 4% | Q3 2013 |

### Year 1
July 1, 2008 - December 31, 2009
Projected Wholesale (WS) Sales: n/a

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Payment Due Date | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|---|
| Q3 2008 | n/a | n/a | Upon Signing | $12,656.25 (ADVANCE) | n/a |
| Q4 2008 | n/a | n/a | 1-Oct-08 | $12,656.25 (ADVANCE) | n/a |
| Q1 2009 | n/a | 6% | 1-Apr-09 | $ 12,656.25 | n/a |
| Q2 2009 | n/a | 6% | 1-Jul-09 | $ 18,984.36 | n/a |
| Q3 2009 | n/a | 6% | 1-Oct-09 | $ 25,312.50 | n/a |
| Q4 2009 | n/a | 6% | 1-Jan-10 | $ 25,312.50 | n/a |

### Year 1 Payment Schedule

| Payment Due Date | For Selling Quarter | Amount |
|---|---|---|
| Upon Execution | n/a | $ 12,656.25 |
| 1-Oct-08 | n/a | $ 12,656.25 |
| 1-Apr-09 | Q1 2009 | $ 12,656.25 |
| 1-Jul-09 | Q2 2009 | $ 18,984.36 |
| 1-Oct-09 | Q3 2009 | $ 25,312.50 |
| Total Guarantee Paid Year 1: | | $ 82,266 |
| Total Guarantee Paid Term to Date: | | $ 82,266 |

### Year 2
January 1, 2010 - December 31, 2010
Projected Wholesale Sales: $ 755,207

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Payment Due Date | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|---|
| Q1 2010 | $ 421,875 | 6% | 1-Apr-10 | $ 25,313 | $ 421,875 |
| Q2 2010 | $ 83,333 | 6% | 1-Jul-10 | $ 5,000 | $ 505,208 |
| Q3 2010 | $ 83,333 | 6% | 1-Oct-10 | $ 5,000 | $ 588,541 |
| Q4 2010 | $ 166,666 | 6% | 1-Jan-11 | $ 10,000 | $ 755,207 |

### Year 2 Payment Schedule

| Payment Due Date | For Selling Quarter | Amount |
|---|---|---|
| 1-Jan-10 | Q4 2009 | $25,312.50 |
| 1-Apr-10 | Q1 2010 | $25,312.50 |
| 1-Jul-10 | Q2 2010 | $5,000.00 |
| 1-Oct-10 | Q3 2010 | $5,000.00 |
| Total Guarantee Paid Year 2: | | $60,625.00 |
| Total Guarantee Paid Term to Date: | | $142,890.61 |

### Year 3
January 1, 2011 - December 31, 2011
Projected Wholesale Sales: $ 1,747,717



| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Payment Due Date | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|---|
| Q1 2011 | $ 210,933 | 6% | 1-Apr-11 | $ 12,656 | $ 966,140 |
| Q2 2011 | $ 314,900 | 6% | 1-Jul-11 | $ 18,894 | $ 1,281,040 |
| Q3 2011 | $ 421,883 | 6% | 1-Oct-11 | $ 25,313 | $ 1,702,924 |
| Q4 2011 | $ 800,000 | 6% | 1-Jan-12 | $ 48,000 | $ 2,502,924 |

**Year 3 Payment Schedule**

| Payment Due Date | For Selling Quarter | Amount |
|---|---|---|
| 1-Jan-11 | Q4 2010 | $ 10,000 |
| 1-Apr-11 | Q1 2011 | $ 12,656 |
| 1-Jul-11 | Q2 2011 | $ 18,894 |
| 1-Oct-11 | Q3 2011 | $ 25,313 |
| Total Guarantee Paid Year 3: | | $ 66,863.00 |
| Total Guarantee Paid Term to Date: | | 209,753.61 |

**EXHIBIT A PAGE 70**

## Year 4
### January 1, 2012 - December 31, 2012
Projected Wholesale Sales: $ 4,800,000

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Payment Due Date | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|---|
| Q1 2012 | $ 900,000 | 5% | 1-Apr-12 | $ 45,000 | $ 3,402,924 |
| Q2 2012 | $ 1,100,000 | 5% | 1-Jul-12 | $ 55,000 | $ 4,502,924 |
| Q3 2012 | $ 1,100,000 | 5% | 1-Oct-12 | $ 55,000 | $ 5,602,924 |
| Q4 2012 | $ 1,700,000 | 5% | 1-Jan-13 | $ 85,000 | $ 7,302,924 |

**Year 4 Payment Schedule**

| Payment Due Date | For Selling Quarter | Amount |
|---|---|---|
| 1-Jan-12 | Q4 2011 | $ 48,000 |
| 1-Apr-12 | Q1 2012 | $ 45,000 |
| 1-Jul-12 | Q2 2012 | $ 55,000 |
| 1-Oct-12 | Q3 2012 | $ 55,000 |
| Total Guarantee Paid Year 4: | | $ 203,000 |
| Total Guarantee Paid Term to Date: | | $ 412,753.61 |

## Year 5
### January 1, 2013 - December 31, 2013
Projected Wholesale Sales: $ 12,229,925

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Payment Due Date | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|---|
| Q1 2013 | $ 2,300,000 | 5% | 1-Apr-13 | $ 115,000 | $ 9,602,924 |
| Q2 2013 | $ 2,700,000 | 5% | 1-Jul-13 | $ 135,000 | $ 12,302,924 |
| Q3 2013 | $ 3,375,000 | 4% | 1-Oct-13 | $ 135,000 | $ 15,677,924 |
| Q4 2013 | $ 3,854,925 | 4% | 1-Jan-14 | $ 154,197 | $ 19,532,849 |

**Year 5 Payment Schedule**

| Payment Due Date | For Selling Quarter | Amount |
|---|---|---|
| 1-Jan-13 | Q4 2012 | $ 85,000 |
| 1-Apr-13 | Q1 2013 | $ 115,000 |
| 1-Jul-13 | Q2 2013 | $ 135,000 |
| 1-Oct-13 | Q3 2013 | $ 135,000 |
| Total Guarantee Paid Year 5: | | $ 470,000 |
| Total Guarantee Paid to Date: | | $ 882,753.61 |

## Year 6
### January 1, 2014 - January 15, 2015
Projected Wholesale Sales: $ 15,984,500

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Payment Due Date | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|---|
| Q1 2013 | $ 3,996,125 | 4% | 1-Apr-14 | $ 159,845 | $ 23,528,974 |
| Q2 2013 | $ 3,996,125 | 4% | 1-Jul-14 | $ 159,845 | $ 27,525,099 |
| Q3 2013 | $ 3,996,125 | 4% | 1-Oct-14 | $ 159,845 | $ 31,521,224 |
| Q4 2013 | $ 3,996,125 | 4% | 1-Jan-15 | $ 159,845 | $ 35,517,349 |

**Year 6 Payment Schedule**

| Payment Due Date | For Selling Quarter | Amount |
|---|---|---|
| 1-Jan-14 | Q4 2013 | $ 154,197 |
| 1-Apr-14 | Q1 2014 | $ 159,845 |
| 1-Jul-14 | Q2 2014 | $ 159,845 |

| | | |
|---|---|---|
| 1-Oct-14 | Q3 2014 | $ 159,845 |
| 1-Jan-15 | Q4 2014 | $ 159,845 |
| Total Guarantee Paid Year 6: | | $ 793,577 |
| Total Guarantee Paid to Date: | | 1,676,330.61 |

# EXHIBIT B

# LICENSE AGREEMENT

# BETWEEN

# THE BEVERLY HILLS CHAMBER OF COMMERCE

# AND

# JT BRANDS, INC.

**July 10, 2008**

**EXHIBIT B PAGE 74**

## TABLE OF CONTENTS

1.     GRANT OF LICENSE

2.     TERRITORY; MODIFICATION

3.     TERM

4.     CONSIDERATION AND RELATED LICENSEE OBLIGATIONS

5.     REPRESENTATIVE

6.     STATEMENTS, PAYMENTS AND RECORDS

7.     QUALITY STANDARDS AND CONTROL

8.     RIGHT OF INSPECTION

9.     INTELLECTUAL PROPERTY

10.    OTHER LICENSEE REPRESENTATIONS, RIGHTS AND OBLIGATIONS

11.    TERMINATION AND EXPIRATION

12.    REVOCATION OF EXCLUSIVITY

13.    EFFECT OF EXPIRATION OR TERMINATION

14.    ASSIGNABILITY

15.    NOTICES

16.    MISCELLANEOUS

EXHIBIT B PAGE 75

<u>Schedules</u>

Schedule A        Property

Schedule B        Licensed Products

Schedule C        Territory and Channels of Distribution

Schedule D        Performance Schedule

Schedule E        Royalties and Projected Wholesale Sales

Schedule F        Royalty Report

-ii-

**EXHIBIT B PAGE 76**

## LICENSE AGREEMENT

THIS AGREEMENT is made and entered into effective as of the 26th day of June, 2008 ("Effective Date"), by and between Beverly Hills Chamber of Commerce and Civic Association, a California non-profit corporation with its principal place of business at 239 South Beverly Drive, Beverly Hills, California 90212 (hereinafter referred to as "LICENSOR"), and J.T. Brands, Inc. a California corporation with its principal place of business at 200 Pine Avenue, Long Beach California (hereinafter referred to as "LICENSEE").

**RECITALS:**

A.       The Beverly Hills Chamber of Commerce (the "LICENSOR") is the owner of the LOVE, BEVERLY HILLS XX mark as depicted in **Schedule A** of this Agreement (the "Property").

B.       Bradford Licensing Inc. ("Bradford") is the licensing agent of the LICENSOR in connection with the licensing of the Property.

C.       LICENSEE desires to obtain the right and license to use the Property on and in connection with the manufacture, distribution and sale of the products indicated on **Schedule B** hereto (the "Licensed Products") in the geographical territory indicated on **Schedule C** hereto (the "Territory"), on the terms and conditions herein, and LICENSOR is willing to grant LICENSEE such right and license on such terms and conditions.

NOW THEREFORE, in consideration of the above premises and the mutual covenants, conditions and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties agree as follows:

1.       **GRANT OF LICENSE**

1.1       Grant.  LICENSOR hereby grants to LICENSEE, and LICENSEE hereby accepts upon the terms and conditions herein specified, the exclusive right and license to utilize the Property in the Territory solely upon and in connection with the manufacture, distribution and sale of the Licensed Products.  No license is granted hereunder for the use of the Property for any other purpose other than on or in connection with the Licensed Products as set forth herein, or anywhere except in the Territory.  In the event of any question about whether any specific product or products are Licensed Products, the determination of LICENSOR shall be conclusive.

1.2       Retail Distribution of Licensed Products.  LICENSEE agrees to use good faith efforts to design, manufacture, market and distribute the Licensed Products throughout the Territory.  The Licensed Products produced under this Agreement shall be placed in distribution by the LICENSEE in a fully finished condition solely for sale at the retail market level or its equivalent, solely in the Territory,

-1-

**EXHIBIT B PAGE 77**

and solely through the Channels of Distribution (as defined in Schedule C). LICENSEE agrees that it will not make or authorize any use, direct or indirect, of the Licensed Products outside the Territory or outside the Channels of Distribution and that it will not intentionally sell Licensed Products to any person who intends or is likely to resell them or to alter, modify, re-package or refill them, or make them a part of some other product, to sell them outside the Territory or outside the Channels of Distribution, or to use them in any unauthorized manner outside the Territory or outside the Channels of Distribution.

1.3     <u>Reservation of Rights</u>

1.3.1   Any and all rights in and to the Property which are not expressly granted to LICENSEE herein are hereby reserved by the LICENSOR for its own use or for grant to other parties.  Any one or more of such reserved rights may be exercised or enjoyed by the LICENSOR, directly or indirectly, from time to time at any and at all times.

1.3.2   Accordingly, without limiting the foregoing, LICENSOR may grant rights or licenses to others to use the Property to manufacture, distribute and sell, or have others manufacture, distribute or sell for them any products other than the Licensed Products inside of the Territory.  LICENSOR further reserves the right to itself for the use of the Property for premium items, promotions (including those involving payment or partial payment by customers), athletic, entertainment and other sponsorship-related programs, catalogues, mail order and electronic commerce, and in restricted venues, *e.g.*, events, concerts, sports events, recreation, theme and amusement parks, schools, stadiums and theaters ("<u>LICENSOR Uses</u>").

1.3.3   LICENSOR hereby grants to LICENSEE the right of first refusal to supply LICENSOR with products for LICENSOR Uses as defined in Section 1.3.2.

1.3.4   In the event that LICENSEE acts as a supplier of products to LICENSOR, or any parties authorized by LICENSOR, such sales shall be subject to the provisions of Section 4.1 of this Agreement regarding payment of Royalties.

1.3.5   If LICENSEE is unable or unwilling to fill an order for Licensed Products for LICENSOR as provided in Section 1.3.2, or for any customer of LICENSOR within sixty (60) days from said order, LICENSOR shall have the right to seek and license another party or parties to fill said order(s).

1.3.6   LICENSEE may not sub-license the rights granted by this Agreement without the express prior written approval of LICENSOR, and any such

-2-

**EXHIBIT B PAGE 78**

sub-license or attempted sub-license shall constitute a material breach of this Agreement.

2. **TERRITORY; MODIFICATION**

2.1     Territory.  The rights granted to LICENSEE under this Agreement shall be limited to those countries ("Countries") identified on Schedule C hereto which, collectively, shall constitute the "Territory."  LICENSEE agrees that it will not make or authorize any use, direct or indirect, of the Property outside of the Territory or outside of the Channels of Distribution, and that it will not intentionally sell Licensed Products to persons who intend or are likely to resell them outside the Territory or outside the Channels of Distribution.

2.2     Reduction in Territory.  LICENSEE agrees that LICENSOR shall be entitled to reduce the scope of the Territory, on a Country-by-Country basis, if at any time during the Term of this Agreement LICENSEE fails to perform this Agreement in accordance with the terms and conditions herein with respect to any such Country.  For purposes of this Agreement, the term *"perform this Agreement"* shall mean actively selling Licensed Products in commercial quantities within each Country in accordance with the performance schedule for such Country attached as **Schedule D** ("Performance Schedule").  In the event that LICENSEE fails to perform this Agreement in accordance with the Performance Schedule as to any Country, LICENSOR may give written notice to LICENSEE specifying the Country which is at risk of being lost.  If LICENSEE fails to perform this Agreement with respect to such Country within one hundred and eighty (180) days following such notice, then such Country shall be removed from the Territory and this Agreement effective upon the expiration of the one hundred and eighty (180) day period.  The parties agree to negotiate in good faith to establish mutually-acceptable performance criteria for any country not listed on Schedule D. Once established, the country shall be added to Schedule D as a "Country" for all purposes under this Agreement.

3. **TERM**

3.1     Term.  The term ("Term") of this Agreement shall commence on June 1, 2008, and shall terminate on December 31, 2013 ("Termination Date"), unless sooner terminated in accordance with the provisions of this Agreement.

3.2     Renewal.  LICENSOR agrees that provided LICENSEE continues to "perform this Agreement" (as defined hereinabove)  throughout the Term. LICENSEE may request renewal of the term of this Agreement for an additional five (5)-year period by giving notice of requested renewal to LICENSOR at least one hundred and eighty  (180) days prior to the expiration of the Term.  Such renewal shall be subject to LICENSOR's consent, which shall not be unreasonably withheld and shall be provided in writing to LICENSEE at least ninety (90) days prior to the expiration of the Term.  The Royalty Rates for any such renewal period shall increase at LICENSOR's request, but not by adding more than 0.5% to the current rates.

**EXHIBIT B PAGE 79**

4. **CONSIDERATION AND RELATED LICENSEE OBLIGATIONS**

4.1     Royalties.  In consideration of the right and license herein granted, LICENSEE shall pay to LICENSOR, on all units of Licensed Products sold, royalties at the royalty rates as set forth in **Schedule E** hereto ("Royalties"), which shall be a percentage of LICENSEE'S Net Wholesale Sales of the Licensed Products covered by this Agreement, in United States Dollars, computed upon each unit of the Licensed product sold, shipped or otherwise distributed by LICENSEE or any of its representatives, affiliated and associated or subsidiary companies (each hereinafter a "Related Company").  Royalties shall accrue when the Licensed Products are invoiced or shipped, whichever occurs first, and shall be payable concurrently with the periodic statements required in Section 6 herein.  The term "Net Wholesale Sales" shall mean the gross invoice price billed to LICENSEE'S customers, less customary quantity discounts, returns actually credited and charged to and paid by the customer, and reasonable returns of defective products, provided such discounts, credits and returns do not aggregate greater than 10% of the gross invoice price plus sales taxes (if applicable).  No other deductions shall be permitted from Net Wholesale Sales, including, without limitation, deductions for the cost of shipping, cost of packaging, advertising or promotional expenses, cash or volume discounts, uncollectible accounts, bad debts, excise or income taxes, or other costs or expenses incurred by LICENSEE in the manufacture, sale, distribution, advertisement or promotion of Licensed Products.  If LICENSEE sells Licensed Products to a Related Company, the invoice price used to determine Net Wholesale Sales shall be based on the invoice price at which the Licensed Products are re-sold by the Related Company to an unrelated customer in an arms-length transaction.  If Licensed Products are bundled with non-licensed products, Royalties shall be paid on the Net Wholesale Sales of the entire bundle of products.

4.2     Advance.  LICENSEE agrees to pay LICENSOR a non-refundable advance against Royalties ("Advance") in two (2) payments as follows: first, the sum of $6,093.75, payable upon execution of this Agreement, and second, a payment of $6,093.75 due and payable on October 1, 2008.  The Advance shall be applied against the total minimum referred to in Section 4.3 below.

4.3     Guaranteed Minimum Royalties.  LICENSEE agrees that, notwithstanding the actual amount of Net Wholesale Sales, it shall be obliged to make certain minimum payments within each period ("Guaranteed Minimum Royalties") as set forth in Schedule E.  For each quarter LICENSEE shall pay the greater of the actual Royalties owed under this Agreement, as set forth in Schedule E, or the Guaranteed Minimum Royalties.

4.4     Taxes and Changes.  LICENSEE shall be responsible for and shall indemnify, defend and hold harmless LICENSOR from and against all excise and income taxes, customs duties, levies, imposts or any similar charges now or hereafter imposed, based upon the manufacture, delivery, license, sale, possession or use of the Licensed Products (including, but not limited to sales, use, inventory, income

-4-

and value-added taxes on sales of Licensed Products), and no such charges shall be deducted from any Royalties or Advance.

4.5     <u>Close-Out Sales</u>.  LICENSEE shall use its best efforts to ensure that Licensed Products are not sold to close-out retailers or at close-out prices while at retail (which is agreed to mean a discount of more than 30% below MSRP) more than twice per calendar year per retailer.  This includes, but is not limited to, including a clause prohibiting such discounts in its agreements with third party retailers and distributors.  Such permitted discounts shall be restricted to retailer promotions lasting no more than one (1) calendar month each.  LICENSEE shall use reasonable efforts to police any discounting of 30% below MSRP.

## 5.     <u>REPRESENTATIVE</u>

5.1     <u>Bradford</u>.  LICENSEE acknowledges that Bradford is acting as exclusive Agent for LICENSOR and is designated to generally act on behalf of LICENSOR hereunder, sometimes in conjunction with LICENSOR and sometimes in its place and stead, to perform functions such as, but not limited to, receiving payments made payable to LICENSOR, providing statements as set forth in Section 6, and performing the various quality control functions as set forth in Section 7.  All references to administrative duties of the LICENSOR in this Agreement may be performed by Bradford.  LICENSOR agrees that it will be bound by any authorized communications or representations of Bradford.  Notwithstanding anything herein to the contrary, LICENSOR, in its sole and complete discretion, may replace Bradford immediately at any time upon written notice to LICENSEE, without affecting the validity of this Agreement.

## 6.     <u>STATEMENTS, PAYMENTS AND RECORDS</u>

6.1     <u>Royalty Reports</u>.  LICENSEE shall, on a calendar quarterly basis, pay to LICENSOR, the amounts described in Section 4, together with a royalty report covering such quarter.  Royalty reports shall be submitted to Bradford on behalf of LICENSOR in the form attached hereto as **Schedule F** ("<u>Royalty Report</u>") or such other mutually agreed upon format and shall be rendered regardless of whether Royalties are actually due and payable for such quarterly period.  Royalty Reports shall state:

6.1.1     LICENSEE'S net shipments, by number of each Licensed Product, reported separately, for the reporting period;

6.1.2     LICENSEE'S Net Wholesale Sales for each Licensed Product, reported separately, for the reporting period; and

6.1.3     a computation of Royalties due, taking into account and applying any Guaranteed Minimum Royalties.

If the Territory covers more than one country, Royalty Reports shall be prepared on a country-by-country basis as well as for the entire Territory.  LICENSEE shall

**EXHIBIT B PAGE 81**

ensure that all Royalty Reports are received by LICENSOR on a quarterly basis within fifteen (15) days after the close of each calendar quarter (March 31, June 30, September 30 and December 31 of each year) during the Term, commencing with the first full calendar quarter following the Effective Date of this Agreement.

6.2     Payments.  Royalties (including Guaranteed Minimum Royalties) shall be paid quarterly and received no later than fifteen (15) days after the closed of each quarter during the Term (each a "Royalty Payment").  LICENSEE acknowledges and agrees that notwithstanding anything in herein contrary, its obligation to make any Royalty Payments under this Agreement shall survive any expiration of this Agreement.

6.3     Currency.  Royalties may be computed in the currency of the country where earned and paid to the LICENSOR in U.S. Dollars at the exchange rate received by LICENSEE at the time of conversion.  LICENSEE shall be solely responsible for all costs of any currency conversion to U.S. Dollars, foreign withholding taxes, and similar taxes or charges, and such costs shall not reduce the amounts due to LICENSOR hereunder.

6.4     Acceptance of Reports.  LICENSOR'S acceptance of any Royalty Report or Royalty Payment by LICENSEE shall not act as a waiver of any of LICENSOR'S rights hereunder, including, without limitation, LICENSOR'S rights to recover amounts due as a result of errors or inconsistencies in any Royalty Report. LICENSEE shall promptly pay all such amounts upon LICENSOR'S request.  All payments to LICENSOR hereunder shall be non-refundable and shall be made without set-off of any amount whatsoever, whether based upon any claimed debt or liability of LICENSOR to LICENSEE.  All Royalties shall be payable and, together with the Royalty Reports, shall be sent to: **Bradford Licensing Associates, 7 Oak Place, Suite 1, Montclair, New Jersey 07042, Attention: Sabrina Puleo**.

6.5     Records.  LICENSEE shall keep, maintain and preserve in LICENSEE'S principal place of business during the Term and for at least three (3) years following any expiration or termination of this Agreement for any reason, complete and accurate records and accounts covering all transactions relating to this Agreement including, without limitation, invoices, correspondence, banking, financial and all other pertinent records and accounts.  Such records and accounts shall be maintained in accordance with generally accepted accounting principles consistently applied.  LICENSOR or its designee shall be entitled to:  (i) audit and inspect such records and accounts, as often as it deems necessary at any time during or after the Term of this Agreement during reasonable business hours and upon five (5) days prior written notice to LICENSEE; and (ii) upon ten (10) days prior written notice, obtain copies and summaries of such records and accounts. LICENSEE agrees not to cause or permit any interference with LICENSOR or its designee in the performance of their duties of inspection and audit.  In the event any errors or discrepancies are discovered in any records, statements or accounts or in payments resulting therefrom, they shall immediately be rectified by

-6-

LICENSEE and the appropriate payments made by LICENSEE, together with interest at the then Citibank, N.A. prime rate per annum compounded from the date the payment was originally due. Should any willful errors or discrepancies be disclosed or any audit deficiency of ten percent (10%) or more of the Royalties owing to LICENSOR for the applicable audit period be discovered, then in addition to all other relief to which LICENSOR may be entitled, LICENSOR may, at its sole option, immediately terminate this Agreement upon notice to LICENSEE. In addition, LICENSEE shall promptly reimburse LICENSOR for the full cost of such inspection and audit, together with interest at the then Citibank, N.A. prime rate per annum for any additional monies found to be due as a result of the inspection or audit compounded from the date the payment was originally due. Any termination hereunder shall not relieve LICENSEE of any obligation to remit any audit deficiency and associated costs and expenses, or any unpaid portion of the Guaranteed Minimum Royalties, or any other amounts owed hereunder to LICENSOR.

6.6     <u>Right to Dispute Records</u>.  Receipt or acceptance by LICENSOR or its nominees of any of the statements furnished pursuant to this Agreement, the exercise by LICENSOR in whole or in part at any time or times of the right to audit and inspect records and accounts, or the receipt or deposit by LICENSOR or its nominees of any payment tendered by or on behalf of LICENSEE shall be without prejudice to any rights or remedies of LICENSOR and shall not prevent LICENSOR from thereafter disputing the accuracy of any such statements, payments, records and accounts.

## 7. **QUALITY STANDARDS AND CONTROL**

7.1     <u>Quality Standards</u>.  LICENSEE covenants that all the Licensed Products, and also all related materials displaying the Property, such as, but not limited to, containers, packaging, wrapping materials, labels, hang tags, advertising materials, promotional displays and materials, catalogs, artwork, and other pictorial and textual materials prepared in connection with the Licensed Products (collectively the "<u>Collateral</u>"), shall be of the highest standard and quality and meet beauty industry standards for luxury items approved by LICENSOR. In all cases, the quality of produced Licensed Products shall be at least as high as the quality of samples approved by LICENSOR. Under no circumstances shall the Licensed Products be pornographic, or controversial for political, ethnic, racial, or gender reasons, or be in bad taste, or reflect adversely upon LICENSOR, determined solely in the discretion of LICENSOR.

7.2     <u>Supplies</u>.  LICENSEE shall ensure that there are sufficient quantities of each type of Licensed Product available throughout the Territory to meet public demand and that the manufacture, distribution, sale, promotion and advertisement of the Licensed Products comply with all applicable laws and regulations.

7.3     <u>Materials</u>.  LICENSEE agrees that the products used in the production of the Licensed Products shall be: essential oils, lotions, creams, soaps, shampoos,

-7-

**EXHIBIT B PAGE 83**

conditioners, cosmetics and organics, all of which shall meet current legal, industry, environmental, health and safety standards in each jurisdiction in the Territory.

7.4     Artwork/Samples.  LICENSEE shall submit to LICENSOR for its prior written approval all artwork, pre-production prototypes and samples of Licensed Products and Collateral, such as cartons, containers, packing or wrapping material, tags, labels or similar item or any related advertising, promotional or display materials in connection with the Licensed Products, clearly indicating the specific placement and use of the Property on such Licensed Products and Collateral (collectively, "Artwork/Samples"), at all stages of development and production. LICENSOR'S approval may be granted or withheld in LICENSOR'S sole discretion, which will not be unreasonably withheld, as LICENSOR shall have absolute and final approval of all such Artwork/Samples.  LICENSEE may not manufacture, use, offer for sale, sell, advertise, ship or distribute any Licensed Products or Collateral without LICENSOR'S prior written approval of the Artwork/Samples, which must be obtained in writing from LICENSOR before the Licensed Products or Collateral are manufactured, advertised, promoted, distributed or sold.  LICENSOR and LICENSEE agree to the following approval process:

7.4.1   LICENSEE shall first submit Artwork/Samples to Bradford for review and approval.  Bradford shall have five (5) business days from day of receipt to review submissions and provide comments to LICENSOR. LICENSOR shall provide written approval or provide further comments to LICENSEE within five (5) business days of receipt from Bradford.  If LICENSOR does not provide LICENSEE written approval or comments by the conclusion of the five (5)-day period, LICENSEE shall provide notice to LICENSOR advising LICENSOR that it shall have ten (10) additional business days to provide formal approval or comments.  If the Artwork/Samples have not been approved or comments provided by the conclusion of this extended period, the submission shall, upon such conclusion, be deemed approved.  All costs associated with the approval process shall be borne by LICENSEE.

7.4.2   Comments from LICENSOR may include required changes.  Any required changes to any Artwork/Samples shall be made by LICENSEE in a timely manner and updated Artwork/Samples shall be shipped to LICENSOR, at LICENSEE'S expense, for approval in the manner set forth herein.  After the Artwork/Samples have been fully approved by LICENSOR, LICENSEE shall not materially depart therefrom (i.e., in type, style, model, grade, description or the like) without the express written consent of LICENSOR in the manner set forth herein.

7.4.3   All Artwork/Samples not approved by LICENSOR shall be destroyed or shall have the Property removed (if possible) within thirty (30) days after disapproval, and any approved Artwork/Samples shall be

-8-

**EXHIBIT B PAGE 84**

destroyed or shall have the Property removed (if possible) within thirty (30) days following the expiration or termination of this Agreement. In all cases, disposition of Artwork/Samples shall be attested to in a certificate, signed by one of LICENSEE'S officers and delivered to LICENSOR upon LICENSOR's request.

7.5     <u>Production Samples</u>.  LICENSEE shall furnish LICENSOR, without charge, a minimum of six (6), but not more than twelve (12), samples of each finished Licensed Product from the first production run ("<u>Production Samples</u>") together with any Collateral, if applicable.  No Licensed Product shall be manufactured, distributed, sold or used by LICENSEE until all Artwork/Samples as defined above have been finally approved by LICENSOR.  Further written approval will be necessary if there is any change proposed by LICENSOR or LICENSEE in type, style, model, grade, description or the like from any previously approved Licensed Products and Collateral. Licensed Products/Collateral shall not be manufactured, distributed, sold or used which differ from the approved pre-production Samples.

7.6     <u>Deficiency</u>.  Promptly upon receipt from LICENSOR of information or notice that any Licensed Products or Collateral manufactured, sold or used by LICENSEE do not meet or have not met the specifications or standards of nature and quality prescribed by LICENSOR, LICENSEE shall correct such deficiency forthwith at LICENSEE'S expense.  LICENSEE shall thereupon submit samples of the corrected Licensed Products or Collateral pursuant to this Section 7, for approval.  In the event the deficiency is that of sub-standard Licensed Product or that of material misuse of the Property, all existing inventory or work in progress of Licensed Products and/or Collateral containing the deficiency shall, at LICENSEE'S expense, either be corrected to LICENSOR'S satisfaction or shall be destroyed.  The foregoing shall not preclude or limit in any way LICENSOR'S rights under Section 10 herein.

7.7     <u>Additional Samples</u>.  LICENSOR may, periodically, but not more often than four (4) times per calendar year during the Term, require that LICENSEE submit to LICENSOR, without charge, additional samples of Licensed Products together with Collateral beyond that provided for in this Section 7, for subsequent review of the quality and copyright, trademark, and other legal notices on same and for any other purpose the LICENSOR deems appropriate.  No Royalties shall be due or payable on samples furnished to LICENSOR.

7.8     <u>Changes</u>.   In the event that LICENSEE changes or modifies any Artwork/Samples previously approved by LICENSOR without LICENSOR'S written consent, or in the event LICENSEE'S manufacture, distribution, sale or marketing of the Licensed Products reflects unfavorably upon LICENSOR, the Property or Licensed Products, LICENSOR shall have the right in its sole discretion to withdraw its approval and, at its election, to terminate this Agreement with respect to such Licensed Products or in its entirety.  Upon notice from LICENSOR, LICENSEE shall immediately cease all use of the Property

-9-

**EXHIBIT B PAGE 85**

including but not limited to, the manufacture, distribution, sale and marketing of Licensed Products to which the termination applies, and within ten (10) days thereafter shall remit all amounts, if any, due and owing to LICENSOR hereunder.  If there are other Licensed Products under this Agreement not affected by such termination, this Agreement shall remain in full force and effect as to those other Licensed Products only.

7.9     Warranty.  LICENSEE shall insure at all times that the Licensed Products and Collateral meet LICENSOR'S standards of nature and quality and LICENSEE shall cooperate fully in all reasonable ways with LICENSOR in enabling LICENSOR to ascertain that all Licensed Products and Collateral materials meet said standards.  LICENSEE acknowledges and agrees that if any Licensed Products manufactured and sold by it under this Agreement are of inferior quality in material and/or workmanship, the substantial goodwill which LICENSOR has cultivated and now possesses in and to the Property will be impaired, diminished and/or diluted.  Therefore, LICENSEE represents and warrants to LICENSOR as well as to LICENSEE'S customers that the Licensed Products will be merchantable, fit for the purposes for which LICENSEE has advertised or marketed them, and will meet or exceed the quality of like products manufactured by LICENSEE.

## 8.     RIGHT OF INSPECTION

8.1     Inspection.  LICENSEE shall allow LICENSOR or its designee to enter LICENSEE'S premises and all other facilities utilized by LICENSEE in connection with the Licensed Product during regular business hours, upon three (3) business days' notice, for the purpose of inspecting the Licensed Products, the Collateral and/or the facilities in which they are manufactured and/or packaged.  In the event that LICENSOR'S quality standards are not met, LICENSEE shall, upon written notice from LICENSOR, discontinue the manufacture, distribution and sale of such Licensed Products and/or related Collateral.  LICENSEE shall remedy such failure of quality to LICENSOR'S satisfaction within ten (10) business days after LICENSEE'S receipt of notice thereof; failure to timely complete such remedial measures shall constitute a material breach of this Agreement and shall entitle LICENSOR to terminate this Agreement upon written notice to LICENSEE.

## 9.     INTELLECTUAL PROPERTY

9.1     LICENSOR Rights.  LICENSEE acknowledges LICENSOR'S exclusive rights in the Property and further acknowledges the value of the good will associated with the Property, that the Property and all ultimate rights therein belong exclusively to the LICENSOR, and that the Property is famous and has developed secondary meaning and connotes an image of prestige, quality and exclusivity in the minds of the public.  LICENSEE agrees that the Property is, and shall remain, the property of LICENSOR and that LICENSEE obtains no right, title or interest in or to the Property except for the limited rights set forth in this

-10-

Agreement.  LICENSEE acknowledges and agrees that any goodwill generated by LICENSEE'S use of the Property shall inure exclusively to the benefit of LICENSOR.

9.2      <u>Waiver of Rights</u>.  LICENSEE waives all claims of and to ownership of any rights in the Property and shall not, during the Term, any extension and/or renewal thereof, or at any time thereafter, dispute or contest, directly or indirectly, the LICENSOR's ownership in and to the Property, the  LICENSOR'S exclusive right (subject to the rights granted in this license) to use and/or exploit the Property, the validity of any of the copyrights or trademarks pertaining thereto or the LICENSOR's ownership thereof, nor shall the LICENSEE assist or aid others whether directly or indirectly in doing so.

9.3      <u>Use.</u>  LICENSEE shall use the Property only in connection with the Licensed Products and agrees that all of LICENSEE'S use under this Agreement inures to the benefit of LICENSOR.

9.4      <u>LICENSEE Contributions</u>.   LICENSEE agrees that all artwork, graphics, layouts slogans, names, titles or similar materials incorporating, or being used in association with, the Property which may be created by the LICENSEE or its subcontractors pursuant to this Agreement shall become the sole property of LICENSOR, including trademark and copyright rights, and LICENSEE agrees on behalf of itself, its employees, its subcontractors and any other party with whom it may contract to create such materials, to promptly execute any and all appropriate documents**, *e.g.*,** assignments, in this regard.  LICENSEE warrants and represents that all such materials which it creates or uses shall be original and, to the best of its knowledge, will not infringe the copyright or trademark rights of others.

9.5      <u>LICENSOR Registration</u>.   LICENSEE expressly acknowledges that LICENSOR makes no representation or warranty as to its rights to the Property in the various specific Countries in the Territory.   LICENSEE understands and agrees that it is relying upon its own due diligence in this respect.   Further, LICENSOR shall have no obligation to register or seek registration, or renew the registration or legal protection, of any of the Property in any Country in the Territory.  LICENSOR shall have the right to register trademarks and/or claims to copyright for any design incorporating the Property as may be reasonably necessary, in LICENSOR's sole discretion, to protect LICENSOR's interests in and to the Property.   Any and all applications for registration or claims to copyright, where applicable, shall identify LICENSOR as the copyright owner; all applications to register trademarks shall identify LICENSOR as the trademark owner. The LICENSEE shall, upon LICENSOR'S request, assign to LICENSOR, in writing, any and all intellectual property rights in the Property that might accrue to LICENSEE under the laws of any jurisdiction, and all intellectual property rights in or works derived from the Property.

9.6      <u>LICENSEE Registration</u>.  LICENSEE agrees to take steps to promptly register trademarks on a country by country basis for the mark LOVE, BEVERLY HILLS

**EXHIBIT B PAGE 87**

XX and variations on the mark as mutually agreed on with LICENSOR in each foreign Territory and for each type of goods for which LICENSEE sells or intends to sell or manufacture Licensed Product. Applications for registration shall be applied for in the name of LICENSOR. LICENSEE shall consult with LICENSOR concerning the particulars of filing of foreign trademark applications, and LICENSOR shall pre-approve the filing and costs of filing and prosecution in particular territories before LICENSEE can incur any recoupable costs which may be charged against LICENSOR as provided below. LICENSEE shall provide LICENSOR with copies of all documents associated with the prosecution of any trademark application. All attorneys fees and government filing fees in connection with all trademark registrations of the LOVE, BEVERLY HILLS XX marks shall be advanced by LICENSEE which shall have the right to recoup such attorneys fees and costs specifically from royalties earned and accrued in the territory in which the marks are registered. Recoupable attorneys fees and costs for foreign trademark prosecution to be applied against royalties shall not exceed $3,000 per territory per class without prior written permission of LICENSOR, except that filing and registration in the European Union shall not exceed $6,000 for the filing and registration of a Community Trademark application.

9.7     Samples. LICENSEE shall, at LICENSOR'S request, and at LICENSOR'S expense, provide any samples of the Licensed Products, or any photographic reproductions of the same, for use in the filing of copyright claims or trademark applications.

9.8     Notice Labels. LICENSEE represents and warrants that it will provide notice on all Licensed Products and Collateral materials bearing any reproductions or use of the Property, as follows: The mark LOVE, BEVERLY HILLS XX™ is a trademark of the Beverly Hills Chamber of Commerce, California, U.S.A. LICENSEE agrees to follow LICENSOR'S instructions and guidelines regarding proper usage of the Property in all respects. LICENSEE acknowledges that the omission of said notice shall constitute a material breach of this Agreement and recourse shall be at the sole discretion of LICENSOR, including, but not limited to penalties and/or additional compensation for such omission LICENSOR may seek legal and/or equitable relief in connection therewith.

9.9     Changes to Property. LICENSOR shall have the right at any time, upon notice to LICENSEE, to make additions to, deletions from, and changes in the Property at its complete discretion, and LICENSEE shall adopt and use any and all such additions, deletions and changes as soon as practicable in all new production of the Licensed Products and/or Collateral.

9.10    Copying, Duplication. LICENSEE shall not undertake or permit any copying, duplication, reproduction or other exploitation of the Property (or any portion or element thereof) except as expressly authorized hereunder.

9.11    Third-Party Marks. LICENSEE shall ensure that no Licensed Products (including any Collateral related thereto) contain or incorporate any names,

-12-

characters and/or likenesses trademarks, service marks or trade names owned by any other third party without LICENSOR'S prior written consent.

9.12    <u>Infringement</u>.  LICENSEE agrees to promptly notify LICENSOR of any actual or suspected infringements of the Property and/or the Licensed Products and to assist LICENSOR in protecting and enforcing such rights of LICENSOR. LICENSOR shall be under no obligation to defend its rights in the Property or to refute any third-party claims of ownership or infringement.  At LICENSOR'S request, LICENSEE shall cooperate with LICENSOR and assist fully in preventing any infringement or unfair use by any third party of the Licensed Products, or the Property.  LICENSOR, in its sole discretion, shall determine what course of action, if any, it elects to pursue in regard to said infringement or unfair use and shall be under no obligation whatsoever to take action at LICENSEE'S request.  This section shall survive the expiration or any termination of this Agreement.

9.13    <u>Termination</u>.  Immediately upon termination or expiration of this Agreement, subject to the provisions of this Section 9, LICENSEE shall immediately cease all use of the Property and all rights granted LICENSEE hereunder shall revert to LICENSOR.

9.14    <u>Survival</u>. All provisions of this Section 9 shall survive any termination hereof.

## 10.    <u>OTHER LICENSEE REPRESENTATIONS, RIGHTS AND OBLIGATIONS</u>

10.1    <u>Authorization</u>.    LICENSEE represents, warrants and agrees that: (i) LICENSEE is a corporation duly organized, validly existing and in good standing under the laws of the State of California; has full corporate power and authority to conduct its business as now being conducted and as contemplated hereby; and holds all necessary licenses and permits from all government entities for the proper conduct of said business; (ii) LICENSEE has the unrestricted right, power and authority to enter into this Agreement and to perform its obligations hereunder, and neither the execution and delivery of this Agreement nor the consummation of the actions contemplated hereby will (a) violate any provisions of its charter documents, (b) violate, conflict with or constitute a default under any contract to which it is a party or (c) violate any law binding on it; (iii) LICENSEE will comply with all applicable laws, regulations, ordinances and other requirements involving the use of the Property and the conduct of LICENSEE'S business in connection therewith in any and all jurisdictions, domestic and foreign; and (iv) LICENSEE will not harm, misuse or bring disrepute to the Property.

10.2    <u>Subcontracting</u>.  LICENSEE shall have the right to subcontract for the manufacture and production of the Licensed Products and/or Collateral provided however, that, irrespective of, or in addition to, any other agreements between LICENSEE and a subcontractor, LICENSEE agrees that:

-13-

10.2.1     any such subcontractor shall be fully subject to, and bound by, every provision of this Agreement;

10.2.2     any such subcontractor shall be made aware that it may not sell any Licensed Products manufactured by it to anyone but LICENSEE;

10.2.3     any such subcontractor shall agree that any related designs, labels, packaging or other materials incorporating or associated with the Property shall become the property of LICENSOR and that LICENSEE shall be responsible for obtaining any relevant supporting legal documentation;

10.2.4     any such subcontractor shall agree to immediately cease all manufacture of Licensed Products upon notice of termination or expiration of this Agreement;

10.2.5     a breach by a subcontractor of any provision of this Agreement shall be considered a breach by LICENSEE;

10.2.6     LICENSEE shall remain primarily and completely obligated under all of the provisions of this Agreement;

10.2.7     LICENSEE shall promptly furnish to LICENSOR a list of all such subcontractors and shall update this list each quarter; and

10.2.8     LICENSEE agrees to immediately notify any sub-contractor in writing upon termination or expiration of this Agreement, with a copy sent to LICENSOR.

10.3     <u>Compliance with Laws</u>.  LICENSEE warrants and represents that it will: comply with all laws, regulations, ordinances, governmental standards and the like applicable to the manufacture, sale, distribution, promotion and advertisement of the Licensed Products in all jurisdictions; that all Licensed Products will meet current industry environmental, health and safety standards in all jurisdiction; and agrees to indemnify and hold LICENSOR harmless in this regard.

10.4     <u>Goodwill</u>.  LICENSEE acknowledges the tremendous value and goodwill of the Property accruing solely to LICENSOR and agrees not to use the Property in any manner which may, in LICENSOR'S judgment, be in bad taste, be inconsistent with LICENSOR'S public image or which may in any way disparage LICENSOR or its reputation, including, but not limited to, types and placement of advertising and types of channels of distribution, nor take any action which will harm or jeopardize the Property or LICENSOR'S ownership thereof, in any way.

10.5     <u>Confidentiality</u>.  During the Term and thereafter, LICENSEE shall keep confidential all of LICENSOR'S confidential proprietary information, knowledge or trade secrets, such as but not limited to, marketing and advertising plans, licensing plans, market research data and the like, of which it becomes aware

-14-

**EXHIBIT B PAGE 90**

during the course of its relationship with LICENSOR.  If LICENSEE is uncertain about the status of a particular piece of information, it shall consult with LICENSOR to determine such status.  This confidentiality obligation shall cease when the information becomes generally known to the public.

10.6      Indemnification.  LICENSEE hereby agrees to indemnify, defend and hold harmless forever the LICENSOR, Bradford, and their respective agents, representatives, employees, attorneys, successors and assigns (all individually and collectively referred to as "Indemnitees") from and against any and all causes of action, claims, demands, losses, costs, fines, judgments, settlements and expenses (including attorneys' fees and court costs incurred), investigations, damages, penalties and liabilities of any kind or nature whatsoever, directly or indirectly arising out of, resulting from, relating to or connected with LICENSEE'S use of the Property, including without limitation: (i) any breach of any representation, warranty or covenant of LICENSEE hereunder; (ii) any defect in the design, formulation or manufacture, or any use by any person or entity of, any Licensed Products; (iii) any defamation by LICENSEE or invasion of the right of privacy, publicity or other personal or property right; (iv) any breach of any confidentiality or trade secret provision or agreement; (v) any use of any patent, process, method or device; (vi) any infringement of any copyright or trademark not licensed hereunder by LICENSOR; and (vii) any manufacture, storage, advertising, promotion, warranty, distribution or use of the Licensed Products.  LICENSEE shall promptly upon receipt of notice of any such claim defend such claim at LICENSEE'S sole cost and expense by counsel reasonably satisfactory to Indemnitees; or LICENSOR, at its option, may engage counsel and defend such claim at LICENSEE'S sole cost and expense for which LICENSEE shall pay within ten (10) business days upon being invoiced therefore.  No settlement of any claim for which indemnity shall be made hereunder shall be made by LICENSEE without the prior written consent of LICENSOR.  This Section shall survive the expiration or any termination of this Agreement.

10.7      Insurance.  LICENSEE will obtain and maintain, at its sole cost and expense, during the Term and for a period of five (5) years thereafter, general comprehensive liability insurance, product liability insurance and advertiser's liability insurance covering, without limitation, bodily injury, personal injury, property damage and casualty loss.  Such policies of insurance shall provide full protection against any and all claims, demands, causes of action arising out of any defects in, or the reasonably foreseeable use of the Licensed Products which is the subject of this Agreement and shall name LICENSOR and Bradford as additional insureds with a deductible of not more than $10,000 (certificate of which shall be furnished to LICENSOR) providing adequate protection for LICENSOR, Bradford and their respective officers, agents, and employees against any claims, demands, costs and liabilities of any kind arising out of or in connection with any alleged defects in Licensed Products or any use thereof.  Such policies of insurance shall have endorsements or coverage with combined single limits of Two Million dollars (U.S. $2,000,000), and shall be provided by insurers admitted in the state of California and with a rating of B+, VII or better in the most recent

-15-

edition of Best's Key Rating Guide, Property-Casualty Edition qualified insurance carrier. Each policy of insurance shall be endorsed to state that coverage shall not be suspended, voided or canceled and shall not be reduced in coverage or limits except after thirty (30) days prior written notice provided to LICENSOR. Upon prior request of the carrier, the notice period may be reduced to ten (10) days in the event of non-payment of premium. In addition, such policies of insurance shall contain an endorsement that negates the "other insurance" clause in the policy and a statement that the insurance provided is primary and that any similar insurance carried by LICENSOR is neither primary nor contributing. Maintenance of such insurance and performance of LICENSEE of its obligations hereunder shall not relieve LICENSEE of liability under the indemnity contained in this Section 10.

## 11. **TERMINATION AND EXPIRATION**

11.1      <u>Termination.</u>      LICENSOR shall have the right to terminate this Agreement, or any portion thereof, upon written notice to LICENSEE, without prejudice to any other rights which it may have, for any of the following:

11.1.1      LICENSEE fails to generate the Projected Wholesale Sales set forth on Schedule E within the time period indicated therein, subject to cure in accordance with Section 12.1.4; or

11.1.2      LICENSEE defaults in the performance of any of its obligations, or breaches of its representations or warranties provided for in this Agreement; or

11.1.3      any court, arbitration panel, government agency or body finds that the Licensed Products manufactured by LICENSEE are defective in any way, manner or form; or

11.1.4      the LICENSEE shall be unable to pay its debts when due, or shall make any assignment for the benefit of creditors, or shall file any petition under the bankruptcy or insolvency laws of any jurisdiction, country or place, or shall have or suffer a receiver or trustee to be appointed for its business or property, or be adjudicated a bankrupt or an insolvent; or

11.1.5      a subcontractor engages in conduct which, if engaged in by LICENSEE, would entitle LICENSOR to terminate this Agreement (however, LICENSOR will endeavor to discuss with LICENSEE what action LICENSEE must take or cause to be taken to remedy any damages to LICENSOR resulting from such subcontractor's conduct and the nature and extent of the action to be taken shall be at LICENSOR'S sole and absolute discretion); or

11.1.6      LICENSEE'S use of the Property violates the terms and conditions of this Agreement; or

**EXHIBIT B PAGE 92**

11.1.7    LICENSEE fails to remit any payment due hereunder or to deliver any of the Royalty Reports, and such default shall continue without cure for a period of three (3) business days after written notice of such default is sent by LICENSOR to LICENSEE; provided however, that with respect to subsequent breaches under this paragraph, LICENSOR may terminate this Agreement immediately upon notice to LICENSEE.

11.2    <u>Notice of Termination and Right of Correction</u>.  Except as otherwise provided herein, in the event that any of these defaults occur, LICENSOR may give written notice of termination.  LICENSEE shall have twenty (20) days after the receipt of notice in which to correct the situation giving rise to the notice, or to assure to LICENSOR'S satisfaction that appropriate corrective measures are being taken.  For the purposes hereof, the cessation by LICENSEE of all sales and distribution of the Licensed Products which shall have given rise to a default hereunder shall be deemed a correction of such default.  Failing such satisfactory correction or assurance, this Agreement shall terminate.

11.3    <u>Exceptions to Right of Correction</u>.   Notwithstanding the provisions of Section 11.2, LICENSEE shall have no right of correction in the event of:

11.3.1    willful errors or discrepancies in LICENSEE'S records as referred to in Section 6; or

11.3.2    statements or payments being late more than twice in any year during the Term; or

11.3.3    the occurrence of the same default, other than concerning statements or payments, more than twice during the Term, or during any renewal period.

## 12.   REVOCATION OF EXCLUSIVITY

12.1    <u>Distribution Obligations</u>.  LICENSEE' agrees that its failure to comply with any of the following covenants, whether or not constituting a material breach of this Agreement, shall result in LICENSOR having the special revocation rights (in its sole discretion) set forth in Section 12.2 below:

12.1.1    LICENSEE agrees to submit each Licensed Product to LICENSOR for its approval no later than the end of the fourth (4th) full calendar quarter following the Effective Date of this Agreement.  Submissions may consist of flat concept art or pre-production samples.

12.1.2    Once a Licensed Product is approved by LICENSOR for production, LICENSEE shall commence manufacturing and shall distribute the Licensed Product, in commercial quantities, through its Channels of Distribution, in one (1) or more Countries (each a "<u>Target Country</u>") in

-17-

the Territory, no later than the end of the second (2nd) full calendar quarter thereafter.

    12.1.3    Once distribution of a Licensed Product has commenced in a Target Country, LICENSEE shall use its best efforts to continuously distribute the Licensed Product in such Country, in commercially reasonable quantities, and LICENSEE shall not allow a period of more than ninety (90) days to elapse during which it does not distribute the Licensed Products in commercially reasonable quantities within such Target Country.

    12.1.4    LICENSEE shall assure that actual total wholesale sales shall be within 15% of the Projected Wholesale Sales targets set forth on **Schedule E**; provided, however, if at any time such total sales fall below the Projected Wholesale Sales targets by more than 15%, LICENSEE shall have two (2) full calendar quarters to cure.

12.2    <u>Loss of Exclusivity</u>.  If LICENSEE fails to meet any of the foregoing requirements in Section 12.1.1, 12.1.2 or 12.1.3, then upon sixty (60)-days' prior written notice, LICENSOR shall be entitled to revoke LICENSEE's exclusive right to use the Property with respect to the subject Licensed Products in the subject Target Country.  If LICENSEE fails to meet the requirement in Section 12.1.4, then upon sixty (60) days' prior written notice, LICENSOR shall be entitled to revoke LICENSEE's exclusive right to use the Property for all purposes in the Territory.

## 13.    <u>EFFECT OF EXPIRATION OR TERMINATION</u>

13.1    <u>Rights Revert</u>.  Upon the expiration or termination of this Agreement, all rights granted to LICENSEE hereunder shall automatically and immediately revert to LICENSOR, and LICENSEE shall have no further right to exploit or in any way deal with any Licensed Products, Collateral or related materials. Immediately upon the expiration or termination of this Agreement, LICENSEE shall at LICENSOR'S election either: (i) turn over to LICENSOR all molds, printing plates, artwork, films, silk-screens, and other materials used in the design, creation or reproduction of the Licensed Products, the Collateral or the Property; at their fully-amortized cost; or (ii) provide evidence satisfactory to LICENSOR of their destruction.  In the event of any termination of this Agreement by LICENSOR, LICENSEE shall not be relieved or released from any of its obligations existing prior to such termination.

13.2    <u>Delivery of Final Statement</u>.  LICENSEE shall within thirty (30) days after termination, deliver to LICENSOR a final statement certifying the number and description of Licensed Products on hand or in process of manufacture and make all payments due LICENSOR.  LICENSOR shall have the right to conduct

**EXHIBIT B PAGE 94**

a physical inventory in order to ascertain such inventory or verify such statement. LICENSEE shall have the sole right of disposal of Licensed Products in the event of termination.

13.3    Payment.    Any and all payments due from LICENSEE, including all prospective Guaranteed Minimum Royalties due for the full Term during which the expiration or termination takes place, shall be accelerated and immediately due and payable to LICENSOR, less any Royalties or advances already paid, and no portion of any prior payments shall be repayable to LICENSEE.

13.4    Delivery of Property.   Upon termination or expiration of this Agreement, all labels, signs, packages, wrappers, cartons, circulars, advertisements and other items bearing or containing any reproduction or representation of any of the Property shall automatically and without cost to LICENSOR become the property of LICENSOR, and LICENSEE shall immediately deliver the same to LICENSOR'S place of business or any other location designated by LICENSOR. The reasonable cost of such delivery shall be paid by the LICENSEE. Alternatively, such items may be destroyed at LICENSEE'S sole cost and expense and LICENSEE shall deliver a certificate of destruction to LICENSOR promptly thereafter.

13.5    Delivery of List of Accounts.    Upon termination or expiration of this Agreement, LICENSEE shall promptly deliver to LICENSOR a copy of the most recent lists of all accounts to which it sells Licensed Products and a list of all subcontractors or manufacturers of LICENSEE.

13.6    Guaranteed Minimum Royalties.    Upon termination or expiration  of this Agreement, the total amount of outstanding Guaranteed Minimum Royalties, if any, remaining due under the Term shall become immediately due and payable, less any related Royalties or advances already paid.

13.7    Expiration Right of Disposal.

13.7.1    LICENSEE shall, within thirty (30) days after the normal expiration of the Term or any renewal, deliver to LICENSOR a final statement certifying the number and description of Licensed Products on hand or in process of manufacture and make all payments due LICENSOR. LICENSOR shall also have the right to conduct a physical inventory in order to ascertain such inventory or verify such statement.

13.7.2    After expiration of this Agreement, provided all sums due LICENSOR have first been paid, and statements due are furnished, LICENSEE may dispose of the Licensed Products, in compliance with this Agreement, which are in LICENSEE'S inventory or in process of manufacture at the time of expiration for a period of ninety (90) days after said expiration; provided further that all Royalties with respect to that disposal period

-19-

are paid and statements therefor are furnished in accordance with the terms of this Agreement within thirty (30) days after the disposal period has ended.  Without limitation of the foregoing, LICENSEE shall not, without prior written consent of LICENSOR, distribute or sell any such remaining Licensed Products in a "distress sale" or to third parties for resale, or otherwise.  A "distress sale" shall mean a sale in which the merchandise is sold for less than fifty percent (50%) of its normal wholesale selling price.  At the end of the sell-off period, LICENSOR shall have the right, at its option, to purchase at cost all or any portion of the Licensed Products in License's possession or under its control.  Any Licensed Products purchased hereunder by LICENSOR shall be shipped, at LICENSEE'S expense, to LICENSOR within fifteen (15) days of such order being placed.  Any Licensed Products not purchased by LICENSOR shall be destroyed at LICENSEE'S sole cost and expense and LICENSEE shall deliver a certificate of destruction to LICENSOR promptly thereafter.

13.7.3   Any right of disposal by LICENSEE shall not prohibit LICENSOR from granting rights to others to use the Property on Licensed Product during that disposal period.

13.8     No Consequential Damages.  In no event, whether as a result of breach of contract, tort, (including the negligence of LICENSOR), strict liability, indemnity or otherwise, shall LICENSOR be liable for loss of profit or revenues or for any special, incidental, consequential indirect or exemplary damages arising out of or in connection with this Agreement.

## 14.   ASSIGNABILITY

14.1     Assignment.  All rights and the license hereby granted are and shall be personal to the LICENSEE and shall not be assignable by any action of the LICENSEE or by operation of law, and any attempt at such assignment shall be null and void.  Notwithstanding the foregoing, LICENSEE may engage subcontractors subject to the provisions in Section 10.2.  This Agreement may be freely assigned by LICENSOR without LICENSEE'S consent or approval.  This Agreement shall inure to the benefit of and shall be binding upon LICENSOR'S successors and assigns.

## 15.   NOTICES

15.1     Notices.  All notices and other communications which either party hereto is required or may desire to give to the other, except for payments and statements which shall be sent to the party designated by LICENSOR, e.g., Bradford, shall be given by addressing the same to the other or to Bradford at the address hereinafter set forth in this paragraph, or at such other address as may be designated in writing by any party in a notice to the other given in the manner prescribed in this

-20-

**EXHIBIT B PAGE 96**

paragraph. All such notices shall be deemed given when sent so addressed by certified or registered mail, postage prepaid or by hand delivery, with proof of receipt, or by a reputable express delivery company which requires proof of receipt, such as, but not limited to, Federal Express® or Airborne.® The addresses to which the foregoing shall be given are the following:

If to LICENSOR:

Beverly Hills Chamber of Commerce
and Civic Association
239 South Beverly Drive
Beverly Hills, California 90212
Attention: Daniel Walsh

If to LICENSEE:

J.T. Brands, Inc.
200 Pine Avenue, Ste. 522
Long Beach California 90802
Attention: Geoffrey Thompson

with a copy to:

Bradford Licensing Associates
7 Oak Place, Suite 1
Montclair, NJ 07042
Attention : Michelle Minieri

## 16. **MISCELLANEOUS**

16.1    Remedy For Breach. LICENSEE acknowledges and agrees that a breach of any of the covenants, agreements or undertakings hereunder will cause LICENSOR irreparable injury which cannot be readily remedied in damages or solely by termination of this Agreement and that LICENSOR, in addition to all other legal and equitable remedies, including costs and reasonable attorneys' fees, shall have the right of injunction for any breach of this Agreement by LICENSEE.

16.2    Relationship Between LICENSOR and LICENSEE. Nothing herein shall create, be deemed to create or be construed as creating any partnership, employer-employee, joint venture, or agency relationship between the parties hereto or shall be deemed to render LICENSOR or its Representatives liable for any of the debts or obligations of LICENSEE. LICENSEE shall in no way be considered an agent or representative of LICENSOR in any dealings which LICENSEE may have with any third party and neither of the parties hereto nor any of their employees or agents shall have the power or authority to bind or obligate the other party.

16.3    Survival of Provisions. The expiration or termination of this Agreement shall not affect those provisions, and the rights and obligations therein, set forth in this Agreement which either:

16.3.1    by their terms state, or evidence the intent of the parties, that the provisions survive the expiration or termination of the Agreement, or

-21-

16.3.2    must survive to give effect to the provisions of this Agreement.

16.4    <u>Entirety of Agreement; Amendment</u>.  This Agreement constitutes and contains the entire agreement of the parties hereto relating to the subject matter hereof and no oral or written statements, representations, documents, promises or any other prior materials not embodied herein shall be of any force or effect.  This Agreement cannot be amended, altered or modified except by a written instrument executed by both parties hereto.  Once so executed, such amendments shall become an integral part of this Agreement, subject to all the terms and conditions herein and shall have full force and effect.

16.5    <u>No Waiver</u>.  The failure or delay of LICENSOR to exercise its rights under this Agreement or to complain of any act, omission or default on the part of LICENSEE, no matter how long the same may continue, or to insist upon a strict performance of any of the terms or provisions herein, shall not be deemed or construed to be a waiver by LICENSOR of its rights under this Agreement or a waiver of any subsequent breach or default of the terms or provisions of this Agreement.

16.6    <u>Ownership</u>.  Neither this Agreement nor any act or omission by LICENSOR, nor any use by LICENSEE of the Property in connection with the Licensed Products shall in any way confer or imply a grant of rights, title or interest thereto, or to any element or portion thereof or any other rights, including, without limitation, copyrights, trademarks, trade names, service marks or goodwill associated therewith, the ownership of which shall be and at the times remain solely and exclusively with the LICENSOR.  LICENSOR reserves all rights now known or hereafter devised in and to the Property.  No use by LICENSOR of the Property in any media or manner shall be deemed by LICENSEE to interfere with the limited grant made to it by LICENSOR pursuant hereto.

16.7    <u>LICENSOR'S Claims</u>.   Whatever claim LICENSOR may have against LICENSEE hereunder for Royalties, Advances, and/or Guarantee Minimum Royalties, upon the expiration or early termination of this Agreement, as well as for damages, shall become a first lien upon all Licensed Products manufactured or produced pursuant to the terms of this Agreement and in the possession or under the control of LICENSEE or any related companies.

16.8    <u>Headings</u>.  The headings as to contents of particular provisions herein are inserted only for convenience and are in no way to be construed as part of this Agreement or as a modification of the scope of any terms or provisions of this Agreement.

16.9    <u>Governing Law</u>.

16.9.1    This Agreement, its validity, construction and effect, shall be governed and construed in accordance with the laws of the State of California,

-22-

without reference to its conflicts of laws principles.  All disputes under this Agreement shall be resolved by the courts of the State of California, including the United States District Court for the Central District of California, and the parties consent to the jurisdiction of such courts, agree to accept service of process by mail, and hereby waive any jurisdiction or venue defenses otherwise available to them.

16.9.2    Nothing in this Agreement is intended to be contrary to the laws of any country or political sub-division thereof. In the event that any of the paragraphs or particular terms or conditions set forth herein are held to be unenforceable by a court of record with competent jurisdiction, such paragraph or particular term of condition therein shall be deemed to modified to the extent required within the jurisdiction of such Court and the Agreement shall otherwise remain in full force and effect in such jurisdiction and in its entirety in other jurisdictions.

16.9.3    While any action relating to this Agreement is pending, LICENSEE shall remain obligated to continue to pay Royalties as provided herein.

16.10    <u>Clearances.</u>  Notwithstanding any rights granted by LICENSOR herein with respect to the Property, LICENSEE shall be solely responsible for obtaining all consents and permissions necessary in connection with the activities contemplated hereby including, without limitation, all permissions from copyright owners of all photographs, images, illustrations, stills, sound recordings, audio visual recordings and/or artwork used in the advertising, sale or distribution of the Licensed Products and all persons appearing therein, whether depicting the Property or otherwise.

16.11    <u>Attorney Fees</u>.  In the event of any dispute between the parties arising out of the subject matter of this Agreement, the out-of-pocket costs, expenses and attorneys' fees of the prevailing party incurred in resolving, settling or litigating the dispute shall be paid by the other party in addition to any other relief or damages to which the prevailing party may be entitled.

16.12    <u>Counterparts.</u>   This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same Agreement.

**EXHIBIT B PAGE 99**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first set forth hereinabove.

("LICENSOR")

BEVERLY HILLS CHAMBER OF COMMERCE
AND CIVIC ASSOCIATION

By: _____
Name:  Daniel Walsh
Title: Executive Director

By:_____


("LICENSEE")

JT BRANDS, INC.

By:_____
Name:  Geoffrey Thompson
Title:  President

By:_____
Name:
Title:  Secretary

-24-

**EXHIBIT B PAGE 100**

APPROVED:

BRADFORD LICENSING ASSOCIATES

Name: Michelle Minieri
Title: President

-25-

Schedule A

Property

LOVE, BEVERLY HILLS XX including, without limitation, the associated trademarks, service marks and logos, relating thereto necessary to permit the Licensed Use set forth below in Schedule B (collectively, the "**Property**").

TM Registration Number: 77443157

-26-

Schedule B

Licensed Products

All International Class 3 Products, including fragrance, bath and body care, advanced skincare, haircare, toiletries and cosmetics, to be packaged individually or as gift sets, more specifically described as: perfume such as *eau de parfum*, *eau de toilette*, summer splash, body spray, pure perfume; body and bath care such as shower gels, soaps, body creams, body lotions in 5 'flavors,' body scrubs, body powders, deodorants, hand creams, bath and massage oils, scented wipes, aroma therapy products candles (nonexclusive);scented wipes hair care products such as shampoo, conditioner, sculpting products, hair repair, hair color, hair refresh; skincare products such as advanced skin care for young skin, anti aging skincare, clear skin and pigmentation products; cosmetics and toiletries such as color make-up, household toiletries.

-27-

**EXHIBIT B PAGE 103**

Schedule C

Territory and Channels of Distribution

1.       **Territory**.  The Territory shall be worldwide.

2.       **Channels of Distribution**.  The Channels of Distribution, which shall be those market(s) in which LICENSEE is authorized to sell and/or distribute the Licensed Products directly or through its authorized wholesalers, representatives and/or distributors for eventual resale to the consumer, shall be:  (1) department stores, as this term is customarily used in the industry; (2) specialty and boutique stores (*e.g.,* Sephora, Anthropologie); and (3) online distribution at price points consistent with in-store price points.  If LICENSOR creates a "city store" (online, stand-alone, or store within a store), the Licensed Products under this Agreement shall be eligible for sale at such location.

-28-

**EXHIBIT B PAGE 104**

Schedule D

Performance Schedule

LOVE, BEVERLY HILLS XX
Sales by Territory

**2009 - 2011**

**Territories**                    Estimated Sales*

| **Priority One** | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| USA | 400000 | 1200000 | 2500000 |
| **International** | | | |
| UAE | 100000 | 200000 | 300000 |
| JAPAN | 150000 | 300000 | 400000 |
| SINGAPORE | 50000 | 100000 | 150000 |
| UK / IRELAND | | | 20000 |
| SAUDI ARABIA | 50000 | 150000 | 200000 |
| EU | | | |
| Germany | | 100000 | 200000 |
| France | | 100000 | 200000 |
| Spain | | | 50000 |
| CANADA | | | 20000 |
| MEXICO | 62000 | 150000 | 200000 |
| Total | 412000 | 1100000 | 1740000 |
| **Priority Two** | | | |
| ITALY | | | 20000 |
| GREECE | | | 20000 |
| TURKEY | | | 20000 |
| SCANDINAVIA | | | 20000 |
| SWITZERLAND | | | 20000 |
| HOLLAND | | | 20000 |
| CARIBBEAN | | | 20000 |
| SOUTH KOREA | | | 20000 |
| INDONESIA | | 100000 | 200000 |
| PHILLIPINES | | 100000 | 150000 |
| CHINA | | | 100000 |
| RUSSIA | | 100000 | 300000 |
| UKRAINE | | | 150000 |
| INDIA | | | 200000 |
| KUWAIT | | | 100000 |
| BAHRAIN | | | 50000 |
| QATAR | | | 10000 |
| LEBANON | | | 10000 |
| ISRAEL | | | 200000 |
| VIETNAM | | | 200000 |
| HONG KONG | | | 100000 |

-29-

**EXHIBIT B PAGE 105**

| | | | |
|---|---|---|---|
| LATVIA/LITHUANIA/ESTONIA | | | 50000 |
| Total | 0 | 300000 | 1860000 |
| | | | |
| **Priority Three** | | | |
| SOUTH AMERICA | | | 20000 |
| CENTRAL AMERICA | | | 20000 |
| CIS STATES | | | 20000 |
| SOUTH AFRICA | | | 20000 |
| AFRICA | | | 20000 |
| MALAYSIA | | | 20000 |
| TAIWAN | | | 10000 |
| PANAMA | | | 10000 |
| Total | | | |
| | | | |
| Total all International | 412000 | 1400000 | 3600000 |

\* Sales projected by Territory subject to Distributors launch calendar.

-30-

**EXHIBIT B PAGE 106**

<u>Schedule E</u>

**Love, Beverly Hills xx - JT BRANDS DEAL TERMS\***

*Terms indicate the following assumptions:
Registration costs absorbed by Client
Worldwide availability of Marks in Intn'l Class 3
Timely approvals

| Royalty Rate Sliding Scale | | |
|---|---|---|
| Total Wholesale Sales | Royalty Rate | Projected Slide Quarter |
| $0 - $2,999,999 | 6% | n/a |
| $3,000,000 - $14,999,999 | 5% | Q4 2010 |
| $15,000,000 + | 4% | Q4 2012 |

**Year 1**
**May 1, 2008 - December 31, 2009**
**Projected Wholesale (WS) Sales: $812,500**

| Selling Quarter | Projected Quarterly WS Sales | | Royalty Rate | Guarantee Payment Due | | Total Term to Date WS Sales | |
|---|---|---|---|---|---|---|---|
| Q3 2008 | n/a | | | $6,093.75 ADVANCE | | | |
| Q4 2008 | n/a | | | $6,093.75 ADVANCE | | | |
| Q1 2009 | n/a | | | n/a | | | |
| Q2 2009 | $ | 270,833 | 6% | $ | 16,250 | $ | 270,833 |
| Q3 2009 | $ | 270,833 | 6% | $ | 16,250 | $ | 541,666 |
| Q4 2009 | $ | 270,833 | 6% | $ | 16,250 | $ | 812,499 |

| Year 1 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| Upon Execution | n/a | $ 6,093.75 |
| 1-Oct-08 | n/a | $ 6,093.75 |
| 1-Apr-09 | Q1 2009 | $ - |
| 1-Jul-09 | Q2 2009 | $ 16,250 |
| 1-Oct-09 | Q3 2009 | $ 16,250 |
| Total Guarantee Paid Year 1: | | $ 44,688 |
| Total Guarantee Paid Term to Date: **$44,688** | | |

**EXHIBIT B PAGE 107**

**Year 2**
**January 1, 2010 - December 31, 2010**
**Projected Wholesale Sales: $2,500,000**

| Selling Quarter | Projected Quarterly WS Sales | | Royalty Rate | Guarantee Payment Due | | Total Term to Date WS Sales | |
|---|---|---|---|---|---|---|---|
| Q1 2010 | $ | 625,000 | 6% | $ | 37,500 | $ | 1,437,499 |
| Q2 2010 | $ | 625,000 | 6% | $ | 37,500 | $ | 2,062,499 |
| Q3 2010 | $ | 625,000 | 6% | $ | 37,500 | $ | 2,687,499 |
| Q4 2010 | $ | 625,000 | 5% | $ | 31,250 | $ | 3,312,499 |

| Year 2 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| 1-Jan-10 | Q4 2009 | $       16,250 |
| 1-Apr-10 | Q1 2010 | $       37,500 |
| 1-Jul-10 | Q2 2010 | $       37,500 |
| 1-Oct-10 | Q3 2010 | $       37,500 |
| Total Guarantee Paid Year 2: | | $     128,750 |
| Total Guarantee Paid to Date: **$173,438** | | |

**Year 3**
**January 1, 2011 - December 31, 2011**
**Projected Wholesale Sales: $5,500,000**

| Selling Quarter | Projected Quarterly WS Sales | | Royalty Rate | Guarantee Payment Due | | Total Term to Date WS Sales | |
|---|---|---|---|---|---|---|---|
| Q1 2011 | $ | 1,375,000 | 5% | $ | 68,750 | $ | 4,687,499 |
| Q2 2011 | $ | 1,375,000 | 5% | $ | 68,750 | $ | 6,062,499 |
| Q3 2011 | $ | 1,375,000 | 5% | $ | 68,750 | $ | 7,437,499 |
| Q4 2011 | $ | 1,375,000 | 5% | $ | 68,750 | $ | 8,812,499 |

| Year 3 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| 1-Jan-11 | Q4 2010 | $       31,250 |
| 1-Apr-11 | Q1 2011 | $       68,750 |
| 1-Jul-11 | Q2 2011 | $       68,750 |
| 1-Oct-11 | Q3 2011 | $       68,750 |
| Total Guarantee Paid Year 3: | | $     237,500 |
| Total Guarantee Paid to Date: **$410,938** | | |

-32-

**EXHIBIT B PAGE 108**

**Year 4**
**January 1, 2012 - December 31, 2012**
**Projected Wholesale Sales: $7,500,000**

| Selling Quarter | Projected Quarterly WS Sales | | Royalty Rate | Guarantee Payment Due | | Total Term to Date WS Sales | |
|---|---|---|---|---|---|---|---|
| Q1 2012 | $ | 1,875,000 | 5% | $ | 93,750 | $ | 10,687,499 |
| Q2 2012 | $ | 1,875,000 | 5% | $ | 93,750 | $ | 12,562,499 |
| Q3 2012 | $ | 1,875,000 | 5% | $ | 93,750 | $ | 14,437,499 |
| Q4 2012 | $ | 1,875,000 | 4% | $ | 75,000 | $ | 16,312,499 |

| Year 4 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| 1-Jan-12 | Q4 2011 | $ 68,750 |
| 1-Apr-12 | Q1 2012 | $ 93,750 |
| 1-Jul-12 | Q2 2012 | $ 93,750 |
| 1-Oct-12 | Q3 2012 | $ 93,750 |
| Total Guarantee Paid Year 4 | | $ 350,000 |
| Total Guarantee Paid to Date: **$760,938** | | |

**Year 5**
**January 1, 2013 - December 31, 2013**
**Projected Wholesale Sales: $10,000,000**

| Selling Quarter | Projected Quarterly WS Sales | | Royalty Rate | Guarantee Payment Due | | Total Term to Date WS Sales | |
|---|---|---|---|---|---|---|---|
| Q1 2013 | $ | 2,500,000 | 4% | $ | 100,000 | $ | 18,812,499 |
| Q2 2013 | $ | 2,500,000 | 4% | $ | 100,000 | $ | 21,312,499 |
| Q3 2013 | $ | 2,500,000 | 4% | $ | 100,000 | $ | 23,812,499 |
| Q4 2013 | $ | 2,500,000 | 4% | $ | 100,000 | $ | 26,312,499 |

| Year 5 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| 1-Jan-13 | Q4 2012 | $ 75,000 |
| 1-Apr-13 | Q1 2013 | $ 100,000 |
| 1-Jul-13 | Q2 2014 | $ 100,000 |
| 1-Oct-13 | Q3 2014 | $ 100,000 |
| 1-Jan-14 | Q4 2014 | $ 100,000 |
| Total Guarantee Paid Year 5: | | $ 475,000 |
| Total Guarantee Paid to Date: **$1,235,938** | | |

-33-

**EXHIBIT B PAGE 109**

<u>Schedule F</u>

<u>Royalty Report</u>

Licensee:                                          Date:
Address:                                           For the Period Ending:


Licensing Program:


List All Products (list by Country)                    _____

Net Shipments by Unit (Itemize by Licensed Product):   _____

Net Wholesale Sales (Itemize by Licensed Product):     _____

Total (all Licensed Products) Net Wholesale Sales:     _____

**<u>Combined Net $ Sales for all Countries:</u>**         _____

Royalty Rate %:                                        _____

Total Royalties Due:                                   _____

Guaranteed Minimum Royalties Due:                      _____

Minimum Royalties Already Paid                         _____

**TOTAL PAYMENT DUE**:                                 _____

State Advertising Expenditures (by Product):           _____

By:_____

Name:_____

Title:_____

Original statement and corresponding back up report, plus check made payable to:

Mail to:          Bradford Licensing Associates
                  7 Oak Place, Suite 1
                  Montclair, NJ  07042
                  Attn:  Sabrina Puleo
                  973-509-0200

**EXHIBIT B PAGE 110**

BEVERLY HILLS CHAMBER OF COMMERCE

July 1, 2008

Geoffrey Thompson
JT Brands, Inc.
200 Pine Avenue, Ste. 522
Long Beach, California 90802

Re:    Side Letter to License Agreement between the Beverly Hills Chamber of Commerce and JT Brands, Inc. Dated July 10, 2008 ("License Agreement").

Dear Mr. Thompson:

As we have discussed, this letter agreement memorializes our agreement pertaining to additional terms and provisions related to the above referenced agreement as follows:

1.    Due to the commencement of product development at a time that is later than originally anticipated by the parties, the Chamber and JT Brands agree to the following:  The projected quarterly wholesales sales for Q2 2009 as set forth in Exhibit E may be reduced by 50% of the listed projection.   The projected quarterly wholesales sales for Q3 2009 as set forth in Exhibit E may be reduced by 25% of the listed projection.  In both cases (Q2 2009 and Q3 2009), Section 12.2 of the License Agreement as it relates to Section 12.1.4 shall not apply if the projections as listed in the License Agreement are not met.  Licensee, however, shall be required to meet the new projections as set forth in this Letter Agreement.

2.    The "combined single limits" insurance coverage defined in Section 10.7 will be increased from $2,000,000 to $5,000,000 beginning in Q1 2009 or when merchandise commences shipping whichever occurs first.

Except as otherwise provided herein, the terms of the License Agreement shall be in full force and effect.


Very truly yours,


Daniel Walsh
Executive Director, Beverly Hills Chamber of Commerce

By my signature below, I agree to the terms set forth in this letter agreement dated July 9, 2008.

("LICENSOR")
BEVERLY HILLS CHAMBER OF
COMMERCE AND CIVIC ASSOCIATION

By: _____
Name:  Daniel Walsh
Title: Executive Director

By: _____

("LICENSEE")

JT BRANDS, INC.

By: _____
Name:  Geoffrey Thompson
Title:  President

By: _____
Name:
Title:  Secretary      JB Truscello

BRADFORD LICENSING ASSOCIATES

_____
Name: Michelle Minieri
Title: President

2

EXHIBIT B PAGE 112

## AMENDMENT OF LICENSE AGREEMENT

**THIS AMENDMENT AGREEMENT** effective as of this 1st day of September 2009, by and between the Beverly Hills Chamber of Commerce and Civic Association, a corporation of the State of California, with its principal place of business at 239 South Beverly Drive, Beverly Hills, California 90212, (hereinafter referred to as ("LICENSOR") and J.T. Brands, Inc., a corporation of California, with its principal place of business at 200 Pine Avenue, Long Beach California (hereinafter referred to as "LICENSEE").

**WHEREAS** LICENSOR, the owner and licensed rights holder, and LICENSEE are parties to a certain License Agreement dated May 1st, 2009, wish to amend said Agreement in certain respects without modifying, changing, or otherwise amending any other provisions of said Agreement, and therefore the parties agree as follows:

- EXHIBIT A: DEAL TERM SHEET TO BE AMENDED AS PER ATTACHEMENT.

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment Agreement effective as of the date and year first set forth herein above.

**Beverly Hills Chamber of Commerce and Civic Association ("LICENSOR")**

Signature:_____
Name: Daniel Walsh
Title: Executive Director

**City of Beverly Hills**

Signature:_____
Name: Alison Maxwell
Title: Director of Economic Development

**JT Brands, Inc. ("LICENSEE")**

Signature:_____
Name: Geoffrey Thompson
Title: President

**Bradford Licensing, LLC ("Bradford")**

Signature:_____
Name: Michelle Minieri
Title: President

**EXHIBIT B PAGE 113**

**Love, Beverly Hills xx - JT BRANDS DEAL TERMS\***

*Terms indicate the following assumptions:*

*Registration costs absorbed by Client*

*Worldwide availability of Marks in Int'l Class 3*

*Timely approvals*

| Royalty Rate Sliding Scale | | |
|---|---|---|
| Total Wholesale Sales | Royalty Rate | Projected Slide Quarter |
| $0 - $2,999,999 | 6% | n/a |
| $3,000,000 - $14,999,999 | 5% | Q2 2011 |
| $15,000,000 + | 4% | Q1 2013 |

**Year 1**
**July 1, 2008 - December 31, 2009**
**Projected Wholesale (WS) Sales: 135417**

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|
| Q3 2008 | n/a | | $6,093.75 ADVANCE | |
| Q4 2008 | n/a | | $6,093.75 ADVANCE | |
| Q1 2009 | n/a | | n/a | |
| Q2 2009 | n/a | 6% | $8,124.96 | n/a |
| Q3 2009 | n/a | 6% | $12,187.50 | n/a |
| Q4 2009 | $          135,417 | 6% | $~~16,250.00~~  12187 | $          270,833 |

| Year 1 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| Upon Execution | n/a | $       6,093.75 |
| 1-Oct-08 | n/a | $       6,093.75 |
| 1-Apr-09 | Q1 2009 | $              - |
| 1-Jul-09 | Q2 2009 | $       8,124.96 |
| 1-Oct-09 | Q3 2009 | $      12,187.50 |
| Total Guarantee Paid Year 1: | | **$32,499.96** |
| Total Guarantee Paid Term to Date: | | **$32,499.96** |

**Year 2**
**January 1, 2010 - December 31, 2010**
**Projected Wholesale Sales: $          2,203,125**

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|
| Q1 2010 | $          203,125 | 6% | $   ~~12,187~~  16250 | $          473,958 |
| Q2 2010 | $          400,000 | 6% | $       24,000 | $          873,958 |
| Q3 2010 | $          600,000 | 6% | $       36,000 | $        1,473,958 |
| Q4 2010 | $        1,000,000 | 6% | $       60,000 | $        2,473,958 |

| Year 2 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| 1-Jan-10 | Q4 2009 | $      12,187 |
| 1-Apr-10 | Q1 2010 | $      16,250 |
| 1-Jul-10 | Q2 2010 | $      24,000 |
| 1-Oct-10 | Q3 2010 | $      36,000 |
| Total Guarantee Paid Year 2: | | **$      88,437** |
| Total Guarantee Paid to Date: | | $     120,937 |

**EXHIBIT B PAGE 114**

**Year 3**
**January 1, 2011 - December 31, 2011**
**Projected Wholesale Sales: $        4,800,000**

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|
| Q1 2011 | $ 900,000 | 6% | $ 54,000 | $ 3,373,958 |
| Q2 2011 | $ 1,100,000 | 5% | $ 55,000 | $ 4,473,958 |
| Q3 2011 | $ 1,300,000 | 5% | $ 65,000 | $ 5,773,958 |
| Q4 2011 | $ 1,500,000 | 5% | $ 75,000 | $ 7,273,958 |

| Year 3 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| 1-Jan-11 | Q4 2010 | $ 60,000 |
| 1-Apr-11 | Q1 2011 | $ 54,000 |
| 1-Jul-11 | Q2 2011 | $ 55,000 |
| 1-Oct-11 | Q3 2011 | $ 65,000 |
| Total Guarantee Paid Year 3: | | $ 234,000 |
| Total Guarantee Paid to Date: | | $ 354,937 |

**Year 4**
**January 1, 2012 - December 31, 2012**
**Projected Wholesale Sales: $        7,400,000**

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|
| Q1 2012 | $ 1,500,000 | 5% | $ 75,000 | $ 8,773,958 |
| Q2 2012 | $ 1,700,000 | 5% | $ 85,000 | $ 10,473,958 |
| Q3 2012 | $ 1,900,000 | 5% | $ 95,000 | $ 12,373,958 |
| Q4 2012 | $ 2,300,000 | 5% | $ 115,000 | $ 14,673,958 |

| Year 4 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| 1-Jan-12 | Q4 2011 | $ 75,000 |
| 1-Apr-12 | Q1 2012 | $ 75,000 |
| 1-Jul-12 | Q2 2012 | $ 85,000 |
| 1-Oct-12 | Q3 2012 | $ 95,000 |
| Total Guarantee Paid Year 4 | | $ 330,000 |
| Total Guarantee Paid to Date: | | $ 684,937 |



**EXHIBIT B PAGE 115**

**Year 5**
**January 1, 2013 - December 31, 2013**
**Projected Wholesale Sales:    $           10,000,000**

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|
| Q1 2013 | $         2,000,000 | 4% | $  *4/13* 80,000  $ *91,907* | 16,673,958 |
| Q2 2013 | $         2,300,000 | 4% | $  *7/13* 92,000  $ *103,907* | 18,973,958 |
| Q3 2013 | $         2,700,000 | 4% | $  *10/13* 108,000  $ | 21,673,958 |
| Q4 2013 | $         3,000,000 | 4% | $  *1/14* 120,000  $ | 24,673,958 |

| Year 5 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| 1-Jan-13 | Q4 2012 | $          115,000 |
| 1-Apr-13 | Q1 2013 | $           91,907 |
| 1-Jul-13 | Q2 2013 | $          103,907 |
| 1-Oct-13 | Q3 2013 | $          108,000 |
| 1-Jan-14 | Q4 2013 | $          120,000 |
| Total Guarantee Paid Year 5: | | $          538,814 |
| Total Guarantee Paid to Date: | | $        1,223,751 |

**EXHIBIT B PAGE 116**

Schedule D

Performance Schedule

LOVE, BEVERLY HILLS XX
Sales by Territory

2009 - 2011
2010 -2012 *a/m/as*

| Territories | Estimated Sales* | | |
|---|---|---|---|
| **Priority One** | Year 1 | Year 2 | Year 3 |
| USA | 400000 | 1200000 | 2500000 |
| | | | |
| **International** | | | |
| UAE | 100000 | 200000 | 300000 |
| JAPAN | 150000 | 300000 | 400000 |
| SINGAPORE | 50000 | 100000 | 150000 |
| UK / IRELAND | | | 20000 |
| SAUDI ARABIA | 50000 | 150000 | 200000 |
| EU | | | |
| Germany | | 100000 | 200000 |
| France | | 100000 | 200000 |
| Spain | | | 50000 |
| CANADA | | | 20000 |
| MEXICO | 62000 | 150000 | 200000 |
| Total | 412000 | 1100000 | 1740000 |
| | | | |
| **Priority Two** | | | |
| ITALY | | | 20000 |
| GREECE | | | 20000 |
| TURKEY | | | 20000 |
| SCANDINAVIA | | | 20000 |
| SWITZERLAND | | | 20000 |
| HOLLAND | | | 20000 |
| CARIBBEAN | | | 20000 |
| SOUTH KOREA | | | 20000 |
| INDONESIA | | 100000 | 200000 |
| PHILLIPINES | | 100000 | 150000 |
| CHINA | | | 100000 |
| RUSSIA | | 100000 | 300000 |
| UKRAINE | | | 150000 |
| INDIA | | | 200000 |
| KUWAIT | | | 100000 |
| BAHRAIN | | | 50000 |
| QATAR | | | 10000 |
| LEBANON | | | 10000 |
| ISRAEL | | | 200000 |
| VIETNAM | | | 200000 |
| HONG KONG | | | 100000 |

**EXHIBIT B PAGE 117**

| | | | |
|---|---|---|---|
| LATVIA/LITHUANIA/ESTONIA | | | 50000 |
| Total | 0 | 300000 | 1860000 |
| | | | |
| **Priority Three** | | | |
| SOUTH AMERICA | | | 20000 |
| CENTRAL AMERICA | | | 20000 |
| CIS STATES | | | 20000 |
| SOUTH AFRICA | | | 20000 |
| AFRICA | | | 20000 |
| MALAYSIA | | | 20000 |
| TAIWAN | | | 10000 |
| PANAMA | | | 10000 |
| Total | | | |
| | | | |
| Total all International | 412000 | 1400000 | 3600000 |

* Sales projected by Territory subject to Distributors launch calendar.

-30-

**EXHIBIT B PAGE 118**

AMENDMENT NO. 2 TO LICENSE AGREEMENT

The Beverly Hills Chamber of Commerce and Civic Association, a California corporation, with its principal place of business at 239 South Beverly Drive, Beverly Hills, California, 90212 (hereinafter referred to as "LICENSOR") and J.T. Brands, Inc., a California corporation, with its principal place of business at 200 Pine Avenue, Long Beach, California (hereinafter referred to as "LICENSEE") entered into a written License Agreement dated July 10, 2008, and effective as of June 26, 2008. The License Agreement was subject to a Side Letter to License Agreement dated July 1, 2008, a copy of which is attached hereto as Exhibit "A." The License Agreement was, thereafter, amended by a document dated September 1, 2009, entitled "Amendment of License Agreement," a copy of which is attached hereto as Exhibit "B." The License Agreement, Side Letter, and Amendment of License Agreement are hereinafter collectively referred to as the "LICENSE AGREEMENT." LICENSOR and LICENSEE wish to amend the LICENSE AGREEMENT in certain respects without modifying, changing, or otherwise amending any other provision of the LICENSE AGREEMENT. LICENSOR and LICENSEE are hereinafter collectively referred to as "the Parties."

Therefore, LICENSOR and LICENSEE enter into this Amendment No. 2 to License Agreement ("Amendment No. 2") as of the 1st day of April, 2011, at Beverly Hills, California, and amend the LICENSE AGREEMENT as follows:

1. Section 3.1 (Term") of the LICENSE AGREEMENT shall be amended to read as follows:

"3.1    Term.  The term ("Term") of the License Agreement shall commence on June 1, 2008, and shall terminate on January 15, 2015 ("Termination Date"), unless sooner terminated in accordance with the provisions of this Agreement."

2. Schedule E ("Royalties and Projected Wholesale Sales") attached to the LICENSE AGREEMENT is hereby amended and replaced with a new Schedule E attached to this Amendment No. 2 as Schedule E.

3. The LICENSE AGREEMENT, as amended by this Amendment No. 2, constitutes the entire agreement of the Parties hereto with respect to the subject matter hereof. There are no agreements or understandings between the Parties and no representations by either party to the other as an inducement to enter into this Amendment No. 2 except as may be expressly set forth herein.

4. If any party should bring any legal action or proceeding relating to this Amendment No. 2 (including, without limitation, any action or proceeding to interpret or enforce any provision hereof), the party in whose favor a judgment or decision is rendered shall be entitled to recover reasonable attorneys' fees and expenses from the other. The Parties agree that any legal action or proceeding or agreed upon arbitration

**EXHIBIT B PAGE 119**

or mediation shall be filed in and shall occur in the County of Los Angeles.

　　　5.  The laws of the State of California shall govern this Amendment No. 2.

　　　6.  Except as specifically amended by this Amendment No. 2, the terms set forth in the LICENSE AGREEMENT shall remain in full force and effect.  Unless otherwise amended herein, capitalized terms used in this Amendment No. 2, but not defined, shall have the meaning ascribed thereto in the LICENSE AGREEMENT.

　　　7.  This Amendment No. 2 may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

　　　IN WITNESS WHEREOF, the Parties have executed this Amendment No. 2 as of the day and year first written above.

LICENSOR:

BEVERLY HILLS CHAMBER OF COMMERCE
AND CIVIC ASSOCIATION

By: _____
　　　Name:  Todd F. Johnson
　　　Title:  President


LICENSEE:

JT BRANDS, INC.

By: _____
　　　Name:  Geoffrey Thompson
　　　Title:  President

APPROVED:

BRADFORD LICENSING LLC

By: _____
　　　Name:  Michelle Minieri
　　　Title:  President

S:\Clients\BEVERLY HILLS CHAMBER OF COMMERCE\ADDENDUM 2-NEW.3-24-11.wpd

**EXHIBIT B PAGE 120**

EXHIBIT "A"

**EXHIBIT B PAGE 121**

BEVERLY HILLS CHAMBER OF COMMERCE

July 1, 2008

Geoffrey Thompson
JT Brands, Inc.
200 Pine Avenue, Ste. 522
Long Beach, California 90802

Re:   Side Letter to License Agreement between the Beverly Hills Chamber of Commerce and JT Brands, Inc. Dated July 10, 2008 ("License Agreement").

Dear Mr. Thompson:

As we have discussed, this letter agreement memorializes our agreement pertaining to additional terms and provisions related to the above referenced agreement as follows:

1.      Due to the commencement of product development at a time that is later than originally anticipated by the parties, the Chamber and JT Brands agree to the following:  The projected quarterly wholesales sales for Q2 2009 as set forth in Exhibit E may be reduced by 50% of the listed projection.   The projected quarterly wholesales sales for Q3 2009 as set forth in Exhibit E may be reduced by 25% of the listed projection.  In both cases (Q2 2009 and Q3 2009), Section 12.2 of the License Agreement as it relates to Section 12.1.4 shall not apply if the projections as listed in the License Agreement are not met.  Licensee, however, shall be required to meet the new projections as set forth in this Letter Agreement.

2.      The "combined single limits" insurance coverage defined in Section 10.7 will be increased from $2,000,000 to $5,000,000 beginning in Q1 2009 or when merchandise commences shipping whichever occurs first.

Except as otherwise provided herein, the terms of the License Agreement shall be in full force and effect.


Very truly yours,


Daniel Walsh
Executive Director, Beverly Hills Chamber of Commerce

**EXHIBIT B PAGE 122**

By my signature below, I agree to the terms set forth in this letter agreement dated July 9, 2008.

("LICENSOR")
BEVERLY HILLS CHAMBER OF
COMMERCE AND CIVIC ASSOCIATION

By: _____
Name:  Daniel Walsh
Title: Executive Director

By: _____


("LICENSEE")

JT BRANDS, INC.

By: _____
Name: Geoffrey Thompson
Title: President

By: _____
Name:
Title:  Secretary


BRADFORD LICENSING ASSOCIATES

_____
Name: Michelle Minieri
Title: President

2

**EXHIBIT B PAGE 123**

EXHIBIT "B"

## AMENDMENT OF LICENSE AGREEMENT

THIS AMENDMENT AGREEMENT effective as of this 1st day of September 2009, by and between the Beverly Hills Chamber of Commerce and Civic Association, a corporation of the State of California, with its principal place of business at 239 South Beverly Drive, Beverly Hills, California 90212, (hereinafter referred to as ("LICENSOR") and J.T. Brands, Inc., a corporation of California, with its principal place of business at 200 Pine Avenue, Long Beach California (hereinafter referred to as "LICENSEE").

WHEREAS LICENSOR, the owner and licensed rights holder, and LICENSEE are parties to a certain License Agreement dated May 1st, 2009, wish to amend said Agreement in certain respects without modifying, changing, or otherwise amending any other provisions of said Agreement, and therefore the parties agree as follows:

- EXHIBIT A: DEAL TERM SHEET TO BE AMENDED AS PER ATTACHEMENT.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment Agreement effective as of the date and year first set forth herein above.

Beverly Hills Chamber of Commerce and Civic Association ("LICENSOR")

Signature: _____

Name: Daniel Walsh

Title: Executive Director

**City of Beverly Hills**

Signature: _____

Name: Alison Maxwell

Title: Director of Economic Development

**JT Brands, Inc. ("LICENSEE")**

Signature: _____

Name: Geoffrey Thompson

Title: President

**Bradford Licensing, LLC ("Bradford")**

Signature: _____

Name: Michelle Minieri

Title: President

1 | *AMENDMENT OF LICENSE AGREEMENT 2009*

**EXHIBIT B PAGE 125**

**Love, Beverly Hills xx - JT BRANDS DEAL TERMS***

*Terms indicate the following assumptions:
Registration costs absorbed by Client
Worldwide availability of Marks in Int'l Class 3
Timely approvals

| Royalty Rate Sliding Scale | | |
|---|---|---|
| Total Wholesale Sales | Royalty Rate | Projected Slide Quarter |
| $0 - $2,999,999 | 6% | n/a |
| $3,000,000 - $14,999,999 | 5% | Q2 2011 |
| $15,000,000 + | 4% | Q1 2013 |

**Year 1**
July 1, 2008 - December 31, 2009
Projected Wholesale (WS) Sales: 135417

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|
| Q3 2008 | n/a | | $6,093.75 ADVANCE | |
| Q4 2008 | n/a | | $6,093.75 ADVANCE | |
| Q1 2009 | n/a | | | |
| Q2 2009 | n/a | 6% | $8,124.96' | n/a |
| Q3 2009 | n/a | 6% | $12,187.50 | n/a |
| Q4 2009 | $        135,417 | 6% | $16,250.00  12187 | $        270,833 |

| Year 1 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| Upon Execution | n/a | $   6,093.75 |
| 1-Oct-08 | n/a | $   6,093.75 |
| 1-Apr-09 | Q1 2009 | $        - |
| 1-Jul-09 | Q2 2009 | $   8,124.96 |
| 1-Oct-09 | Q3 2009 | $  12,187.50 |
| Total Guarantee Paid Year 1: | | $32,499.96 |
| Total Guarantee Paid Term to Date: | | $32,499.96 |

**Year 2**
January 1, 2010 - December 31, 2010
Projected Wholesale Sales:  $        2,203,125

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|
| Q1 2010 | $        203,125 | 6% | $  12,187  16250 | $        473,958 |
| Q2 2010 | $        400,000 | 6% | $  24,000 | $        873,958 |
| Q3 2010 | $        600,000 | 6% | $  36,000 | $        1,473,958 |
| Q4 2010 | $        1,000,000 | 6% | $  60,000 | $        2,473,958 |

| Year 2 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| 1-Jan-10 | Q4 2009 | $       12,187 |
| 1-Apr-10 | Q1 2010 | $       16,250 |
| 1-Jul-10 | Q2 2010 | $       24,000 |
| 1-Oct-10 | Q3 2010 | $       36,000 |
| Total Guarantee Paid Year 2: | | $       88,437 |
| Total Guarantee Paid to Date: | | $      120,937 |



**EXHIBIT B PAGE 126**

**Year 3**
**January 1, 2011 - December 31, 2011**
**Projected Wholesale Sales:  $     4,800,000**

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|
| Q1 2011 | $     900,000 | 6% | $  4/11  54,000 | $     3,373,958 |
| Q2 2011 | $   1,100,000 | 5% | $  7/11  55,000 | $     4,473,958 |
| Q3 2011 | $   1,300,000 | 5% | $  10/11  65,000 | $     5,773,958 |
| Q4 2011 | $   1,500,000 | 5% | $  11/11  75,000 | $     7,273,958 |

| Year 3 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| 1-Jan-11 | Q4 2010 | $     60,000 |
| 1-Apr-11 | Q1 2011 | $     54,000 |
| 1-Jul-11 | Q2 2011 | $     55,000 |
| 1-Oct-11 | Q3 2011 | $     65,000 |
| Total Guarantee Paid Year 3: | | $     234,000 |
| Total Guarantee Paid to Date: | | $     354,937 |

**Year 4**
**January 1, 2012 - December 31, 2012**
**Projected Wholesale Sales:  $     7,400,000**

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|
| Q1 2012 | $   1,500,000 | 5% | $  4/12  75,000 | $     8,773,958 |
| Q2 2012 | $   1,700,000 | 5% | $  7/12  85,000 | $   10,473,958 |
| Q3 2012 | $   1,900,000 | 5% | $  10/12  95,000 | $   12,373,958 |
| Q4 2012 | $   2,300,000 | 5% | $  1/13  115,000 | $   14,673,958 |

| Year 4 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| 1-Jan-12 | Q4 2011 | $     75,000 |
| 1-Apr-12 | Q1 2012 | $     75,000 |
| 1-Jul-12 | Q2 2012 | $     85,000 |
| 1-Oct-12 | Q3 2012 | $     95,000 |
| Total Guarantee Paid Year 4 | | $     330,000 |
| Total Guarantee Paid to Date: | | $     684,937 |



**Year 5**
**January 1, 2013 - December 31, 2013**
Projected Wholesale Sales:    $        10,000,000

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Guarantee Payment Due | | Total Term to Date WS Sales |
|---|---|---|---|---|---|
| Q1 2013 | $    2,000,000 | 4% | $    4/13  80,000 | $91,907 | 16,673,958 |
| Q2 2013 | $    2,300,000 | 4% | $    7/13  92,000 | $103,907 | 18,973,958 |
| Q3 2013 | $    2,700,000 | 4% | $    10/13  2,108,000 | $ | 21,673,958 |
| Q4 2013 | $    3,000,000 | 4% | $    1/14  120,000 | $ | 24,673,958 |

| Year 5 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| 1-Jan-13 | Q4 2012 | $    115,000 |
| 1-Apr-13 | Q1 2013 | $    91,907 |
| 1-Jul-13 | Q2 2013 | $    103,907 |
| 1-Oct-13 | Q3 2013 | $    108,000 |
| 1-Jan-14 | Q4 2013 | $    120,000 |
| Total Guarantee Paid Year (5) | | $    538,814 |
| Total Guarantee Paid to Date: | | $    1,223,751 |

Schedule D

Performance Schedule

LOVE, BEVERLY HILLS XX
Sales by Territory

~~2009 – 2011~~
2010 – 2012 (initials)

| Territories | Estimated Sales* | | |
|---|---|---|---|
| **Priority One** | Year 1 | Year 2 | Year 3 |
| USA | 400000 | 1200000 | 2500000 |
| | | | |
| **International** | | | |
| UAE | 100000 | 200000 | 300000 |
| JAPAN | 150000 | 300000 | 400000 |
| SINGAPORE | 50000 | 100000 | 150000 |
| UK / IRELAND | | | 20000 |
| SAUDI ARABIA | 50000 | 150000 | 200000 |
| EU | | | |
| Germany | | 100000 | 200000 |
| France | | 100000 | 200000 |
| Spain | | | 50000 |
| CANADA | | | 20000 |
| MEXICO | 62000 | 150000 | 200000 |
| Total | 412000 | 1100000 | 1740000 |
| | | | |
| **Priority Two** | | | |
| ITALY | | | 20000 |
| GREECE | | | 20000 |
| TURKEY | | | 20000 |
| SCANDINAVIA | | | 20000 |
| SWITZERLAND | | | 20000 |
| HOLLAND | | | 20000 |
| CARIBBEAN | | | 20000 |
| SOUTH KOREA | | | 20000 |
| INDONESIA | | 100000 | 200000 |
| PHILLIPINES | | 100000 | 150000 |
| CHINA | | | 100000 |
| RUSSIA | | 100000 | 300000 |
| UKRAINE | | | 150000 |
| INDIA | | | 200000 |
| KUWAIT | | | 100000 |
| BAHRAIN | | | 50000 |
| QATAR | | | 10000 |
| LEBANON | | | 10000 |
| ISRAEL | | | 200000 |
| VIETNAM | | | 200000 |
| HONG KONG | | | 100000 |



**EXHIBIT B PAGE 129**

| | | | |
|---|---|---|---|
| LATVIA/LITHUANIA/ESTONIA | | | 50000 |
| Total | 0 | 300000 | 1860000 |
| | | | |
| **Priority Three** | | | |
| SOUTH AMERICA | | | 20000 |
| CENTRAL AMERICA | | | 20000 |
| CIS STATES | | | 20000 |
| SOUTH AFRICA | | | 20000 |
| AFRICA | | | 20000 |
| MALAYSIA | | | 20000 |
| TAIWAN | | | 10000 |
| PANAMA | | | 10000 |
| Total | | | |
| | | | |
| Total all International | 412000 | 1400000 | 3600000 |

* Sales projected by Territory subject to Distributors launch calender.



**EXHIBIT B PAGE 130**

# SCHEDULE E

SCHEDULE E

## LOVE BEVERLY HILLS - JT BRANDS DEAL TERMS

*Terms indicate the following assumptions:
Registration costs absorbed by Client
Worldwide availability of Marks in Int'l Class 3
Timely approvals

### Royalty Rate Sliding Scale

| Total Wholesale Sales | Royalty Rate | Projected Slide Quarter |
|---|---|---|
| $0 - $2,999,999 | 6% | n/a |
| $3,000,000 - $14,999,999 | 5% | Q4 2011 |
| $15,000,000 + | 4% | Q3 2013 |

### Year 1
July 1, 2008 - December 31, 2009
Projected Wholesale (WS) Sales: $203,116.66

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Payment Due Date | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|---|
| Q3 2008 | n/a | n/a | Upon Signing | $6,093.75 (ADVANCE) | n/a |
| Q4 2008 | n/a | n/a | 1-Oct-08 | $6,093.75 (ADVANCE) | n/a |
| Q1 2009 | n/a | n/a | 1-Apr-09 | n/a | n/a |
| Q2 2009 | n/a | 6% | 1-Jul-09 $ | 8,124.96 | n/a |
| Q3 2009 | n/a | 6% | 1-Oct-09 | 12,187.50 | n/a |
| Q4 2009 | $ 203,116.66 | 6% | 1-Jan-10 $ | 12,187.00 $ | 203,117 |

### Year 1 Payment Schedule

| Payment Due Date | For Selling Quarter | Amount |
|---|---|---|
| Upon Execution | n/a | $ 6,093.75 |
| 1-Oct-08 | n/a | $ 6,093.75 |
| 1-Apr-09 | Q1 2009 | $ |
| 1-Jul-09 | Q2 2009 | $ 8,124.96 |
| 1-Oct-09 | Q3 2009 | $ 12,187.50 |
| Total Guarantee Paid Year 1: | | $ 32,500 |
| Total Guarantee Paid Term to Date: | | $ 32,500 |

## Year 2
### January 1, 2010 - December 31, 2010
Projected Wholesale Sales: $ 557,300

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | For Selling Quarter | Payment Due Date | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|---|---|
| Q1 2010 | $ 270,833 | 6% | Q4 2009 | 1-Apr-10 | $ 16,250 | 473,950 |
| Q2 2010 | 43,667 | 6% | Q1 2010 | 1-Jul-10 | $ 2,500 | 515,617 |
| Q3 2010 | 41,667 | 6% | Q2 2010 | 1-Oct-10 | $ 2,500 | 557,283 |
| Q4 2010 | 203,133 | 6% | Q3 2010 | 1-Jan-11 | $ 12,188 | 760,417 |

### Year 2 Payment Schedule

| Payment Due Date | For Selling Quarter | Amount |
|---|---|---|
| 1-Jan-10 | Q4 2009 | $12,187.00 |
| 1-Apr-10 | Q1 2010 | $16,250.00 |
| 1-Jul-10 | Q2 2010 | $2,500.00 |
| 1-Oct-10 | Q3 2010 | $2,500.00 |
| 1-Jan-11 | Q3 2010 | $2,500.00 |
| Total Guarantee Paid Year 2: | | $33,437.00 |
| Total Guarantee Paid Term to Date: | | $65,936.96 |

## Year 3
### January 1, 2011 - December 31, 2011
Projected Wholesale Sales: $ 2,900,000

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | For Selling Quarter | Payment Due Date | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|---|---|
| Q1 2011 | $ 400,000 | 6% | Q4 2010 | 1-Apr-11 | $ 24,000 | 1,160,417 |
| Q2 2011 | 600,000 | 6% | Q1 2011 | 1-Jul-11 | $ 36,000 | 1,760,417 |
| Q3 2011 | 1,000,000 | 6% | Q2 2011 | 1-Oct-11 | $ 60,000 | 2,760,417 |
| Q4 2011 | 900,000 | 5% | Q3 2011 | 1-Jan-12 | $ 45,000 | 3,660,417 |

### Year 3 Payment Schedule

| Payment Due Date | For Selling Quarter | Amount |
|---|---|---|
| 1-Jan-11 | Q4 2010 | $ 12,188 |
| 1-Apr-11 | Q1 2011 | $ 24,000 |
| 1-Jul-11 | Q2 2011 | $ 36,000 |
| 1-Oct-11 | Q3 2011 | $ 60,000 |
| Total Guarantee Paid Year 3: | | 132,188.00 |
| Total Guarantee Paid Term to Date: | | 198,124.96 |

**Year 4**
**January 1, 2012 - December 31, 2012**
**Projected Wholesale Sales: $   4,060,000**

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Payment Due Date | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|---|
| Q1 2012 | $ 760,000 | 5% | 1-Apr-12 | $ 38,000 | $ 4,420,417 |
| Q2 2012 | $ 900,000 | 5% | 1-Jul-12 | $ 45,000 | $ 5,320,417 |
| Q3 2012 | $ 1,000,000 | 5% | 1-Oct-12 | $ 50,000 | $ 6,320,417 |
| Q4 2012 | $ 1,400,000 | 5% | 1-Jan-13 | $ 70,000 | $ 7,720,417 |

**Year 4 Payment Schedule**

| Payment Due Date | For Selling Quarter | Amount |
|---|---|---|
| 1-Jan-12 | Q4 2011 | $ 45,000 |
| 1-Apr-12 | Q1 2012 | $ 38,000 |
| 1-Jul-12 | Q2 2012 | $ 45,000 |
| 1-Oct-12 | Q3 2012 | $ 50,000 |
| Total Guarantee Paid Year 4: | | $ 178,000 |
| Total Guarantee Paid Term to Date: | | $ 376,124.96 |

**Year 5**
**January 1, 2013 - December 31, 2013**
**Projected Wholesale Sales: $   11,130,075**

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Payment Due Date | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|---|
| Q1 2013 | $ 2,000,000 | 5% | 1-Apr-13 | $ 100,000 | $ 9,720,417 |
| Q2 2013 | $ 2,200,000 | 5% | 1-Jul-13 | $ 110,000 | $ 11,920,417 |
| Q3 2013 | $ 3,000,000 | 4% | 1-Oct-13 | $ 120,000 | $ 14,920,417 |
| Q4 2013 | $ 3,930,075 | 4% | 1-Jan-14 | $ 157,203 | $ 18,850,492 |

**Year 5 Payment Schedule**

| Payment Due Date | For Selling Quarter | Amount |
|---|---|---|
| 1-Jan-13 | Q4 2012 | $ 70,000 |
| 1-Apr-13 | Q1 2013 | $ 100,000 |
| 1-Jul-13 | Q2 2013 | $ 110,000 |
| 1-Oct-13 | Q3 2013 | $ 120,000 |
| Total Guarantee Paid Year 5: | | $ 400,000 |
| Total Guarantee Paid to Date: | | $ 776,124.96 |

**Year 6**
**January 1, 2014 – January 15, 2015**
**Projected Wholesale Sales: $     17,385,500**

| Selling Quarter | Projected Quarterly WS Sales | Royalty Rate | Payment Due Date | Guarantee Payment Due | Total Term to Date WS Sales |
|---|---|---|---|---|---|
| Q1 2014 | $ 4,346,375 | 4% | 1-Apr-14 | $ 173,855 | 23,198,867 |
| Q2 2014 | $ 4,346,375 | 4% | 1-Jul-14 | $ 173,855 | 27,543,242 |
| Q3 2014 | $ 4,346,375 | 4% | 1-Oct-14 | $ 173,855 | 31,889,617 |
| Q4 2014 | $ 4,346,375 | 4% | 1-Jan-15 | $ 173,855 | 36,235,992 |

| Year 6 Payment Schedule | | |
|---|---|---|
| Payment Due Date | For Selling Quarter | Amount |
| 1-Jan-14 | Q4 2013 | $ 157,203 |
| 1-Apr-14 | Q1 2014 | $ 173,855 |
| 1-Jul-14 | Q2 2014 | $ 173,855 |
| 1-Oct-14 | Q3 2014 | $ 173,855 |
| 1-Jan-15 | Q4 2014 | $ 173,855 |
| Total Guarantee Paid Year 6: | | $ 852,623 |
| Total Guarantee Paid to Date: | | 1,628,747.98 |

**EXHIBIT B PAGE 135**